# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se,*
    Plaintiff,

v.

ROBERT MURPHY, *et al.,*
    Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS ROBERT MURPHY, KATHLEEN DENNEHY AND MASSACHUSETTS DEPARTMENT OF CORRECTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendants the Massachusetts Department of Correction ("DOC"), Robert Murphy and Kathleen Dennehy submit this memorandum in support of their motion to dismiss or, in the alternative, for summary judgment on the Complaint. For the reasons set forth below, the Court should grant this motion.

The plaintiff raises various claims related to his confinement as a civilly committed sexually dangerous person ("SDP") at the Massachusetts Treatment Center ("Treatment Center") against Kathleen Dennehy, Commissioner of Correction, Robert Murphy, Superintendent of the Treatment Center and DOC. The plaintiff seeks only injunctive relief against DOC. Complaint, ¶ 6. He seeks monetary, injunctive and declaratory relief against Commissioner Dennehy and Superintendent Murphy under 42 U.S.C. § 1983. Complaint, Relief, ¶¶ 2,3.

The plaintiff alleges violation of his rights under the American with Disabilities Act ("ADA"), his right to substantive due process under the Fourteenth Amendment and his rights under G.L. c. 123A. He claims that he has not received effective treatment for his (unspecified)

mental illness or his (unspecified) "alleged mental abnormality." See Complaint, ¶ 1. He also claims that the defendants have not made reasonable accommodations for his mental illness. Complaint, ¶ 1.

## STATEMENT OF FACTS

### A.    The Plaintiff's Commitment to the Treatment Center.

On March 15, 1991, the plaintiff pled guilty to and was sentenced to eight concurrent prison terms of 8 to 10 years for three counts of rape of a child with force, one count of assault with intent to rape a child under 16 and four counts of indecent assault and battery on a child under 14. Ex. 1, p. 1. The victim was the plaintiff's daughter whom he raped over a period of time when she was approximately 8 to 10 years old. Ex. 1, p. 2.[1] While awaiting trial, the plaintiff was diagnosed with adjustment disorder with disturbance of mood and chronic alcohol abuse. Ex. 1, p. 1.

Near the end of the plaintiff's prison sentence, the District Attorney for Hampden County filed a petition to civilly commit the plaintiff as a sexually dangerous person. Complaint, ¶ 15. See G.L. c. 123A, § 12. The SDP commitment trial proceeded, jury-waived, before Velis, J., in October, 2001. Ex. 1, p. 1. On June 21, 2002, the plaintiff was adjudicated a SDP and was civilly committed to the Treatment Center for one day to his natural life.[2] See Ex. 1, p. 1. See G.L. c. 123A, § 1 (defining "sexually dangerous person"), §§ 12-14 (detailing SDP commitment process); Commonwealth v. Bruno, 432 Mass. 489, 494-497 (2000) (explaining SDP commitment process under 1999 statutory amendments to G.L. c. 123A).

---

[1]    Between the ages of 14 and 16, the plaintiff had regularly exposed himself to his sister's female friends. Ex. 1, p. 2.

[2]    The Treatment Center is referred to as the Nemansket Correctional Center in G.L. c. 123A, § 2. Throughout the statute, however, the facility is also referred to as the Treatment Center. See, e.g., G.L. c. 123A, §§ 1, 6A, 9, 12, 13. The facility is commonly referred to as the Massachusetts Treatment Center as indicated by its letterhead and other official documents.

Judge Velis concluded that the plaintiff met the statutory criteria for a mental abnormality by reason of pedophilia.  Ex. 1, p. 11.  Judge Velis further concluded that the plaintiff's untreated pedophilia "predisposes him to the commission of criminal sexual acts to a degree that makes him a menace to the health and safety of other persons."  Ex. 1, p. 11.

1.    <u>**The Plaintiff's Mental Illness and Mental Health Care.**</u>

In addition to pedophilia, the plaintiff also suffers from schizophrenia.  Schizophrenia is a mental illness.  It is not known to be caused by a stroke.  See Ex. 2, ¶ 3.

Prior to his transfer to the Treatment Center, the plaintiff was prescribed Risperidone (also called Risperidal) (an anti-psychotic medication), Zoloft (an anti-depressant medication), and Benadryl (a medication used to treat sleep difficulties). See Ex. 2, ¶ 4.  On September 5, 2000, a psychiatrist, Martin Bauermeister, M.D., examined the plaintiff and renewed his prescriptions for Risperidone, Zoloft and Benadryl.  See Ex. 2, ¶ 4.  Dr. Bauermeister also provided the plaintiff with information about these medications from the Department of Mental Health and/or the Physician's Desk Reference.  See Ex. 2, ¶ 4.  On September 12, 2000, the plaintiff, stating that he was concerned with the side effects of the medications given his history of having a stroke, informed Dr. Bauermeister that he no longer wished to take his medications. See Ex. 2, ¶ 5.  The plaintiff also stated that he did not agree with the diagnosis, stating that he thought his symptoms had been misinterpreted. See Ex. 2, ¶ 5.  The plaintiff asked to be monitored closely for the development of possible symptoms. See Ex. 2, ¶ 5.  After reviewing the reporting symptoms and past diagnosis with the plaintiff and determining that the plaintiff was competent and not actively psychotic, Dr. Bauermeister discontinued the medications. See Ex. 2, ¶ 5.  The plaintiff continued to refuse medication for the treatment of his schizophrenia until May, 2004.  See Ex. 2, ¶ 7.

Mental health staff have provided treatment to the plaintiff.  See Ex. 3, ¶ 2. Mental health staff have prepared individual mental health treatment plans on a regular basis for the plaintiff. See Ex. 3, ¶ 2.  Since approximately January, 2002, the plaintiff has been scheduled for individual therapy sessions, typically on a monthly basis, with his primary care clinician, Paul Garrido, a licensed mental health counselor.  See Ex. 3, ¶¶ 1-3.  On occasion when the plaintiff has failed to appear for a scheduled appointment, Mr. Garrido has typically sought the plaintiff out to insure that he was psychiatrically stable and not in crisis. See Ex. 3, ¶ 2.

Mr. Garrido has determined that monthly sessions are clinically appropriate for the plaintiff, given his schizophrenia and functioning within the Treatment Center. See Ex. 3, ¶ 3. When the plaintiff's condition required, Mr. Garrido (and other mental health clinicians) have evaluated the plaintiff more frequently. See Ex. 3, ¶ 3.

Mr. Garrido has informed the plaintiff that the plaintiff is not limited to monthly individual therapy appointments and that, should the plaintiff wish to see Mr. Garrido, he may request to do so by submitting a sick slip form requesting an appointment.  See Ex. 3, ¶ 4.

The plaintiff has also been evaluated periodically by Dr. Bauermeister.  See Ex. 2, ¶¶ 6, 7.  The plaintiff has sometimes failed to appear for scheduled appointments with Dr. Bauermeister. See Ex. 2, ¶ 6.

After discontinuing his medication, the plaintiff has exhibited symptoms of schizophrenia. See Ex. 2, ¶ 6; Ex. 3, ¶ 5.  He sometimes suffered from hallucinations and other symptoms of schizophrenia such as delusions, circumstantial and tangential thought processes and religiosity. Ex. 3, ¶ 5.  He sometimes had conflicts with staff and other residents. Ex. 3, ¶ 5. At times he has been referred to mental health staff for threatening behavior to others or for self injurious behavior. See Ex. 2, ¶ 6.  He has been placed on a mental health watch on occasion. See

Ex. 2, ¶ 6; Ex. 3, ¶ 3. Dr. Bauermeister evaluated the plaintiff on occasion as a result of referrals from mental health staff. See Ex. 2, ¶ 6. While the plaintiff sometimes decompensated, he did not reach the level where it would be appropriate to seek his transfer to Bridgewater State Hospital or to seek a forced medication order. See Ex. 2, ¶ 6.

In April, 2004, Dr. Bauermeister again evaluated the plaintiff after he reportedly put a razor to another resident's throat and threatened to cut it. See Ex. 2, ¶ 7. In May, 2004, mental health staff referred the plaintiff to Dr. Bauermeister for psychotic and threatening behavior and to assess whether medication and transfer to Bridgewater State Hospital were appropriate. See Ex. 2, ¶ 7. The plaintiff, however, agreed to resume anti-psychotic medication and, thus, Dr. Bauermeister determined that it was not necessary to transfer the plaintiff to Bridgewater State Hospital or to seek a forced medication order. See Ex. 2, ¶ 7.

Since the plaintiff has resumed his medication, Mr. Garrido has observed that the plaintiff has presented with less circumstantial and less tangential thought processes, although he sometimes continued to report auditory hallucinations. Ex. 3, ¶ 5.

Since the plaintiff has resumed his medication, Dr. Bauermeister has evaluated the plaintiff regularly. See Ex. 2, ¶ 8. When the plaintiff complained of possible side effects for Risperidone, Dr. Bauermeister recommended, and the plaintiff agreed to take, Cogentin, a medication that reduces the side effects of anti-psychotic medications. See Ex. 2, ¶ 8. Dr. Bauermeister responded to the plaintiff's complaint of feeling sluggish during the day by changing his medication time to the evening. See Ex. 2, ¶ 8. In August, 2005, the plaintiff reported difficulties with his memory, which could be a side effect of his medication. See Ex. 2,

¶ 8.  Mr. Garrido referred the plaintiff to Dr. Bauermeister for evaluation.  See Ex. 3, ¶ 6.[3]  After discussion, the plaintiff and Dr. Bauermeister agreed that the plaintiff would continue with his Risperidone which the plaintiff thought had done him good. See Ex. 2, ¶ 8.  In October, 2005, Dr. Bauermeister again evaluated the plaintiff after he reported an increase in auditory hallucinations and decreased sleep over the past few weeks. See Ex. 2, ¶ 8.  Dr. Bauermeister raised the possibility of increasing the dosage of Risperidone; however, the plaintiff voiced concerns about possible side effects and decided to remain on the current dosage. See Ex. 2, ¶ 8. As recently as November 17, 2005, the plaintiff reported no complaints and told Dr. Bauermeister that he was doing well. See Ex. 2, ¶ 8.

     In November, 2005, a neuropsychological evaluation of the plaintiff was conducted. See Ex. 4, ¶ 9.  A physician will review the results of that assessment to determine what further treatment, if any, is appropriate. See Ex. 4, ¶ 9.[4]

     The plaintiff has had the option to request additional mental health services.  See Ex. 4, ¶¶ 6, 7.  The plaintiff has not complained to mental health staff about the quality of his mental health care. See Ex. 2, ¶ 9; Ex. 3, ¶ 7.

     DOC has established a written policy that provides that an inmate or resident may submit a request for reasonable accommodation by either (1) submitting a request to medical staff for a medically prescribed accommodation, or (2) by completing a written form and submitting it to either medical staff or the Deputy Superintendent of Treatment.  See Ex. 5, ¶ 3 and 103 DOC 207, Special Accommodations for Inmates, attached thereto.  The plaintiff has not submitted a request to either the mental health staff or the Deputy Superintendent of Treatment requesting

---

[3]     Beginning in May, 2005, the plaintiff told Mr. Garrido that he sometimes has problems with his memory. See Ex. 3, ¶ 6.  Mr. Garrido also discussed with the plaintiff strategies to address his reported difficulties with memory.  See Ex. 3, ¶ 6.

that he be given any accommodation as a result of any mental impairment arising either from his stroke or his schizophrenia. See Ex. 2, ¶ 9; Ex. 3, ¶ 7; Ex. 4, ¶ 3; Ex. 5, ¶ 4.[5] The plaintiff has also not submitted grievances about his mental health care (or anything else). See Ex. 4, ¶ 5; Ex. 7, ¶ 2.

While the plaintiff has not requested accommodations due to the alleged mental impairments related to his schizophrenia or stroke, he has obtained written accommodations due to certain physical limitations arising from his stroke. See Ex. 4, ¶ 4. Throughout his stay, the plaintiff has been placed on light work status due to left sided weakness. See Ex. 4, ¶ 4. In 2005, the plaintiff received a medical order for an ace wrap and a left ankle brace (for a left ankle tear). He also received a received a medical order that he be permitted to leave his housing unit earlier than other SDP's for meals so that he would not have to wait as long in line. See Ex. 4, ¶ 4.

### 2.     The Plaintiff's Sex Offender Therapy.

The plaintiff was found to be a sexually dangerous person on June 21, 2002.[6] Ex. 1, p. 12. Beginning on July 1, 2002, DOC contracted with Forensic Health Services, Inc. ("FHS") to provide sex offender treatment services to SDP's. See Ex. 8, ¶ 2.

Each resident is assigned to a primary group, which usually consists of eight to ten residents and one or two therapists. See Ex. 8, ¶ 3. Primary group provides residents with the opportunity to practice skills and concepts learned in psycho-educational classes. See Ex. 8, ¶ 3. It also provides residents with the opportunity to address issues related to their sexual offending. See Ex. 8, ¶ 3. Further, through primary group, the therapists maintain contact with the residents

---

[4]     On December 15, 2005, the undersigned counsel learned that the results have been received. The defendants will file a supplemental affidavit with respect to these results shortly.
[5]     The plaintiff has also not complained to Superintendent Murphy about his sex offender or mental health treatment. See Ex. 6, ¶ 2.
[6]     The plaintiff does not raise any claim about any alleged lack of or deficiency in treatment while he was temporarily committed to the Treatment Center. Further, any claim that predates June, 2002, is barred by the statute of limitations.

to provide clinical oversight of their individualized treatment plan and to provide guidance in an effort to maximize treatment opportunities. See Ex. 8, ¶ 3. Psycho-education classes are didactic in nature and provide a method by which residents learn new concepts and address specific areas related to sexual offending, behavior management and other issues. See Ex. 8, ¶ 3. Psycho-educational classes offer residents the opportunity to learn the basic components and concepts of sex offender treatment. See Ex. 8, ¶ 3. Residents are then expected to practice these concepts and skills in their primary group and in their daily living. See Ex. 8, ¶ 3. Specialty groups are offered to address specific needs within the resident population. See Ex. 8, ¶ 3. For example, there is a survivor's group designed to help residents address their own histories of trauma. See Ex. 8, ¶ 3. Unit meetings are designed to promote pro-social aspects of the therapeutic community. These meetings are typically held on a weekly basis on the housing unit. See Ex. 8, ¶ 3.

Specialized programming is offered for residents who have cognitive limitations or mental illness on the A housing unit. See Ex. 8, ¶ 4. Residents with such limitations are placed in one of two primary groups where the pace is geared to the functional abilities of the group members. See Ex. 8, ¶ 4. Thus, while the treatment areas remain the same as for all residents, the material is reviewed repeatedly to assist these residents in understanding it. See Ex. 8, ¶ 4. Since some of these residents are unable to read or write, instruction includes verbal discussion and review. See Ex. 8, ¶ 4. Residents who have cognitive limitations or mental illness are encouraged to participate in programs offered to all residents, including psycho-educational classes. See Ex. 8, ¶ 4. In addition, psycho-educational classes and specialty groups are offered on A unit for residents with cognitive limitations or mental illness. See Ex. 8, ¶ 4. The psycho-educational classes on A unit address the same types of materials as other psycho-educational

classes but usually at a slower pace and presented in a manner suitable to the individual's learning style. See Ex. 8, ¶ 4.

The plaintiff is assigned to one of the two primary groups for residents with cognitive limitations or mental illness on A unit. See Ex. 8, ¶ 5.  In the opinion of the Program Director, it is appropriate for the plaintiff to be assigned to such a primary group. See Ex. 8, ¶ 5.  Individual sex offender treatment plans are prepared approximately every six months for residents. See Ex. 8, ¶ 6.  A treatment review panel, consisting of senior sex offender treatment program staff, reviews each resident's treatment plan periodically. See Ex. 8, ¶ 6. The program director usually participate in such reviews. See Ex. 8, ¶ 6. In the Program Director's opinion, the plaintiff's treatment plan is appropriate for him. See Ex. 8, ¶ 6.

In June, 2003, the plaintiff refused to participate in a comprehensive assessment which assessment includes testing to assess for reading and comprehension skills, memory and some historical material. Ex. 8, 6/3/03 Contact Note.

From June, 2002, until August, 2004, the plaintiff refused to participate in sex offender treatment (except to attend some unit meetings).  See Ex. 8, 5/23/03 Annual Treatment Review ("ATR"), pp. 2, 6; 5/7/04 ATR, pp. 2, 3; 4/22/05 ATR, pp. 3-4.  Beginning in August, 2004, the plaintiff began to participate in some aspects of the sex offender treatment program.  See Ex. 8, 4/22/05 ATR, pp. 3-4.

The plaintiff has also not signed a release of information to permit his sex offender treatment team access to his records maintained by UMASS.  See Ex. 8, 5/23/03 ATR, p. 3; 5/7/04 ATR, p. 4; 4/22/05 ATR, p. 4.    Without such a release, the plaintiff's sex offender treatment team cannot access his medical or mental health records.  See Ex. 4, ¶ 2.

### 3.  Other Aspects of the Petitioner's Commitment to the Treatment Center.

While the plaintiff has been committed to the Treatment Center, the plaintiff has acted in a threatening and violent manner on a number of occasions and received Observation of Behavior Reports ("OBR's"). [7]  See Ex. 9, OBR # 01-436 (threatening behavior, obscene gestures and actions); OBR # 02-098 (threatening staff); OBR # 02-307 & 02-308 (assaulting staff); OBR # 02-153 (making a threat and unusual behavior); # 03-184 (threatening another resident); # 03-169 (threatening staff, unauthorized use of cleaning supplies); # 04-131 (threatening statements to other residents); # 04-179 (threatening another resident).

While the plaintiff was previously double bunked, he has been in a single room since July 29, 2005.  See Ex. 10, ¶ 2.

### B.        The History of the Treatment Center and the Federal Consent Decree Litigation.

The Treatment Center was previously under dual management.  General Laws c. 123A, § 2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of SDP's with custodial personnel provided by DOC.  St. 1959, c. 615, as appearing in G.L. c. 123A, § 2.  The United States District Court for the District of Massachusetts previously entered consent decrees governing certain aspects of the operation of the Treatment Center that incorporated this dual management scheme.  *See King v. Greenblatt* ("*King I*"), 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995).  Among other things, the consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment."  *Id.;  see also King v. Greenblatt ("King II"),* 127 F.3d 190, 192 (1st Cir. 1997); *King v. Greenblatt*, 149 F.3d 9 (1st Cir. 1998) *("King III")*;

---

[7]        The names of other residents have been redacted.

*King v. Greenblatt*, 53 F.Supp.2d 117, 118-20 (D. Mass. 1999) (detailing changes in conditions at Treatment Center from 1972 to 1992). "General Laws c. 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted 'with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him.'" *Commonwealth v. Barboza*, 387 Mass. 105, 111 (1981), *cert. denied*, 459 U.S. 1020 (1982) (citations omitted).

On January 14, 1994, the Legislature enacted St. 1993, c. 489, § 2, which amended G.L. c. 123A, § 2 by placing sole authority and responsibility over the Treatment Center with DOC. St. 1993, c. 489, § 2, as appearing in G.L. c. 123A, § 2. *See King III*, 149 F.3d at 11-12; *King*, 53 F.Supp.2d at 121.

As a result of this legislative change, in 1994 the Court (Mazzone, J.), began overseeing what ultimately became the final phase of the federal consent decree litigation.  In 1994, the Court appointed the law firm of Hale and Dorr to represent forty-nine SDP's who called themselves the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights.  *King*, 53 F.Supp.2d at 121.

The Court reopened another consent decree case concerning the Treatment Center, Harold G. Williams, et al. v. Michael Lesiak, et al., U.S.D.C. C.A. No. 72-571-ADM, and consolidated it with Mitchell G. King, et al. v. Milton Greenblatt, M.D., et al., U.S.D.C. C.A. No. 72-788-ADM, the case involving the Class of 48 + 1 (together "the federal consent decree litigation").  *King*, 53 F. Supp.2d at 121.

Following the enactment of St. 1993, c. 489, § 2, the Commonwealth moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility.  *King I*, 52 F.3d at 3.  DOC

submitted to the Court an extensive Management Plan for the administration of the Treatment

Center. *King II,* 127 F.3d at 193. The Management Plan encompassed in detail almost every

aspect of life at the Treatment Center including policies, regulations, and rules governing

staffing, clinical treatment, educational and vocational treatment, a community access program,

behavior management, and resident management operations. *Id.; King III*, 149 F.3d at 15. The

Court permitted DOC to implement its plan and modified the consent decrees to place

responsibility for and control of the Treatment Center in DOC. *King II*, 127 F.3d at 194.

The Court, however, did not vacate the consent decrees. *King III*, 149 F.3d at 16.

Instead, the Court elected to exercise close judicial oversight of DOC's compliance with the

consent decrees. *Id*. at 122-23; *King,* 53 F.Supp.2d at 122-23. Additionally, the Court ordered

the DOC to submit an amended plan addressing issues raised by the parties. The Amended Plan

was filed on November 29, 1996. *King*, 53 F.Supp. 2d at 122. A copy of the Amended Plan,

without appendices, is attached to Exhibit 6.

### C.    <u>Termination of the Federal Consent Decrees.</u>

From 1994 to June, 1999, the Court approved, oversaw, and monitored DOC's

assumption of sole control over the Treatment Center, including DOC's expansion of sex

offender treatment services at the Treatment Center to non-civilly committed state prison inmates

("SPI's"). *See, e.g., King*, 53 F.Supp.2d at 121-23. Throughout that period, the SDP's continued

to assert that the DOC's policies and procedures and its introduction of the SPI's into the facility

"essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic

community." *King III*, 149 F.3d at 16. They also complained that DOC's new rules and

regulations and the additional SPI population impaired or affected treatment so as to render it

ineffective and in violation of G.L. c. 123A and the consent decrees. *King*, 53 F.Supp.2d at 123, 135.

This final phase of the consent decree litigation culminated in an evidentiary hearing before the Court in March, 1999. *King*, 53 F.Supp.2d at 124. At the hearing, SDP's reiterated their numerous complaints about DOC's operation of the Treatment Center. *See King*, 53 F.Supp.2d at 129-31, 134-35. After the hearing, the Court terminated the consent decrees. *King*, 53 F.Supp.2d at 136, 139. In doing so, the Court determined that the SDP's complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPI's in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, did not violate the consent decrees and, by implication, did not violate any state or federal rights. *King*, 53 F.Supp.2d at 135, 137. *See King III*, 149 F.3d at 19.

## ARGUMENT

A motion to dismiss for failure to state a claim under Fed R. Civ. P. 12(b)(6) will be granted if it appears to a certainty that the plaintiff would be unable to recover under any set of facts. *Gonzalez-Bernal v. United States*, 907 F.2d 246, 258 (1st Cir. 1990). A court ruling on a motion to dismiss must accept the factual allegations of the Complaint as true and draw all reasonable inferences in the non-moving party's favor. *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 37 (1st Cir. 1991).

Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir. 1995). The moving party bears the initial burden of demonstrating the absence of a material fact.

14

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once done, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial*." Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 158 (1st Cir. 1998).

I.    **THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S ADA CLAIMS.**

   A.    **The Defendants are Entitled to Sovereign Immunity on the Plaintiff's ADA Claims for Money Damages.**

   It is well-settled that the Eleventh Amendment precludes private litigation against the states and their agencies absent their consent.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), *superceded by statute, see Raygor v. University of Minnesota,* 604 N.W.2d 128 (Minn. App. 2000); *Cory v. White*, 457 U.S. 85, 90 (1982).  Essentially, "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Board of Trustees of the University of Alabama, et al. v. Garrett, et al.*, 531 U.S. 356, 361 (2001).  Congress can abrogate the States' Eleventh Amendment immunity, however, "when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'"  *Id.,* (*citing Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000)).

   It is the defendants' contention that Congress lacked the constitutional authority to abrogate state sovereign immunity with respect to Title II of the Americans with Disabilities Act ("ADA"), with respect to claims for money damages arising from inmate/SDP claims.  The United States Supreme Court is presently considering the question of whether Title II of the ADA validly abrogates state sovereign immunity for suits for damages by inmates alleging disability-based discrimination in United States v. State of Georgia, et al. (No. 04-1203), and Tony Goodman v. State of Georgia, et al. (No. 04-1236).  According to the Supreme Court's website, these cases were scheduled for oral argument on November 9, 2005.

Given the pendency of this issue before the Supreme Court, the defendants respectfully request leave to brief this issue further, if appropriate, after the Supreme Court issues its opinion.

**B.    The Plaintiff Is Not Entitled To Compensatory Damages Under The ADA.**

Assuming that the plaintiff may pursue his ADA claim, the plaintiff's claim for compensatory damages under Title II of the ADA must fail where he has not even alleged that the defendants acted with an intentional discriminatory animus to his disability. Neither the Supreme Court nor the First Circuit has determined whether compensatory damages (other than back pay) are available through a private cause of action under Title II of the ADA. *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 20-21 (1st Cir. 2000).

Where courts have allowed compensatory damages under Title II of the ADA, a plaintiff must first demonstrate a discriminatory animus on the part of the public entity. *See Garcia v. S.U.N.Y. Health Services Center of Brooklyn*, 280 F.3d 98, 112-113 (2nd Cir. 2001) (plaintiff may recover damages under Title II of the ADA only upon a showing that the "Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability"); *Harris v. New York State Dept. of Health*, 202 F. Supp.2d 143, 174 (S.D. N.Y. 2002) (claim under ADA Title II dismissed under *Garcia* standard where plaintiff failed to allege that defendant's actions were motivated by irrational animus or ill will based on the claimed disability).

The Complaint is devoid of any showing that the defendants were "motivated by an irrational discriminatory animus" based on his disability. *See Garcia, supra* at 112. Accordingly, the defendants are entitled to summary judgment on the plaintiff's ADA claims to the extent that he seeks monetary damages.

**C.      The Plaintiff Cannot Meet His Burden to Prove a Violation of the ADA as a Matter of Law**.

In order to state a claim under Title II of the ADA, the plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefit of some public entity's services, programs or activities, or was otherwise discriminated against; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000) (*citing* 42 U.S.C. §12132).

**1.      The Plaintiff's Refusal to Take Medication Bars His ADA Claim with Respect to His Schizophrenia**.

To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish that he (1) suffers from a "physical or mental impairment"[8]; (2) that "substantially limits;" (3) "a major life activity." *School Board of Nassau County v. Arline*, 480 U.S. 273, 279 (1987), *superceded by statute, see Shiring v. Runyon*, 90 F.3d 827 (3rd Cir. 1996). An ADA plaintiff bears the burden of establishing a *prima facie* case of unlawful discrimination. *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

Assuming without conceding that the plaintiff's schizophrenia is a qualifying condition, the plaintiff's ADA claim still fails. From September, 2000, until May, 2004, the plaintiff rejected medication to assist him in controlling his schizophrenia. A plaintiff who does not avail himself of proper treatment is not a "qualified individual" under the ADA. *See Rose v. Home Depot USA, Inc.,* 186 F.Supp.2d 595, (D. Md. 2002), *citing Tangires v. The Johns Hopkins Hosp.*, 79 F.Supp.2d 587, 596 (D. Md.), *aff'd*, 230 F.3d 1354 (4th Cir. 2000). Likewise, the plaintiff rejected sex offender treatment at the Treatment Center until August, 2004. Thus,

---

[8]  A physical or mental impairment is defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of several body systems, or any mental or psychological disorder." 29 C.F.R. § 1630.

assuming without conceding that his pedophilia or other mental condition would otherwise be a qualifying condition, the plaintiff is not a "qualified individual" under the ADA.  Thus, at least for the period of time that he rejected treatment, the plaintiff's ADA claim fails as a matter of law.

**2.    The Plaintiff Has Not Requested Accommodations for His Any Mental Illness or Mental Impairment.**

Even assuming that the plaintiff would otherwise fall within the protection of the ADA, the plaintiff has not requested accommodations from either DOC or the Treatment Center's mental health staff for his mental illness or mental impairment, the two methods by which he may seek a reasonable accommodation under 103 DOC 207, <u>Special Accommodations for Inmates</u>, attached to Ex. 5.

> Prison officials are not required to *anticipate* a prisoner's unarticulated need for accommodation or to offer accommodation sua sponte. Indeed, such a requirment would effectively require prison officials to make assumptions about a prisoner's disability, whereas resort to assumptions and stereotypes concerning disabled persons is a  harmful practice that Congress sought to deter by means of the ADA.

*Shedlock v. Department of Correction*, 442 Mass. 844,  856 (2004) (emphasis added), *citing Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110, 117 (1st Cir. 2004), *quoting Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999).  Accordingly, "it is incumbent upon the <u>prisoner</u> to request accommodation in the first instance." *Id.* (emphasis added).

Because the plaintiff has not requested accommodations for his mental illness or other mental impairment, the defendants are entitled to summary judgment on the plaintiff's ADA claim.

**3.    The Plaintiff Is Not Entitled to Placement in a "Regular Mental Hospital" Because Such an Accommodation Would Fundamentally Alter the Nature of the Service, Program or Activity.**

Pursuant to the regulations promulgated by the Attorney General for the purpose of implementing the ADA,

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. §35.130(b)(7).  *See also Memmer v. Marin County Courts*, 169 F.3d 630 (1999). Accordingly, a requested accommodation under the ADA must be reasonable.

An "[a]ccommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, or requires a 'fundamental alteration in the nature of the program.'"  *School Board of Nassau County*, *supra*, at 287 n. 17.  In considering whether an accommodation presents an undue burden, the court must take into account the nature and cost of the accommodation, the size of the facility in terms of the financial resources and personnel, and the type of operations involved, including composition, structure, and function.  *Riel v. Electronic Data Systems Corp.,* 99 F.3d 678, 681 (5th Cir. 1996).  An accommodation which presents an "extensive, substantial, or disruptive" deviation is considered an undue hardship and therefore not reasonable.  29 C.F.R. §1630.2(p).

The plaintiff apparently seeks placement in a "regular mental hospital (not a hospital for the criminally insane) and such community based treatment as the treatment professionals in a regular mental hospital determine to be appropriate . . . ."  Complaint, ¶ 59.  This requested "accommodation" is *per se* unreasonable.  The plaintiff essentially seeks to use the ADA to invalidate his SDP commitment.  *See* G.L. c. 123A, § 14(d) (if the fact finder concludes that the person is sexually dangerous, "such person *shall* be committed to the treatment center . . . for an indeterminate period of a minimum of one day and a maximum of such person's natural life until discharged pursuant to the provisions of section 9") (emphasis added).[9]  He thus seeks a benefit – release from the Treatment  Center -- to which other non-disabled SDP's are not entitled.[10]

---

[9]      While G.L. c. 123A, § 2A permits the transfer of SDP's who continue to serve prison sentences to other DOC prisons under certain limited circumstances, that provision does not apply to the plaintiff who is not currently serving a prison sentence.

[10]      Given his current compliance with his medication and his current presentation, it is questionable whether the plaintiff would even meet the criteria for placement in a "regular mental hospital" under G.L. c. 123.

Further, such an accommodation is unreasonable because it fails to consider the goals of SDP commitment, which are to protect the public while attempting to treat the SDP. *See, e.g., Sheridan, petitioner*, 412 Mass. 599, 604 (1992) ("the primary objective of c. 123A . . . is to care for, treat, and, it is hoped, rehabilitate the sexually dangerous person, while at the same time protecting society from this person's violent, aggressive and compulsive behaviors"). Commitment under c. 123A has the important function of custody. The statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment and rehabilitation" of sexually dangerous persons. G.L. c. 123A, § 2. Transfer to a regular mental hospital would require a fundamental alteration in his SDP commitment and would jeopardize public safety.

For these reasons, the defendants are entitled to summary judgment on the plaintiff's ADA claims.

## II.    THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON EACH OF THE PLAINTIFF'S SECTION 1983 CLAIMS.

### A.    The Plaintiff's Section 1983 Claims Are Barred by the ADA.

Assuming *arguendo* that the plaintiff's ADA claim is not barred by sovereign immunity, its presence in this litigation bars the plaintiff from bringing his other constitutional claims pursuant to 42 U.S.C. § 1983 for recovery on the same claims. It is well settled that § 1983 may be used to enforce rights contained in the Constitution as well as rights contained in federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980). An exception exists when a federal statute contains a comprehensive remedial scheme. The Supreme Court has held that, "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981). This Court has

found that the ADA provides a comprehensive remedial scheme, which precludes § 1983 actions. *See Meara v. Bennett*, 27 F. Supp. 2d 288, 290 (D. Mass. 1998). The Eighth and Eleventh Circuits have also reached the same result. *See Pona v. Cecil Whittaker's Inc.*, 155 F.3d 1034, 1038 (8th Cir. 1998); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997). The Eighth Circuit has explained that the ADA's "detailed" enforcement provisions were "imported" from Title VII of the Civil Rights Act of 1964. *Pona*, 155 F.3d at 1038. As such, it too was deemed to preclude § 1983 actions. *Id.*

Accordingly, if the plaintiff is permitted to pursue his ADA claim in this litigation, since the ADA provides a comprehensive remedial scheme, the plaintiff's § 1983 claims concerning violations of the the Fourteenth Amendment, to the extent that they are based entirely on the facts alleged to support his ADA claims, are precluded as a matter of law.

## III.  THE PLAINTIFF HAS FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES AND, THUS, HIS STATE LAW CLAIMS ARE BARRED. ___

The plaintiff asserts various claims under G.L. c. 123A, the statute that governs SDP proceedings, the State Sanitary Code and the Department of Public Health ("DPH") regulations. See, e.g., Complaint, ¶¶ 34 (alleging that the defendants are holding the plaintiff in conditions that exceed the "least restrictive alternative");  39 (claiming that double bunking and a leaking roof is a violation of the State Sanitary Code and Department of Public Health regulations);  56 (claiming that the plaintiff has not been availed of a hearing on his motion for a speedy trial on his § 9 petition).  To the extent that the plaintiff's claims rest in state law, they are barred by the provisions of G.L. c. 127, §§ 38E, 38F, because he has not alleged that he has exhausted the administrative remedies available to him as required under state law. General Laws c. 127, § 38F provides that:

> An inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E; but the court may consider such claim if a final administrative resolution of a grievance filed pursuant to said section 38E has not been decided within 180 days from the date of filing such a grievance, or if the inmate can demonstrate to the court that exigent circumstances exist which, if delayed pursuant to the requirements of this section, would jeopardize the life or seriously impair the health of the inmate, or, for actions seeking equitable relief.

General Laws c. 127, § 38E(a) provides, in relevant part, that the Commissioner "shall promulgate regulations to establish a fair, impartial, speedy and effective system for the resolution of grievances filed against the department, its officers or employees, by inmates who are committed to, held by or in the custody of the department in a state, county, or federal correctional facility, or the <u>Massachusetts treatment center</u>." (Emphasis added). DOC has adopted grievance procedures, 103 CMR 491, <u>Inmate Grievances</u>. This statute further provides that:

> (c) Grievances that may be brought by inmates subject to the provisions of subsections (a) and (b) shall include all grievances arising out of or resulting from a condition of or occurrence during confinement, whether or not said grievance is presented in the form of petition for a writ of habeas corpus. A petition for a writ of habeas corpus seeking only release from unlawful imprisonment or restraint and no other relief shall not be subject to the provisions of this section. All applicable statute of limitations and presentment periods shall be tolled from the date of the filing of a grievance pursuant to this section until the final administrative resolution of the grievance

The statute, by its, terms includes the Treatment Center. The term "inmate" is not specifically defined in G.L. c. 127. Thus, the definition contained in G.L. , c. 125, § 1 provides that:

> As used in this chapter and <u>elsewhere in the general laws</u>, unless the context otherwise requires, the following words shall have the following meanings: . . .

> (i) ""inmate", a committed offender or such other person as is placed in custody in a correctional facility in accordance with law . . . .

(Emphasis added).  The plaintiff makes no claim that he has exhausted the grievance procedures available to him for his state law claims.  Indeed, the plaintiff has not done so.  See Ex. 4, ¶5; Ex. 7, ¶ 2.  Accordingly, his state law claims fail.

## IV.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST THE DOC DEFENDANTS UNDER G.L. C.  123A.

The plaintiff asserts that the defendants have violated his rights under G.L. c. 123A by detaining him "longer than necessary on the basis of unreliable and imprecise evidence, and without a reliable mechanism to secure an impartial review of his status on at least an annual basis."  Complaint, ¶ 54(e).  He also complains that, while he has filed a petition for discharge pursuant to G.L. c. 123A, § 9, he has not been afforded a hearing on his motion for a speedy trial.  Complaint, ¶¶ 55, 56.[11]  He seeks an order compelling the defendants to schedule and to proceed with a hearing on his petition for discharge on or before August 12, 2005, or to release him.  Complaint, Relief, ¶ 4, p. 13.  Since August 12, 2005 has passed, the plaintiff's requested relief is moot.

Regardless, the plaintiff fails to state a claim against the defendants because the defendants have no authority either to schedule the trial on the plaintiff's  § 9 petition or to release him absent a finding that he is no longer sexually dangerous.  General Laws c. 123A, § 9 provides that the scheduling of hearings is under the control of the administrative justice of the superior court department.  Section 9 does not authorize DOC, Commissioner Dennehy or Superintendent Murphy to schedule § 9 trials.  Because the defendants have no authority to schedule § 9 trials, it follows that they cannot be held responsible for the fact that the plaintiff's

---

[11]      The plaintiff asserts that § 9 petitions are heard in the order that they are filed and that they are heard three to four years after they are filed.  Complaint, ¶ 57.  The defendants do not agree that these assertions accurately reflect the current management of the Unified Session by the Superior Court.  Regardless, however, the defendants do not control the scheduling of § 9 petitions.  See G.L. c. 123A, § 9 (administrative justice of the superior court department schedules § 9 petitions).

trial has not been scheduled.  Likewise, the defendants have no authority to release the plaintiff

absent a finding that he is no longer a sexually dangerous person.  *See* G.L. c. 123A, § 14(d) (if

the person is found to be sexually dangerous, he "shall be committed to the treatment center . . .

for an indeterminate period of a minimum of one day and a maximum of such person's natural

life until discharged pursuant to the provisions of section 9").  The plaintiff, therefore, has failed

to state a claim under G.L. c. 123A.[12]

## V.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATION OF HIS RIGHT TO BE HELD IN CONDITIONS THAT ARE THE LEAST RESTRICTIVE ALTERNATIVE.

The plaintiff asserts that he is being held in conditions that exceed the "least restrictive

alternative" and which are "substantially more restrictive and punitive than the prisons in which

[the plaintiff] served his nine years in prison."  Complaint, § 34.  The plaintiff lists ways in

which his confinement as a SDP at the Treatment Center allegedly differs from his incarceration

as an ordinary SPI at various level four security prisons, where he was incarcerated for portions

of his prison sentence.  See Complaint, §§ 37, 38, 40, 42.  The plaintiff claims that the

defendants have violated his right to substantive due process under the Fourteenth Amendment

and his rights under G.L. c. 123A, § 6A.  He seeks injunctive, monetary and declaratory relief.

Complaint, § 54.  As discussed above, his claim under G.L. c. 123A fails because he has not

exhausted his grievance remedies.  His substantive due process claim also fails.

---

[12]    To the extent that the petitioner claims that he is entitled to a hearing on his § 9 petition every 12 months, this claim has already been rejected by the Supreme Judicial Court. *In re Trimmer*, 375 Mass. 588, 590 (1978).  In *Trimmer*, SJC specifically concluded that "the one-year period, rather than serving as an automatic criterion of whether a speedy hearing was provided, fixes a limitation on the number of hearings which an SDP may request." *Trimmer*, 375 Mass. at 590.  *See* G.L. c. 123A, § 9 ("Any person committed to the treatment center shall be entitled to file a petition for examination and discharge once in every twelve months.").

### A.     The Alleged Differences Between Conditions at the Treatment Center and Other Prisons Do Not Violate Substantive Due Process.

Substantive due process "'prevents the government from engaging in conduct that shocks the conscience, or . . . .interferes with rights implicit in the concept of ordered liberty." *Dutil, petitioner*, 437 Mass. 9, 13 (2002), *citing Aime v. Commonwealth*, 414 Mass. 667, 673 (1993) and *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095 (1987) (internal quotations omitted).  Due process requires that the conditions and duration of civil confinement bear some reasonable relation to the purpose for which persons are committed.  *Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 736 (2001).  The dual purposes of SDP commitment are to protect the public and to attempt to treat the SDP. *See, e.g., Sheridan, petitioner*, 412 Mass. 599, 604 (1992).  Thus, SDP's may be subject to conditions that advance goals such as preventing escape and assuring the safety of others.  *See Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir.), *cert. denied*, 540 U.S. 985 (2003).

The alleged differences in the conditions of confinement at the Treatment Center and other level four security prisons do not shock the conscience or interfere with rights implicit in the concept of ordered liberty. Other prisons house SPI's serving criminal sentences who share in common a need for classification to a particular security level. In contrast, SDP's are committed to the Treatment Center because they have a mental condition that renders them likely to engage in future sexual misconduct. *See* G.L. c. 123A, § 1 (defining SDP).

Notably, there are significant differences in DOC's ability to manage SPI's and SDP's. State law requires that SDP's be housed at the Treatment Center except in limited circumstances. *See* G.L. c. 123A, §§ 2, 2A; 103 CMR 460, Transfer Procedures for the Massachusetts Treatment

Center.[13]  The Commissioner, therefore, has a limited ability to transfer certain SDP's.  In

contrast, the Commissioner has virtually unfettered discretion to classify SPI's subject only to

the requirements of DOC's classification regulations.  *See* G.L. c. 127, § 97; 103 CMR 420,

Classification.  If a SPI violates institutional rules, he can be placed in segregation within the

institution, he can be transferred to higher custody or, for certain serious infractions, he may be

placed in the Departmental Disciplinary Unit for up to ten years.  *See, e.g.*, 103 CMR 430,

Disciplinary Proceedings ("disciplinary regulations"), specifically, 103 CMR 430.25(3)(d). The

disciplinary regulations do not apply to SDP's.  Rather, 103 CMR 431, Observation of Behavior

Reports ("OBR regulations"), applies to SDP's.  The range of sanctions contained in the OBR

regulations is dramatically compressed compared to that available in the disciplinary regulations.

Different conditions of confinement for different populations that have different needs do not,

therefore, violate substantive due process. Indeed, even the plaintiff is not in the same situation

as he was when confined as a SPI at other DOC facilities. In June, 2002, there was an

adjudication, beyond a reasonable doubt, that the plaintiff's present mental condition renders him

likely to sexually reoffend if he is not confined to a secure facility.  *See* G.L. c. 123A, §§ 1,

14(d). The plaintiff is housed at a Treatment Center from SPI's.  He has a statutory right to

treatment.  G.L. c.123A, § 2.

        As discussed above, the federal courts, in the context of the consent decree litigation,

have already concluded that the conditions of confinement at the Treatment Center comport with

constitutional requirements. This Court and the First Circuit have already examined complaints

about SDP's about limitations on the amount of clothing, room visits, funds, telephone calls, etc.

The First Circuit held that "'the Plan justifies some reduction in these privileges because of past

---

[13]        A SDP may be transferred to another facility only if he continues to serve a prison sentence.  Because the
plaintiff is not presently serving a criminal sentence, the plaintiff may not be transferred from the Treatment Center

experiences with security, assault, gambling, coercion and interruptions in treatment,'" and `[n]o reduction rises to the level of a constitutional infraction.'"  *King*, 53 F.Supp.2d at 134, *quoting King III*, 149 F.3d at 19.  Likewise, none of the conditions complained of here rises to the level of a constitutional violation.

While the plaintiff alleges that SPI's are also housed at the Treatment Center, Complaint, 36, the federal court has already approved this practice.  *See King*, 53 F.Supp.2d at 121-23. While the plaintiff complains that DOC applies many of its regulations (also applicable to SPI's) to SDP's, the federal court has also approved this practice.  The DOC announced its intention to apply various regulations to SDP's in the Amended Plan.  See, e.g., Ex. 6, Amended Plan, pp. 36 (property, inmate funds and visitation regulations), 38-39 (mail regulations), 41 (telephone regulations, inmate accountability policy).  The federal court approved DOC's Amended Plan and permitted DOC to implement the plan.  *See King*, 53 F.Supp.2d at 137.

The plaintiff also challenges the practice of double bunking SDP's.  See Complaint, 36. Because the plaintiff is no longer double bunked, any claim for injunctive relief is moot.  The plaintiff makes no allegation, however, that the defendants are not following the double bunking procedures established in the original Management Plan and incorporated by reference into the Amended Plan.  See Ex. 6, Amended Plan, p. 46. Regardless, double bunking, in and of itself, is not a *per se* constitutional violation. *See Doe v. Gaughan*, 808 F.2d 871, 885 (1st Cir. 1996) (overcrowding, without more, does not amount to a constitutional violation); *Bell v. Wolfish*, 441 U.S. 520, 541 (1979) (there is no "one man, one cell" principle lurking in the Due Process Claus; rather, the Due Process Clause is only implicated if detainees are confined in such a manner as to cause them to endure genuine privations and hardship over an extended period of time). Likewise, the plaintiff's other allegations do not amount to constitutional violations.

_____

to another DOC facility.

**B.**    **The Plaintiff's Claims Are Barred by Res Judicata and Collateral Estoppel.**

The plaintiff is barred from relitigating this issue by the doctrines of *res judicata* and

collateral estoppel.  The doctrine of *res judicata* "bars all parties and their privies from

relitigating issues where were raised or *could have been raised* in a previous action, once a court

has entered a final judgment on the merits in the previous action."  *Aunyx Corp. v. Canon U.S.A.,*

*Inc.,* 978 F.2d 3, 6 (1st Cir. 1992) (emphasis in original), *cert. denied*, 507 U.S. 973 (1993).

To promote judicial economy, the doctrine of claim preclusion makes a valid, final

judgement conclusive on the parties and their privies and bars further litigation of all matters that

were or should have been adjudicated in the action.  *Heacock v. Heacock*, 402 Mass. 21, 23

(1988); *Boyd v. Jamaica Plain Co-Op. Bank*, 7 Mass. App. Ct. 153, 163 (1979). The essential

elements of *res judicata* are:  (1) a final judgment on the merits in an earlier action; (2) an

identity of parties or privies in the two suits; and (3) an identity of the cause of action in both the

earlier and the later suits.  *Aunyx Corp.,* 978 F.2d at 6; *see Grella v. Salem Five Cent Savings*

*Bank*, 42 F.3d 26, 30 (1st Cir. 1994). The doctrine is also "based on the idea that the party to be

precluded has had the incentive and opportunity to litigate the matter fully in the first law suit."

*Heacock*, 402 Mass. at 24.

In this case, the first two elements are satisfied. Although the plaintiff was not a party to

the consent decree litigation, he, and every other SDP, should be barred from relitigating these

claims. There is a very close relationship between this plaintiff and the plaintiffs in the consent

decree litigation. First, the consent decrees and the consent decree litigation encompassed and

applied to all SDP's at the Treatment Center. Although this plaintiff was committed to the

Treatment Center after the termination of the consent decree litigation, he and every other new

SDP committed after the reinstatement of SDP commitments, *see* G.L. c. 123A, §§ 12-15,

benefits from the consent decree litigation. The intent of the consent decree litigation was to resolve "systematic" issues concerning DOC's takeover of the Treatment Center, its management of the entire facility, and the conditions it imposed on the entire population of SDP residents. *King III*, 149 F.3d at 11-12; *see King*, 53 F.Supp. at 137. This is a unique population. Only individuals adjudicated SDP and committed to the Treatment Center pursuant to G.L. c. 123A benefitted, and continue to benefit, from the consent decree litigation. The interests of the named plaintiffs in the consent decree litigation were identical to the interests of this plaintiff.

The Court held that its "decision does not preclude [SDP's] from challenging events on the basis of constitutional or other protected rights." *King*, 53 F.Supp. 2d at 137. Clearly, an SDP is not precluded from challenging a specific event or wrong that occurred to him. *See, e.g. Cameron v Tomes*, 990 F.2d 14 (1st Cir. 1993). Likewise, the Court did not preclude SDP's from challenging constitutional wrongs committed after the termination of the consent decrees. *King*, 53 F.Supp.2d at 137. The plaintiff, however, has broadly challenged DOC's operation of the Treatment Center. His claims do not raise discreet violations arising from a single event.

Further, the defendants are entitled to use claim preclusion even though they were not named defendants in the federal consent decree litigation. The Court acted as if the Commonwealth were the defendant in the federal consent decree litigation. *See King*, 53 F.Supp.2d at 122. The present plaintiff has filed this action against DOC, an agency of the Commonwealth, and Commissioner Dennehy and Superintendent Murphy, in part, in their capacities as officials of an agency of the Commonwealth. Thus, there is privity between the present and prior defendants for claim preclusion purposes. *See generally, Cohen v. Shea*, 788 F.Supp. 66, 68 (D.Mass. 1992); *Trustees of Stigmatine Fathers, Inc. v. Secretary of Admin. & Fin.,* 369 Mass. 562, 566-67 (1976).

With respect to the identity of the cause of action, the First Circuit Court of Appeals has adopted a "transactional" definition of *res judicata* from the *Restatement (Second) of Judgments* § 24, which provides that "[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of transactions out of which the action arose."   *Aunyx Corp.*, 978 F.2d at 6-7.  It does not matter if the two cases advance different legal theories.  Indeed, "[t]he fact that different legal theories are presented in each case does not mean that the same transaction is not behind each. . . . '[S]o long as different theories of recovery, however prolific, derive from the same cause of action, the requisite identity is achieved if, and to the extent that, all such theories concern the 'same operative nucleus of fact.'"   *Aunyx Corp.*, 978 F.2d at 7 (citations omitted).

In the consent decree litigation, the federal courts ruled on the constitutionality of the Legislature's transfer of sole control of the Treatment Center to DOC.  *See King I*, 52 F.3d at 4. In addition, the SDP's alleged that DOC's new regime of rules and regulations coupled with the introduction of over 300 SPI's was unlawful and unconstitutional. *See  King*, 53 F.Supp.2d at 122.  The Court ruled that these complaints, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees.  *King*, 53 F.Supp.2d at 135. The Court concluded that the plan itself did not violate the federal consent decrees and permitted DOC to implement all aspects of its plan. *King*, 53 Supp.2d at 121-22.  The Court considered and reviewed the claims the plaintiff wishes to relitigate here. The plaintiff is, therefore, barred from relitigating these issues.

The doctrine of issue preclusion is equally applicable and bars the plaintiff's present claims before this Court.  "'When an issue of fact or law is actually litigated and determined by a

valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.' . . . 'In certain circumstances, mutuality of the parties is not required.  A nonparty may use [issue preclusion] defensively against a party to the original action who had a full and fair opportunity to litigate the issues in question.'"  *Fay v. Federal Nat'l Mortgage Ass'n*, 419 Mass. 782, 789 (1995) (citations omitted). *See Keystone Shipping Co. v. New England Power Co.,* 109 F.3d 46, 51 (1st Cir. 1997) (noting that Massachusetts applies doctrine of issue preclusion in same traditional manner as federal court).

As discussed above, the plaintiff's constitutional challenges were actually litigated or could have been litigated in the federal consent decree litigation.  Moreover, the determination of these issues was essential to the Court's decision to terminate the consent decrees.  The Court could not lawfully terminate the consent decrees that were created to remedy past violations of statutory and constitutional rights if there were ongoing violations.  *See King*, 53 F.Supp.2d at 124.  Indeed, the plaintiffs alleged that past statutory and constitutional wrongs had not been remedied and DOC's management of the Treatment Center had unlawfully and unconstitutionally transformed it into a penal environment no different from any other prison.  *See King*, 53 F.Supp.2d at 123, 135. Ultimately, the Court properly concluded that DOC's management of the Treatment Center did not violate any statutory or constitutional rights and, therefore, terminated the consent decrees.  *King,* 53 F.Supp.2d at 135, 137, 139.  *See Bruno*, 432 Mass. at 514 (noting that the Court determined that DOC's management plan comports with constitutional requirements).  Because there was a full and fair opportunity to litigate these issues in the consent decree litigation, this Court should dismiss the plaintiff's Complaint.

**C.**     **A Violation of G.L. c. 123A, § 6A Presents No Federal Claim.**

To state a civil rights claim under 42 U.S.C. § 1983, the plaintiff must allege that the defendants, acting under color of state law, committed some conduct which deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Johnson v. Summers*, 411 Mass. 82, 86 (1991). This statute, 42 U.S.C. § 1983, in and of itself does not offer the plaintiff any substantive ground for relief. It is well established that § 1983 is not a source of substantive rights, but merely provides a method for vindicating <u>federal</u> rights conferred under the United States Constitution or federal law. *Chapman v. Houston Welfare Rights, Org.*, 441 U.S. 600, 615-618 (1978).

In addition, rights that arise only from state law are not enforceable by § 1983. Since § 1983 requires violation of a federal constitutional or statutory right, the mere failure to properly follow state law or regulations cannot provide the basis for a § 1983 claim. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 230 (1st Cir. 1992); *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992) ("It is bedrock law in this circuit, . . . that violations of state law -- even where arbitrary, capricious, or undertaken in bad faith -- do not, without more, give rise to a denial of substantive due process under the U.S. Constitution").

General Laws, c. 123A, § 6A provides that the "[a]ny person committed as a sexually dangerous person to the treatment center or branch thereof under the provisions of this chapter shall be held in the most appropriate level of security required to ensure the protection of the public, correctional staff, himself and others." Even if a violation of this provision of state law occurred, this violation would not give rise to a claim under § 1983.

Regardless, the Treatment Center has already been found to provide differing levels of security in the course of the consent decree litigation. In the consent decree litigation, the Court stated that "[e]ffective treatment is offered; physical conditions have improved greatly; there are differing levels of security; meaningful work, education and avocational programs; and discipline, including sequestration, conforms to acceptable standards of due process; all under the least restrictive conditions necessary to achieve the purposes of commitment, namely, the care, treatment, rehabilitation, and custody of sexually dangerous persons." *King*, 53 F.Supp.2d at 137 (emphasis added). Further, the Treatment Center has several levels of security. The Treatment Center has a main facility. *King*, 53 F.Supp.2d at 125. The Treatment Center has a Minimum Privilege Unit ("MPU") where SDP's who have been found guilty of violating certain institutional rules may be placed pursuant to 103 CMR 431, Observation of Behavior Reports. *See King III*, 149 F.3d at 21. The Treatment Center also has the Community Access Program and the Community Transition House ("CTH") which is also less restrictive than the main facility. *See King III*, 149 F.3d at 17.[14]

This Court should, therefore, dismiss the Complaint.

**VI.     THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIM OF INADEQUATE SEX OFFENDER OR MENTAL HEALTH TREATMENT.**

**A.     The Plaintiff's Claim for Inadequate Treatment for His Mental Illness Fails.**

Prison officials are entitled to rely on the professional judgment of their contractual medical providers. *Layne v. Vinzant*, 657 F.2d 468, 472 (1st Cir. 1981); *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (because they lacked medical expertise, the prison's treatment director and warden could not be held liable for medical staff's diagnostic decision not to refer

---

[14]     The CTH has been temporarily closed following the escape of a SDP. That temporary closure, however, has had no impact on the plaintiff who has not alleged that he has applied for the CTH or that he meets the eligibility

prisoner to doctor for treatment of a shoulder injury); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Rosen v. Chang*, 811 F. Supp. 754, 761 (D.R.I. 1993).[15]

The First Circuit has held that "it is plain that an inmate deserves adequate medical care." *U.S. v. DeCologero*, 821 F.2d 39, 42 (1st Cir. 1987). Adequate services are "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Id.* at 43. An inmate is not, however, entitled to ideal care or the care of his choice. *DeCologero*, 821 F.2d at 42; *DesRosiers*, 949 F.2d at 18.

In this case, it is clear that the plaintiff has received significant mental health care as deemed appropriate by a mental health clinician and a psychiatrist. Accordingly, the defendants are entitled to qualified immunity. *See Rosen v. Chang*, 811 F.Supp. 754, 761 (D.R.I. 1993) (prison administrator entitled to qualified immunity when he relied upon licensed medical providers "to exercise informed medical judgment and to provide adequate health care" to a prisoner).

Instead, it is well-established that "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Munoz,* 770 F.2d at 259 (*citing Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir. 1981) (*quoting Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

The plaintiff suggests that his condition has deteriorated and that this triggers liability on the part of the defendants. See Complaint, ¶ 1. The plaintiff fails to acknowledge, however, his

---

requirements for placement in the CTH.

[15]    Indeed, by contractual agreement, the defendants have <u>no</u> authority or control over the type, timing and level of services provided to inmates by its current or former contractual medical and mental health providers. See Ex. 11, ¶¶ 2-5. Due to their contract with UMMS, even were the Court to order the defendants to provide a different type or level of medical or mental health treatment to the plaintiff, the defendants would be contractually powerless to comply with its Order.

long-term refusals of medication and their potential effect on his allegedly deteriorated

condition.  It is well established that an inmate who refuses care offered at a prison may not then

maintain an Eighth Amendment claim for deliberate indifference to his serious medical needs.

*See e.g. Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (prison officials were

not liable where plaintiff refused medical treatment for drug ingestion and denied ingesting

drugs); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal of an Eighth Amendment

claim would be proper if inmate's behavior made it difficult or impossible to treat him

effectively); *Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (inmate who refused a

confirmatory test that would have led to treatment had no claim for deliberate indifference);

*Logan v. Clark*, 119 F.3d 647, 650 (8th Cir. 1997) (no deliberate indifference where doctors'

efforts were impeded by inmate's inability or unwillingness to follow treatment instructions).

The same analysis should apply to this case.[16]  *See Watkins*, 273 F.3d at 685-686 (under the

Fourteenth Amendment, pre-trial detainee has a right to adequate medical care analogous to

Eighth Amendment right of prisoners).

Accordingly, since the defendants were entitled to defer to the professional judgment of

their contractual mental health providers and since the plaintiff refused to accept the medication

offered to him, his claim fails as a matter of law.[17]

## B.    The Plaintiff's Claim for Inadequate Sex Offender Treatment Fails.

The plaintiff alleges that he has not been afforded adequate sex offender treatment for his

"alleged mental abnormality."  Complaint, ¶ 54(c).  The First Circuit has explicitly declined to

---

[16]     To the extent that the plaintiff complains that the neuropsychological assessment was not completed as
recommended by the CAB, that testing has now been completed.  Thus, any request for injunctive relief on this basis
is now moot.

[17]     Notably, since the plaintiff resumed anti-psychotic medication in May, 2004, his mental condition has
shown some signs of improvement, which suggests that the prescribed medication is both appropriate and helpful.
See Ex. 3, ¶ 5.

find that a constitutional right to treatment exists at the Treatment Center. *Langton v. Johnston*, 928 F.2d 1206, 1217 (1st Cir. 1991). In *Langton*, the First Circuit found it unnecessary to reach the constitutional inquiry because the consent decree "set a higher standard than the Constitution" in affording treatment for Treatment Center residents. *Langton*, 928 F.2d at 1217. Two years later, the First Circuit again declined to reach this issue, concluding that state law provided a right to treatment at the Treatment Center that "equals or exceeds anything that the Supreme Court would likely impose under the due process clause." *Cameron v. Tomes*, 990 F.2d 14, 19 (1st Cir. 1993). State law continues to provide the plaintiff with a statutory right to treatment. *See* G.L. c. 123A, § 2. Accordingly, this Court should refrain from addressing the constitutional issue raised by the plaintiff. *See Langton*, 928 F.2d at 1217 ("It has long been settled that if a court can resolve a dispute without confronting an unsettled constitutional issue, it should proceed in that fashion."). As discussed above, to the extent that the plaintiff raises a claim arising under state law, this claim is not enforceable under § 1983.

Even if the Court were to consider that SDP's have a due process right to some sex offender treatment, however, his claim fails. States enjoy "wide latitude in developing treatment regimens." *Hendricks*, 521 U.S. at 368 n. 4. Further, the "'State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment.'" *Id*. at n. 4 (citation omitted). The Treatment Center is just such a facility.

At most, SDP's have a right to some treatment and that the treatment be decided by mental health professionals. *See Allison,* 332 F.3d at 1081, *citing Youngberg v. Romeo*, 457 U.S. 37 (1982). DOC contracts with a vendor for the provision of sex offender treatment to SDP's. See Ex. 8, ¶ 2. Professional judgment about the plaintiff's sex offender treatment program has

been exercised in this case.  See Ex. 8, ¶¶ 5-6.  Under the cases discussed above, the defendants

are entitled to rely on the professional judgment of DOC's contractual provider in determining an

appropriate sex offender treatment program and are thus entitled to qualified immunity.

Further, until August, 2004, the plaintiff refused to participate in the program. See Ex. 8,

5/23/03 Annual Treatment Review ("ATR"), pp. 2, 6; 5/7/04 ATR, pp. 2, 3; 4/22/05 ATR, pp. 3-

4.  In 2003, the plaintiff also refused to participate in a Comprehensive Assessment, which would

include testing for reading and comprehension skill, memory and historical material.  See Ex. 8,

6/3/03 Contact Note.

The plaintiff complains that his sex offender treatment team has failed to compile a list of

his psychiatric symptoms.  See Complaint, ¶ 27.  The plaintiff, however, has refused to provide

his treatment team with a release to permit the team to access his mental health records

maintained by UMASS.  See Ex. 8, 5/23/03 ATR, p. 3; 5/7/04 ATR, p. 4; 4/22/05 ATR, p. 4.

Without such a release, the plaintiff's sex offender treatment team cannot access his medical or

mental health records.  See Ex. 4, ¶ 2.

Based on the cases cited above, his failure to participate in the recommended treatment

program, to participate in a recommended assessment and to provide his treatment team with a

release defeats his claim.[18]  The defendants are therefore entitled to summary judgment.

## VII.    THE PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF THE STATE SANITARY CODE OR DPH REGULATIONS.

The plaintiff asserts that certain conditions at the Treatment Center violate the State

Sanitary Code, 105 CMR 410.00, or Department of Public Health regulations relating to

---

[18]    Even if his condition(s) were wholly untreatable, that fact would not render his commitment
unconstitutional.  Civil commitment is constitutional even if the mental condition is untreatable.  *Hendricks*, 521
U.S. at 365-366 ("under the appropriate circumstances and when accompanied by proper procedures, incapacitation
may be a legitimate end of the civil law").

correctional facilities, 105 CMR 451.00 ("DPH Regulations").  He specifically challenges the practice of double bunking and alleges that there is a leaking roof on his housing unit.  See Complaint, ¶ 39.  The plaintiff has failed to state a claim.  Accordingly, this Court should dismiss these claims.

A.     __The Plaintiff Has No Private Right of Action To Enforce DPH Regulations.__

The DPH Regulations, set forth at 105 CMR 451.00, Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities, apply to the Treatment Center. DPH evaluates the Treatment Center under the standards applicable to correctional facilities, 105 CMR 451.00, Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities ("DPH Regulations").  See 105 CMR 451.001 (DPH is required to inspect each correctional facility twice annually and to report on its findings and recommendations). The DPH Regulations define a "correctional facility" in relevant part as "any building, enclosure, space or structure used for the custody, and rehabilitation of committed offenders and of such other persons as may be placed in custody therein in accordance with law, as defined by M.G.L. c. 125, § 1.  105 CMR 451.020.  See G.L. c. 125, § 1(d) (defining a "correctional facility" as "any building, enclosure, space or structure used for the custody, control and rehabilitation of committed offenders and of such other persons as may be placed in custody therein in accordance with law"); see also G.L. c. 125, § 1(n) (defining a "state correctional facility" as "any correctional facility owned, operated, administered or subject to the control of the department of correction, including but not limited to . . . .").

The DPH Regulations define a "committed offender" as "a person convicted of a crime and committed under sentence to a correctional facility."  Id.  See G.L. c. 125, § 1(c) (same). The DPH Regulations define an "inmate" as a "committed offender, detainee or such other person as

is placed in custody in a correctional facility." *Id.*  *See* G.L. c. 125, § 1(i) (defining an "inmate" as "a committed offender or such other person as is placed in custody in a correctional facility in accordance with law.").  Thus, the plaintiff and other civilly committed SDP's are "inmates" for purposes of the DPH Regulations.

The plaintiff seeks recovery for the defendants' alleged violation of the DPH Regulations. The plaintiff's claim fails because the plaintiff lacks standing to enforce the DPH Regulations.  In the absence of any indication that the Legislature intended a statute to create a private right of action, none should be inferred by the Court.  *Loffredo v. Center for Addictive Behaviors*, 426 Mass. 541, 545-547 (1998).   The Legislature has charged the DPH with promulgating regulations governing minimum health and sanitation standards at correctional facilities.  G.L. c. 111, § 21.  The DPH Commissioner has been delegated overall responsibility of administering the Commonwealth's sanitation laws.  G.L. c. 17, § 2.  In *Attorney General v. Sheriff of Worcester County*, the Supreme Judicial Court held that it is the duty of the sheriff [here, the Superintendent] to ensure compliance with health and sanitation regulations [105 C.M.R. § 451.000, *et seq.*] at correctional facilities and detention centers, and that the Attorney General may maintain a civil action to establish that duty.  382 Mass. 57, 58, 59 (1980).  *See* G.L. c. 111, § 21.

This comprehensive grant of authority and responsibility displaces any private right of action.  Specifically:

> [A] reading of 105 CMR 451.00, et seq., makes it clear that broad discretion is left to the Commissioner of the Department of Public Health in regulating the health standards at correctional facilities.  If the Commissioner believes that there are conditions which are dangerous to the public health constituting an emergency, the Commissioner shall notify the Commissioner of Corrections, the Secretary of Human Services and the Governor, and request that the Governor declare that an emergency exists which is detrimental to the public health.  This authority vested in the Department of Public Health Commissioner carries with it,

by inference, the right to seek judicial relief through declaratory judgment. Such a right is shared by the Attorney General of the Commonwealth as the chief law officer of the Commonwealth. **Nowhere in c. 111, § 21 is there a private cause of action. Nor does 105 CMR 451.00 et seq. provide for a private cause of action.** Rather, the provisions provide for the minimum health and sanitation standards at correctional facilities. **The proper party to address public health issues therefore is the Attorney General or the Commissioner of Public Health.**

*O'Brien v. DuBois, et. al.,* Worcester Superior Court, Civil Action No. 94-2170 (1995) (Carhart, J.), attached as Ex. 12. *See also Alexander, et. al. v. DuBois, et. al.*, Middlesex Superior Court, Civil Action No. 94-6486 (1997) (Gershengorn, J.), attached as Ex. 13. The plaintiff has no ability to bring a private right of action under the General Laws to enforce his civil rights or due process concerns relating to public health standards.[19] This Court should dismiss the Plaintiff's Complaint.

**B.    The Plaintiff Fails to State a Claim for Violation of the State Sanitary Code.**

The plaintiff claims that double bunking and the leaking rook violate the State Sanitary Code, promulgated pursuant to G.L. c. 111, § 127A and contained at 105 CMR 410*, et seq.*. The Commonwealth and its agencies are exempt from G.L. c. 111, § 127A, the statute authorizing DPH to promulgate the State Sanitary Code. *See* Opinion of the Attorney General (00/01 Op AG No. 2 (2001), 2001 Mass. AG Lexis 1 (April 25, 2001) and cases cited therein. The Department of Correction falls under the purview of the Executive Office of Public Safety, an agency of the Commonwealth. G.L. c. 6A, §§ 2[20] and 18.[21] Accordingly, the State Sanitary Code does not apply to the Treatment Center.

---

[19]    Further, "[t]he mere failure to conform to State minimum standards does not *per se* establish a constitutional violation." *Richardson v. Sheriff of Middlesex County*, 407 Mass. 455, 460 (1990) (internal quotations omitted).

[20]    "There are hereby established the following executive offices, each of which shall serve directly under the governor: . . . public safety . . .." G.L. c. 6A, § 2.

[21]    "The following state agencies are hereby declared to be within the executive office

40

Further, neither G.L. c. 111, § 127A nor the resulting regulations, 105 CMR 410,

provides for a private right of action. Rather, G.L. c. 111, § 127A provides that local boards of

health shall enforce the State SanitataryCode "in the same manner in which local health rules and

regulations are enforced."  DPH may "in like manner enforce" the State Sanitatary Code if local

boards "fail after the lapse of a reasonable length of time to enforce the same." *Id.* For the same

reasons why there is no private right of action under the DPH Regulations, there is no private

right of action under the State Sanitatary Code. Accordingly, the plaintiff cannot maintain an

action for enforcement of the State Sanitatary Code.

Even if there were, the plaintiff could not maintain an action in this Court.  General Laws

c. 111, § 127A specifically provides that the Superior Court "shall have jurisdiction" over actions

to enforce the State Sanitary Code. G.L. c. 111, § 127A. Thus, even if the statute could be read as

providing a private right of action against the Commonwealth, which it cannot, suit in this Court

would be barred by the Eleventh Amendment. The Eleventh Amendment to the United States

Constitution bars suit against a state by its own citizens unless the state has waived its sovereign

immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989).  Because the statute

limits jurisdiction to the Superior Court, there has been no waiver of sovereign immunity.

## VIII.  THE PLAINTIFF HAS FAILED TO STATE A CLAIM THAT G.L. C. 123A IS UNCONSTITUIONAL "AS APPLIED" TO HIM.

The plaintiff asserts that, as a result of "the imprecise and unreliable evidence used by the

CAB and the defendants to continue to justify [the plaintiff's] continued detention, combined

with the legislatively mandated punitive conditions of confinement, and the defendant's overly

restrictive implementation, have turned [his] civil commitment into a mechanism for continued

---

of public safety: . . . the department of correction, including the parole board and all other agencies within said
department . . .."  G.L. c. 6A, § 18.

retribution or general deterence (sic)." Complaint, ¶ 52. In essence, the plaintiff asserts that the conditions of his confinement transform his civil commitment into punishment.

Both the United States Supreme Court and the Supreme Judicial Court have already rejected "as applied" challenges to civil commitment schemes. In 2001, the United States Supreme Court rejected a claim that the Washington statute for civil commitment of sexually violent predators was punitive "as applied" to a particular individual. *See Seling v. Young*, 531 U.S. 250, 121 U.S. 727, 735 (2001). In *Seling*, the Supreme Court held that an "'as applied' analysis would prove unworkable." *Id.* The Court rejected the argument that a civil commitment statute can be punitive as applied to a particular person when the highest State court has already definitively construed the statute as civil. *Id.* at 733-735. Applying *Seling*, the Supreme Judicial Court held that because G.L. c. 123A is civil in nature, the specific conditions of a SDP's confinement do not transform the statute from civil to punitive. *Dutil, petitioner*, 437 Mass. 9, 20 (2002); *see also Commonwealth v. Bruno*, 432 Mass. 489, 500-502 (2000) (declaring that current and former version of G.L. c. 123A is civil and not punitive).

To the extent that the plaintiff claims that G.L. c. 123A violates substantive due process because it is not narrowly tailored to further a legitimate and compelling interest, his claim is meritless. In upholding Kansas' similar Sexually Violent Predator Act ("SVP Act"), the Supreme Court held that, although freedom from physical restraint is a fundamental right, a state may, in certain narrow circumstances, provide for "the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public." *Id.* at 2079. The Court held that Kansas' SVP Act comports with substantive due process by requiring proof of past sexually violent behavior coupled with a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated. *Kansas v. Hendricks*, 521 U.S.

346, 117 S.Ct. 2072, 2080 (1997). The commitment provisions of G.L. c. 123A, as amended by

St. 1999, c. 74, are similar to those of the Kansas SVP Act and, for the same reasons, comport

with substantive due process requirements.

Under the version applicable to the plaintiff, G.L. c. 123A permits civil commitment of a

person who, in relevant part, has been convicted of a statutorily enumerated sexual offense and

"who suffers from a mental abnormality or personality disorder which makes the person likely to

engage in sexual offenses if not confined to a secure facility."[22] G.L. c. 123A, § 1; *see also*

*Dutil,* 437 Mass. at 13-19 (holding that pre-1990 version of G.L. c. 123A comports with

substantive due process standards articulated in *Hendricks*). General Laws c. 123A, therefore,

satisfies the *Hendricks* requirement of past sexually violent behavior coupled with proof of a

current mental condition rendering the person likely to engage in future sexual misconduct

unless confined. The statute is thus narrowly tailored to serve a compelling state interest in

protecting the public from sexually dangerous persons. *See Bruno,* 432 Mass. at 500; St. 1999, c.

74, emergency preamble (statute's stated purpose is "to protect forthwith the vulnerable

members of our communities from sexual offenders").[23] Accordingly, the plaintiff's claim fails.

## IX.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST COMMISSIONER DENNEHY AND SUPERINTENDENT MURPHY IN THEIR INDIVIDUAL CAPACITIES.

To establish liability under 42 U.S.C. § 1983, a party must prove that the challenged

conduct is "attributable to a person acting under color of state law" and that the conduct "worked

a denial of rights secured by the Constitution or federal law." *Soto v. Flores*, 103 F.3d 1056,

---

[22]      A "mental abnormality" is defined as "a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." A "personality disorder" is defined as "congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses."

1061 (1st Cir.), *cert. denied*, 522 U.S. 819 (1997). The plaintiff does not allege that Commissioner Dennehy or Superintendent Murphy defendants directly deprived him of a constitutional right. That is, he does not claim that these defendants personally participated in any of the alleged harms. Accordingly, he has failed to state a claim against Commissioner Dennehy or Superintendent Murphy.

Nor can the plaintiff prevail against these defendants under a theory of respondeat superior. Supervisory liability under § 1983 cannot be predicated only on a theory of respondeat superior. *See Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989). Rather, a supervisor may be deemed liable "only on the basis of his own acts or omissions." *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 91-92 (1st Cir. 1994); *see Bowen v. City of Manchester*, 966 F.2d 13, 20 (1st Cir. 1992). Mere negligence by the supervisor is not enough to create liability. *See Maldonado-Denis*, 23 F.3d at 582; *Febus-Rodriguez*, 14 F.3d at 92; *Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.), *cert. denied*, 506 U.S. 837 (1992); *see also Monell v. Department of Social Servs.,* 436 U.S. 658, 692-94 & n. 58 (1978). Nor can liability be imposed for simple failure to exercise proper supervisory control. *Stoute v. Berman*, 555 F.Supp. 507, 511 (D.Mass. 1976). Commissioner Dennehy and Superintendent Murphy are entitled to summary judgment.

---

[23]     Even if a SDP could prove that he was not receiving adequate treatment or the conditions of his confinement were unlawful, his remedy would be revised conditions, not immediate release. *See Dutil, petitioner*, 437 Mass. 9, 22 (2002).

X.     **THE PLAINTIFF CANNOT RECOVER MONEY DAMAGES AGAINST COMMISSIONER DENNEHY OR SUPERINTENDENT MURPHY IN THEIR OFFICIAL CAPACITIES UNDER 42 U.S.C. ' 1983.**

To the extent that the plaintiff seeks to recover monetary damages under 42 U.S.C. § 1983 against Commissioner Dennehy and Superintendent Murphy in their official capacities, his claims are barred.

To state a claim for monetary damages under 42 U.S.C. § 1983, a plaintiff must allege that a "person" acting under color of law deprived him of a federal statutory or constitutional right. *See* 42 U.S.C. § 1983. State officials acting in their official capacities are not "persons" within the meaning of ' 1983 for purposes of monetary damages. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . As such, it is not different from a suit against the State itself"); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *O'Malley v. Sheriff of Worcester County,* 415 Mass. 132, 141 n. 13 (1993) (same). The plaintiff's claims for money damages against Commissioner Dennehy and Superintendent Murphy in their official capacities fail as a matter of law. This Court should, therefore, dismiss these claims.

XI.     **COMMISSIONER DENNEHY AND SUPERINTENDENT MURPHY ARE ENTITLED TO THE PROTECTION OF QUALIFIED IMMUNITY ON THE PLAINTIFF'S CONDITIONS OF CONFINEMENT CLAIMS**

As public officers in their roles as DOC employees, Commissioner Dennehy and Superintendent Murphy are entitled to qualified immunity from a suit for damages in their individual capacities on the plaintiff's claims about his conditions of confinement.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Subsequently, the Supreme Court refined the qualified immunity inquiry, writing:

> The contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted); *see Souza v. Pina*, 53 F.3d 423, 425 (1st Cir. 1995); *Horta v. Sullivan*, 4 F.3d 2, 13 (1st Cir. 1993).

The central purpose of affording government officials qualified immunity from suit is to protect them "'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994), *citing Harlow*, 457 U.S. at 806. Qualified immunity plays a critical role in striking the "balance...between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Davis v. Scherer*, 468 U.S. 183, 195 (1984). The Supreme Judicial Court has recognized that "[i]f State officials were held personally liable for damages every time regulations that they issued or enforced pursuant to statute were found to violate the Federal Constitution, only the most fearless among them would dare to fulfill their duties." *O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 144 (1993) (emphasis added).

Once a defendant raises a qualified immunity defense, the burden is on the plaintiff to show that the law was clearly established at the time of the alleged violation. *Dixon v. Richter*, 922 F.2d 1456, 1460 (10th Cir. 1991). If the plaintiff does not meet this initial burden, "the government official is properly spared the burden and expense of proceeding any further." *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511,

526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability;...it is effectively lost if a case is erroneously permitted to go to trial."); *see Harlow*, 457 U.S. at 818 (until the "threshold immunity question is resolved, discovery should not be allowed").  Thus, qualified immunity questions should be resolved at the earliest possible stage of the litigation. *Anderson*, 483 U.S. at 646 n. 6; *Harlow*, 457 U.S. at 817; *see Singer v. Maine*, 49 F.3d 837, 844 (1st Cir. 1995) (where a qualified immunity defense is asserted by pre-trial motion, usual summary judgment standard applies regarding existence of genuine issue of material fact and moving party's entitlement to judgment as a matter of law).

Qualified immunity is a powerful defense.  "[Q]ualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected from civil rights suits for money damages."  *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir.), *cert. denied*, 516 U.S. 1029 (1995) (citation omitted*); see Hunter v. Bryant*, 502 U.S. 224, 229 (1991); *Malley v. Briggs*, 475 U.S. 335, 343 (1986).  Qualified immunity protects law enforcement officers from "bad guesses and gray areas" and ensures that they are liable only "for transgressing the bright lines."  *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *quoting Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).

The First Circuit has established a two-part inquiry for qualified immunity analysis:

> First, the court must establish whether the constitutional right asserted by the plaintiff was 'clearly established' at the time of the alleged violation. . . .Second, the court must ask whether a 'reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.'

*St. Hilaire v. City of Laconia*, 71 F.3d 20, 24 (1st Cir. 1995), *cert. denied*, 518 U.S. 1017 (1996), *citing Hegarty*, 53 F.3d at 1371 & *Burns v. Loranger*, 907 F.2d 233, 235-36 (1990).  Qualified immunity, therefore, does not turn on the government official's state of mind.  Rather, it turns on the "objective legal reasonableness " of the official's action, in light of legal rules that were

"clearly established" at the time the action was taken. *Anderson*, 483 U.S. at 639; *see Wood v. Clemons*, 89 F.3d 922, 927 (1ˢᵗ Cir. 1996) ("The 'touchstone' of the qualified immunity question is the concept of 'objective legal reasonableness.'") (citation omitted).  The inquiry becomes whether the official acted as a reasonable official might in light of the information that the official possessed at the time of the challenged conduct.  *Wood*, 89 F.3d at 929-30.

As the Supreme Court has stated, a "necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).  As a predicate to the "objective reasonableness" inquiry, therefore, "a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights."  *Singer*, 49 F.3d at 844 (citation and internal quotation omitted); *see Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 531 (1ˢᵗ Cir. 1995), *cert. denied*, 516 U.S. 1159 (1996).

Whether an asserted federal right was clearly established at a particular time so that a public official who allegedly violated the right has qualified immunity is a question of law, not one of legal facts.  *Elder*, 510 U.S. at 516; *see Hegarty*, 53 F.3d at 1373.  Accordingly, appellate review of qualified immunity must be conducted in light of all relevant precedents, not simply those cited to or discovered by the parties or the trial court.  *Id.*

> For purposes of determining qualified immunity, the officer's actions are measured by a standard of "objective legal reasonableness...in light of the legal rules that were clearly established at the time [they] were taken," [footnote omitted].  <u>Anderson v. Creighton</u>, 483 U.S.. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed. 2d 523 (1987) (internal quotation omitted).

*St. Hilaire*, 71 F.3d at 24.  "It is not enough for the constitutional right to be 'clearly established' at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law."  *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998), *citing Berthiaume v. Caron*, 142 F.3d 12, 15

(1st Cir. 1998). "This qualified immunity standard leaves 'ample room for mistaken judgments.'" *Ringuette*, 146 F.3d at 5, *quoting Malley*, 475 U.S. at 343; *see Berthiaume*, 142 F.3d at15 (the question is whether in the circumstances that confronted the official, a reasonable official would have understood that what he is doing violated that right). Qualified immunity permits some leeway for mistakes, even negligent ones, without the consequence of legal liability. *Foster*, 844 F.Supp. at 24.

While "the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Wilson*, 141 F.3d at 114; *see Souza*, 53 F.3d at 425 (right must have been clearly established at time of the challenged conduct). Qualified immunity may exist even though, in hindsight, a court might determine that the action of the official violated the Constitution. *Berthiaume*, 142 F.3d at 15; *see Wood*, 53 F.3d at 1375-76 (inquiry must be made based on information available to the official at the time the challenged conduct occurred without indulging hindsight).

As the First Circuit has noted,

> [t]he Supreme Court, recognizing that the use of summary judgment in qualified immunity cases could be undermined, has held that a very broad articulation of the 'clearly' established law at the time of the alleged violation is inappropriate:
>
> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence, more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. <u>Anderson</u>, 483 U.S. at 640, 107 S.Ct. 3039.

*St. Hilaire*, 71 F.3d at 24; *see Singer*, 49 F.3d at 845 (inquiry is "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged") (citations and internal quotations omitted). If there is a "legitimate question" as to whether an official's conduct rises to a constitutional violation, the official is entitled to qualified immunity. *Singer*, 49 F.3d at 845.

With respect to double bunking, the practice of double bunking has been specifically approved by the federal court through the approval of the Amended Plan. See Ex. 6, p. 46. Further, the First Circuit Court of Appeals has recently rejected a constitutional challenge to double bunking brought by other SDP's. *See Cote v. Murphy*, 2005 U.S. App. Lexis 22912 (1st Cir. 2005).[24] The fact that the federal courts have upheld the practice – along with the cases cited above -- means that the plaintiff cannot demonstrate that it was clearly established that double bunking SDP's violates their constitutional rights. Indeed, these decisions show that just the opposite is true – the right to double bunk SDP's is clearly established.

Likewise, the fact that the federal court has approved the application of various DOC regulations to SDP's means that the plaintiff cannot establish that it was clearly established that the application of such regulations to DOC violates his constitutional rights. Again, the federal court's approval shows that just the opposite is true – the right to apply such regulations to SDP's is clearly established. The consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment." *See, e.g., King v. Greenblatt*, 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995). By approving the Amended Plan that specifically incorporated the application of certain regulations to SDP's, the federal court has already approved these procedures as the least restrictive conditions necessary to achieve the purposes of commitment. Indeed, after reviewing the Amended Plan, the Court stated that:

> Effective treatment is offered; physical conditions have improved greatly; there are differing levels of security; meaningful work, education, and avocational programs; and discipline, including sequestration, conforms to acceptable standards of due process; all under the least restrictive conditions necessary to achieve the purposes of commitment, namely, the care, treatment, rehabilitation, and custody of sexually dangerous persons.

*King*, 53 F.Supp.2d at 137.

---

[24]     That *Cote* is an unpublished decision does not change this result. The fact that the First Circuit Court of Appeals has found that the practice of double bunking SDP's at the Treatment Center is not *per se* unconstitutional

Thus, the plaintiff cannot show that the application of these regulations to SDP's violated any of his clearly established federal rights. Rather, just the opposite is the case. That is, DOC's ability to apply these regulations to SDP's has been established and approved by the federal courts through the consent decree litigation. The plaintiff's claim, therefore, fails as a matter of law.

For these reasons and the other reasons discussed above, none of the plaintiff's allegations establishes the violation of a clearly established right. Accordingly, Commissioner Dennehy and Superintendent Murphy are entitled to the protection of qualified immunity on the plaintiff's conditions of confinement claims.

## **CONCLUSION**

For the foregoing reasons, the DOC Defendants respectfully request that this Court dismiss the Complaint or, in the alternative, grant summary judgment in their favor.

> Defendants Massachusetts Department of
> Correction, Robert Murphy and Kathleen
> Dennehy,
>
> NANCY ANKERS WHITE
> Special Assistant Attorney General
>
> /s/ Mary P. Murray
> By:    Mary P. Murray, Counsel  (BBO # 555215)
> Department of Correction
> Massachusetts Treatment Center
> 30 Administration Road
> Bridgewater, Massachusetts 02324
> (508) 279-8184
> (508) 279-8181 (fax)
> MPMurray@DOC.state.ma.us

Dated:  December 16, 2005

---

means that the plaintiff cannot demonstrate that the unconstitutionality of the practice has been clearly established.

<u>Certificate of Service</u>

I hereby certify that I caused a copy of the within document to be served as follows: *Pro Se* Plaintiff William Hebert, by intra-facility mail, Massachusetts Treatment Center 30 Administration Road, Bridgewater, MA  02324;

<u>/s/ Mary P. Murray</u>
Mary P. Murray

Dated:  December 16, 2005

06/21/02  FRI 15:23 FAX 14137371611          HAMPDEN SUPERIOR COURT                    ☒002

## COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                                    **SUPERIOR COURT**
                                                **CIVIL-SDP**
                                                **CASE NO. 00-650**

## COMMONWEALTH OF MASSACHUSETTS

### vs.

### WILLIAM HEBERT

### FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT ON THE PETITION OF THE COMMONWEALTH OF MASSACHUSETTS FOR COMMITMENT OF THE RESPONDENT UNDER G.L. c. 123A

This matter came before the Court for trial of a petition by the Commonwealth of Massachusetts to commit the defendant, William Hebert ("Hebert"), as a sexually dangerous person pursuant to G.L. c. 123A, § 1.  The Commonwealth filed the petition on July 13, 2000.  A probable cause hearing was held on April 24, 2001.  On May 3, 2001, the Court (Page, J.) found probable cause and ordered Hebert to be committed to the Treatment Center at MCI-Bridgewater for a sixty-day examination period.  Hebert waived his right to a jury trial.  The matter was tried before me on October 16, 17, 18, 19 and 22, 2001.  Upon consideration of the credible evidence, including sixteen documentary exhibits and testimony from four trial witnesses, I make the following findings of fact and rulings of law.

### FINDINGS OF FACT

On March 15, 1991, in Hampden Superior Court, Hebert pled guilty and was sentenced to eight concurrent terms of  8 to 10 years for each of  three counts of rape of a child with force (G.L. c. 265, § 22A), for one count of assault with intent to rape a child under sixteen (G.L. c. 265, § 24B, and each of four counts of indecent assault and battery on a child under fourteen (G.L. c. 265, § 13B).  Each of these convictions qualifies as a conviction by reason of a "sexual

— Ex. 1                    —

offense" as that term is defined in G.L. c. 123A, § 1, and the Court collectively refers to them as "the governing offenses." Hebert served his sentence at several state prisons, and was scheduled to be released on July 31, 2000.

Each of the governing offenses involved Hebert's biological daughter, the victim, over the course of one to two years (1988-1990 or June 1989 to April 22, 1990)[1], while the victim was eight to ten years old. During the victim's weekend visits with her father, at several different locations where he was living during that period, Hebert forced her to masturbate him, forced her to perform oral sex on him, and on one occasion unsuccessfully attempted to insert his penis into her anus. Hebert threatened the victim that he would badly hurt her and kill her mother if she informed anyone about the abuse. The victim disclosed the abuse to her mother in April, 1990. Shortly after such disclosure, Hebert admitted himself to Franklin Medical Center in Greenfield complaining of suicidal ideation. He was diagnosed with adjustment disorder with disturbance of mood and chronic alcohol abuse. He was discharged and referred for sex offender treatment with a social worker, Roy Dudley.

Hebert was born in January 25, 1959, as one of six children in an intact family. There is some evidence that Hebert had been sexually abused as a child. A social worker who treated Hebert, Roy Dudley, reported without further information that Hebert had been sexually victimized by older boys. Between the ages of 14 and 16, Hebert regularly exposed himself to his sister's female friends.

---

[1] In her interview by police on April 30, 1990, the victim stated that Hebert did not molest her until after DSS spoke with her on June 9, 1989. The last assault occurred on or about April 22, 1990. In other interviews, the victim stated that the assaults occurred over the course of two years. In April of 1990, the defendant, however, told staff at Franklin Medical Center that he had abused the victim over the course of four years.

Hebert began drinking alcohol at age 14; by age 18, he was drinking heavily.

From age 17-20, Hebert lived with his first girlfriend, Debra Hebert. Their son was born in 1977, when Hebert was 18 years old. In 1978 or 1979, they were married for three months when Debra Hebert left him and sought a divorce. In 1979, the couple's daughter, the victim, was born. Hebert admitted to having slapped and punched Debra Hebert.

Hebert completed the 8th grade in Chicopee and received his GED in 1992 or 1993 while incarcerated for the governing offenses. Prior to his incarceration, he worked as a delivery driver for a glass company. A June, 1994 classification report contains a note that Hebert reported having suffered a stroke in April of 1993.

Prior to committing the governing offenses, Hebert had been convicted in 1978 of disorderly conduct and sentenced to three months of probation. He was also convicted in 1978 of breaking glass in a building and was sentenced to ten months of probation. In 1983, he was convicted of possessing cocaine and fined $100. In 1987, he was convicted of disorderly conduct, for which the court fined him $50, and convicted of operating a motor vehicle under the influence of alcohol, for which he was sentenced to a term of probation for one year.

During his incarceration for the governing offenses, Hebert completed three of the four phases of sex offender treatment offered by the Department of Correction ("the DOC"). The treatment program provides the offender an opportunity to understand the nature of his deviant behavior, to recognize the factors which lead to deviant arousal and risk of reoffending and to develop a plan to prevent reoffending. In April, 1996, however, Hebert refused to continue with the treatment. The fourth phase, in which he did not participate, focuses on relapse prevention. The DOC's comprehensive relapse prevention program provides sex offenders an opportunity to

3

acquire skills to suppress or control their deviant fantasies or urges.

While incarcerated, Hebert also participated at times in GED courses and Alcoholics Anonymous, and he maintained work assignments in the kitchen and library. Over the course of his incarceration, Hebert was transferred between six state prisons, often for fighting. He was denied parole in 1998 on the grounds that he was not then involved in a sex offender treatment program, and that he was at a risk to reoffend without such treatment.

While committed to the Treatment Center for evaluation following the probable cause hearing, Hebert was examined by two qualified examiners, William Hazelett, Ph.D ("Hazelett") and Carol G. Feldman ("Feldman").

Hazelett is a licensed pyschologist and designated forensic psychologist who has a doctoral degree in experimental psychology. To conduct his evaluation of Hebert and prepare a report for this Court, Hazelett interviewed him for two hours, reviewed his prison and parole board records, and considered aspects of Hebert's history which are known to be risk factors. Hazelett did not administer any psychological tests for recidivism, such as Static 99, or the Minnesota Sex Offender Screening Tool ("MSOST").

Hazelett reported that Hebert's speech and thinking during the interview were "generally reality-oriented," but that from time to time he exhibited vague and tangential thinking, which is a trait of schizophrenia, and that Hebert reported he had been hearing voices. Although Hebert had been prescribed Resperidol for these symptoms, but was taken off of it because he no longer wanted to take it.

Hebert told Hazelett that in order to prevent a relapse in sex offending, he has talked with a priest and decided to abstain from any form of sexual stimulation. Hebert did not otherwise

4

indicate to Hazelett what he would do to stop any urges to reoffend.

Hazelett testified that Hebert meets the definition in G.L. c. 123A of suffering from a mental abnormality, pedophilia. Furthermore, in Hazelett's opinion, Hebert would be likely to reoffend due to the presence of five risk factors: (1) his deviant sexual preferences, (2) his failure to complete sex offender treatment, (3) his history of anti-social behavior, (4) his history of alcohol abuse, and (5) his current mental state consisting of disorganized thinking, not being treated by medication prescribed by doctors.

In Hazelett's opinion, while a relapse prevention program is not a prerequisite to recidivism, Hebert's failure to complete such a program, when combined with his other risk factors, supports the conclusion that Hebert is likely to reoffend. I credit Hazelett's opinion that there is no evidence that Hebert can control his deviant sexual inclinations, and that it is generally acknowledged in Hazelett's field that such inclinations do not disappear on their own.

Hazelett testified that the phrase "likely to reoffend," as he employs it in his evaluation, means that there is a chance of anywhere between 1% and 100% that Hebert will reoffend. The Court rejects this interpretation, because it gives no meaningful guidance on the issue upon which Hazelett has been ordered to perform an evaluation. Rather, it is reasonable to infer that the Legislature intended "likely to reoffend" to mean a chance of greater than 50% that the person reoffend. Moreover, the fact that Hazelett has failed to support his conclusion that Hebert is likely to reoffend does not bar this Court, as the fact-finder, from making such a finding based upon its own assessment of the relevant risk factors identified by Hazelett.

The second qualified examiner testifying for the Commonwealth was Carol G. Feldman ("Feldman"), who has been a licensed clinical psychologist since 1979, a designated forensic

5

psychologist since 1989, and a qualified examiner since 2000. Feldman holds masters and a doctoral degree in psychology as well as a juris doctor degree. On approximately 12 on 15 occasions, Feldman has been asked to give her opinion as to whether probable cause existed in order to file a petition for sexual dangerousness under c. 123A. Feldman has also been asked to perform approximately 20 qualified court ordered examinations as a qualified examiner following a determination of probable cause.

Feldman performed an evaluation and diagnosis of Hebert as to whether he was a sexually dangerous person pursuant to G.L. c. 123A. Feldman did not utilize the actuarial methods of Static-99 or MSOST, which she opines, very few professionals currently utilize. Rather, she relied upon what she describes as an adjusted or guided clinical method[2] which considers the relevant risk factors for reoffense.[3] I find that experienced forensic clinicians use the guided clinical method, and that it is currently generally accepted in Feldman's and Hazelett's professional community.

Feldman interviewed Hebert while he was not taking any psychiatric medication, *such as Resperidol*. He reported to her during the interview that he had no current auditory hallucinations. His speech was disorganized and repetitive and often nonsensical.

In addition to interviewing Hebert, Feldman reviewed prison classification reports, grand

---

[2] According to Hazelett, in the guided clinical method or adjusted clinical method, a clinician bases its assessment of reoffending upon an interview of the subject, a review of the subject's history, and consideration of the empirical risk factors for reoffending.

[3] This approach is consistent with the conclusions of a leading researcher in the same field, R. Karl Hanson, who has opined that research on actuarial measures for sexual offense recidivism "has yet to demonstrate a clear superiority to the best clinical assessment methods." R. Karl Hanson (1998), What do We Know About Sex Offender Risk Assessment? *Psychology, Public Policy, and Law*, Vol. 4, No. 1 -2, p. 53. (Marked for identification as Exhibit B).

jury minutes, Chicopee Police Department records, records from Franklin Medical Center, parole records, and a note from Roy Dudley, all relating to Hebert.

Feldman's definition of sexually dangerous person and mental abnormality were not inconsistent with those terms as defined in c. 123A.[4]

Feldman determined that Hebert presently suffers from a mental abnormality, pedophilia. She based this opinion on the presence of the following risk factors: Hebert's history of sex offending, his failure to complete sex offender treatment, his use of alcohol as a disinhibitor, the chronicity of his sex offending (whether the offenses occurred over a period of four or two years), and the fact that he offended against a young child. Feldman explained that, within the field of forensic psychology, pedophilia is sexual behavior or fantasies over a period of at least six months involving a child 13 years old or younger, where the perpetrator is at least 16 years old and the behavior has caused distress in social functioning. I credit Feldman's diagnosis of Hebert as a pedophile.

Feldman noted that Hebert's failure to develop a comprehensive relapse prevention plan. She asked Hebert about some aspects of what is known as a "deviant cycle," which includes the following five issues: disinhibitors, high risk situations or triggers, deviant arousal, interventions and a comprehensive relapse prevention plan. When Feldman asked Hebert about how he could identify the triggers which are a part of his deviant cycle, Hebert responded, "I haven't been watching TV. When I pick up a newspaper, I look at the advertisement of female undergarments.

---

[4] Feldman defined a sexually dangerous person as "any person who's been convicted of a sex offense and who either has mental abnormality or personality disorder that would make it likely that he would reoffend." She described mental abnormality as "an acquired or congenital condition that affects the emotional volitional capacity of a person in such a manner that it predisposes that person to commit a sex offense."

7

It catches my attention, women and their brassieres. For children, there is a total acknowledgement that ain't going to happen to me. I acknowledge what the offense was that got me into prison." Hebert told Feldman that he stopped sex offender treatment in 1996 "[b]ecause of the light in which I was traveling though the system. At that time I couldn't understand the objective of it."

Hebert's thought disorder, in Feldman's opinion, rendered Hebert less able to control his deviant impulses.

Based upon her evaluation, Feldman concluded that Hebert is a sexually dangerous person as that is defined by G.L. c. 123A, § 1, and that, based upon the chronicity of his sex offending, the fact that he sexually abused a young child, and that he interrupted treatment, that he is likely to reoffend if not confined to a secure facility. Feldman explained that, in her opinion, there is a chance of nearly 100% that Hebert would reoffend if not confined to a secure facility. She further opined that Hebert's failure to complete treatment, particularly the fourth phase in which he had an opportunity to understand his deviant cycle, indicates that he remains a pedophile, because, as she testified, the deviant arousal does not evaporate without treatment, and participation in the comprehensive relapse prevention program is a prerequisite to nonrecidivism. I find that Feldman's evaluation of Hebert and her conclusion that he is likely to reoffend are well supported.

Another witness for the Commonwealth, Dr. Katrin Rouse ("Rouse"), testified as to her evaluation of Hebert. Rouse holds a doctoral degree in psychology and is a forensic psychologist and qualified examiner. Like Hazelett and Feldman, Rouse employed a guided clinical method, although she did not interview Hebert, but rather based her conclusions upon a review of his

records.  Rouse concurred with Feldman that actuarial methods of predicting sexual offender recidivism are too new to have been proven reliable or valid.

Rouse diagnosed Hebert with a personality disorder, which is defined in c. 123A, §1, as "A congenital or acquired or mental condition that results in a general lack of ability to control one's sexual impulses."  Specifically, Rouse opined that, within a reasonable degree of professional certainty, Hebert meets the statutory criteria for sexual dangerousness, based upon: (1) Hebert's conviction of a sex offense, (2) Rouse's provisional diagnosis[5] of Hebert with an antisocial personality disorder as that condition is defined in DSM-IV,[6] (3) Rouse's conclusion that Hebert meets the criteria in DSM-IV for pedophilia,[7] which qualifies as a mental abnormality under c. 123A, and (4) Rouse's opinion that Hebert is likely (which she construes to mean "more likely than not") to commit a sexual offense if he is not confined to a secure facility, due to his failure to complete sex offender treatment.

At the request of Hebert, Daniel Kriegman, Ph.D, a licensed psychologist, conducted a psychological evaluation of Hebert which was based upon an interview of Hebert and a review of his records.  To assess Hebert's risk of reoffending, Kriegman utilized an adjusted actuarial or

---

[5] Rouse explained that because she was not permitted to interview Hebert, her diagnosis was provisional, which is when a clinician concludes that a preponderance of evidence suggests a person would meet the criteria for that diagnosis.

[6] DSM-IV stands for Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, by the American Psychiatric Association.

[7] The diagnostic criteria for pedophilia include:  A. Over a period of six months, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger).  B. The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.  C. The person is at least 16 years and at least 5 years older than the child or children in Criterion A. DSM-IV-TR, p. 572.

9

statistical approach, and criticized the pure clinical approach, which he ambiguously and unpersuasively claims the Commonwealth's qualified experts in this case employed.[8]

Kriegman concluded that Hebert's governing offenses were opportunistic rather than chronic. I do not credit Kriegman's conclusion that the governing offenses were opportunistic, as they occurred over the course of at least one year. Kriegman further opined that Hebert committed them while under the influence of alcohol, and that they were not the product of some compulsion or strong pedophilic desires. Although Kriegman appeared to concede that Hebert would have qualified as a pedophile at the time he abused his daughter, Kriegman opines that he is not currently a pedophile and not likely to reoffend. Kriegman has fallen far short of demonstrating that the statistical or actuarial assessment model on which be bases this conclusion is currently viewed in the forensic psychology community as a more accurate tool for measuring sexual offense recidivism than the guided clinical methodology employed by the two qualified examiners in this case. Consequently, I do not credit Kriegman's ultimate conclusions in this matter.

## RULINGS OF LAW AND ULTIMATE FINDINGS OF FACT

General Laws c. 123A, § 1, defines a sexually dangerous person as

"any person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility...."

The Commonwealth bears the burden of proving beyond a reasonable doubt that Hebert is a

---

[8] For example, Kriegman states in his report, "In guided clinical assessment–in contrast to the pure clinical method that is used by the Commonwealth's experts (sometimes alone *and sometimes mixed with the guided clinical approach*)...."

sexually dangerous person.  Accordingly, it must establish, beyond a reasonable doubt, that (1) Hebert was convicted of a sexual offense as that term is defined in G.L. c. 123A, §1, (2) Hebert currently suffers from a mental abnormality or a personality disorder as those terms are defined by G.L. c. 123A, § 1, and (3) as a result of his current mental abnormality or personality disorder, Hebert is likely to commit additional sexual offenses if not confined to a secure facility.

I find and rule that the Commonwealth has met its burden as to each of these elements. Hebert's governing offenses constitute sexual offenses within the meaning of G.L. c. 123A, § 1. The Commonwealth has also established that Hebert currently suffers from a mental abnormality, pedophilia.  Section 1 of chapter 123A defines "mental abnormality" as a

> "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons."

Hebert's sexual molestation of his young daughter, whether such abuse occurred over the course of one, two, or four years, establishes that, at least at the time of the offenses, Hebert was a pedophile.  Although the criteria for pedophilia do not require the person to have acted on his sexual urges or that he be predisposed to commit sexual acts and thus present a menace to others' health and safety, as does the definition of "mental abnormality" in Section 1 of c. 123A, I find and rule that Hebert's current condition meets both standards, because he did act on his deviant sexual urges and his failure to complete sex offender treatment renders him an untreated pedophile.

I find that his untreated pedophilia predisposes him to the commission of criminal sexual acts to a degree that makes him a menace to the health and safety of other persons.

11

Furthermore, I find and rule that Hebert's failure to complete the fourth phase of sex offender treatment particularly renders him, in combination with the existence of other risk factors identified by the qualified examiners, more likely than not to reoffend if he is not confined to a secure facility. Hebert's responses to an examiner's questions regarding relapse prevention confirm that he has developed no skills to identify what triggers his deviant urges or what effective and realistic measures he can take to avoid acting on such inclinations. His untreated thought disorder leaves him more vulnerable to resist deviant urges. Moreover, the chronicity of Hebert's molestation of his young daughter and his history of alcohol abuse further bolster the conclusion that it is more likely than not that Hebert will reoffend if released. Accordingly, the Commonwealth has proven beyond a reasonable doubt that Hebert is presently a sexually dangerous person and that he is likely to reoffend if not confined to a secure facility.

### ORDER

For the foregoing reasons, it is hereby **ORDERED** that the Commonwealth's Petition be **ALLOWED**.

Peter A. Velis
Justice of the Superior Court

**Dated:** June 21, 2002

12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se,*
　　　　　Plaintiff,

v.

ROBERT MURPHY, *et al.,*
　　　　　Defendants.

### AFFIDAVIT OF MARTIN BAUERMEISTER, M.D.

1.　　I am a psychiatrist licensed to practice in the Commonwealth of Massachusetts.  Since
approximately 1991, I have been employed by various vendors that have contracted with
the Department of Correction ("DOC") to provide psychiatric services to DOC
inmates/residents. I am currently employed by UMASS Correctional Health Care
Program ("UMASS"), the company that presently contracts with DOC for the provision
of medical and mental health services to DOC inmates/residents.

2.　　Beginning in September, 2000, I have treated and followed William Hebert, a resident of
the Massachusetts Treatment Center ("Treatment Center").

3.　　Mr. Hebert suffers from schizophrenia.  Schizophrenia is a mental illness. Schizophrenia
is not known to be caused by a stroke.

4.　　On September 5, 2000, I evaluated Mr. Hebert and renewed his prescriptions for
Risperidone, an anti-psychotic medication, Zoloft, an anti-depressant medication, and
Benadryl, a medication used to treat sleep difficulties.  Mr. Hebert had previously been
prescribed these medications while at the North Central Correctional Institution at
Gardner ("NCCI").  I also gave Mr. Hebert copies of information about these medications
from the Department of Mental Health and/or the Physician's Desk Reference.

5.　　On September 12, 2000, I again met with Mr. Hebert who informed me that he wished to
discontinue his medications because he was concerned about possible side effects of the
medications given his history of a stroke.  He also stated that he thought that his
symptoms had been misinterpreted.  He asked to be monitored closely for the
development of possible symptoms.  After reviewing the reporting symptoms and his past
diagnosis with Mr. Hebert, I discontinued his medications.  In my opinion, he was, at that
time, competent to make this decision and not actively psychotic. At that time, Mr.
Hebert had no complaints and did not present as a risk to himself or others.

$Ex. 2$

6.  After discontinuing his medication, Mr. Hebert exhibited symptoms of schizophrenia. At times, he has been referred for evaluation by mental health staff for threatening behavior to others or for self injurious behavior. He has been placed on a mental health watch on occcasion. On occasion, I have evaluated Mr. Hebert as a result of referrals by mental health staff. While Mr. Hebert has sometimes decompensated, he did not reach the level where it would be appropriate to seek his transfer to Bridgewater State Hospital or to seek a forced medication order. On occasion, Mr. Hebert failed to appear for scheduled appointments with me.

7.  In April, 2004, I again evaluated Mr. Hebert after he reportedly placed put a razor to another resident's throat and threatened to cut it. In May, 2004, mental health staff referred Mr. Hebert to me for evaluation for psychotic and threatening behavior and to assess whether medication and possible transfer to Bridgewater State Hospital were appropriate. Mr. Hebert, however, agreed to resume his anti-pscyhotic medication, Risperidone. Thus, I determined that it was not necessary to seek his transfer to Bridgewater State Hospital or to seek a forced medication order at that time.

8.  Since Mr. Hebert has resumed his medication, I have evaluated him regularly. When Mr. Hebert complained of possible side effects from Risperidone, I adjusted his dosage. On another occasion, I discussed with him the possibility of taking Cogentin, a medication that reduces the side effects of anti-psychotic medications. Mr. Hebert agreed to take this medication and I have continued to prescribe it for him. When Mr. Hebert reported feeling sluggish during the day, I changed his medication time to the evening to address this issue. In August, 2005, Mr. Hebert reported difficulties with his memory, which could be a side effect of his medication. After discussion, Mr. Hebert and I agreed that he would continue with the Risperidone which Mr. Hebert thought had done him good. In October, 2005, I evaluated Mr. Hebert after he reported an increase in auditory hallucinations and decreased sleep over the prior few weeks. I discussed the possibility of increasing the dosage of Risperidone; however, Mr. Hebert expressed concerns about possible side effects and decided to remain on his current dosage. As recently as November 17, 2005, Mr. Hebert reported no complaints and told me that he was doing well.

9.  Mr. Hebert has not complained to me about the mental health treatment that he has received while at the Treatment Center. Further, Mr. Hebert has not requested of me any accommodation for his schizophrenia or any other mental condition.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14TH DAY OF DECEMBER, 2005.

Martin Bauermeister, M.D.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se,*
      Plaintiff,

v.

ROBERT MURPHY, *et al.,*
      Defendants.

AFFIDAVIT OF PAUL GARRIDO, L.M.H.C.

I, Paul Garrido, being duly sworn, do hereby depose and state as follows:

1.     I am a licensed mental health clinician (L.M.H.C.) in the Commonwealth of Massachusetts. I have a bachelors degree in psychology and a master's degree in rehabilitation counseling. From approximately 1976 to 1987, I worked for the Department of Mental Retardation as a clinician. From 1987 to 1992, I was an employee of the Department of Correction ("DOC"), working as a mental health clinician in various DOC facilities. In 1992, DOC contracted with an outside vendor for the provision of mental health treatment services. Since 1992, I have worked for the various vendors that have contracted with DOC for the provision of mental health services. I am currently employed by UMASS Correctional Health Care Program, the company that presently contracts with DOC for the provision of medical and mental health services to DOC inmates/residents at the Massachusetts Treatment Center ("Treatment Center"). I have worked as a mental health clinician at the Treatment Center since approximately January, 2001.

2.     Since approximately January, 2002, I have been the primary care clinician ("PCC") assigned to work with William Hebert who is civilly committed to the Treatment Center. As Mr. Hebert's PCC, I prepare mental health treatment plans which are regularly reviewed and updated. Since January, 2002, I have had regularly scheduled individual therapy sessions with Mr. Hebert. On occasion, Mr. Hebert has not attended the scheduled session. When that has happened, I have usually sought out Mr. Hebert on his housing unit or elsewhere in the Treatment Center to check on him to insure that he was psychiatrically stable and not in crisis.

3.     Typically, I have had individual sessions scheduled with Mr. Hebert on a monthly basis, which I have determined to be clinically appropriate given Mr. Hebert's schizophrenia and functioning within the Treatment Center. When Mr. Hebert's condition has required, I (and other mental health clinicians) have evaluated Mr. Hebert more frequently. I have

—     *Ex. 3*     —

evaluated Mr. Hebert on occasion when he has been placed on a mental health watch due to decompensation in his behavior.

4.    I have informed Mr. Hebert that he is not limited to monthly individual therapy appointments.  I have also informed Mr. Hebert that, should he wish to speak with me at any time other than a regularly scheduled appointment, he may request to do so by submitting a sick slip form requesting an appointment.

5.    I am aware that Mr. Hebert declined psychotropic medications for the period of approximately September, 2000, until approximately May, 2004.  Mr. Hebert has sometimes suffered from hallucinations and other symptoms of schizophrenia such as delusional, circumstantial and tangential thought processes and religiosity.  He has sometimes had conflicts with staff and other residents.  In my opinion, since Mr. Hebert resumed psychotropic medications in 2004, he has presented with less circumstantial and less tangential thought processes.   Mr. Hebert has, however, sometimes continued to report auditory hallucinations.

6.    Beginning in approximately May, 2005, Mr. Hebert has sometimes indicated that he was having problems with his memory.  In approximately August, 2005, he also indicated that he has had problems sleeping and feeling lethargic.  I referred Mr. Hebert for evaluation by psychiatrist, Martin Bauermeister, M.D., to determine if these issues could be potential side effects of Mr. Hebert's medication.  I have also discussed strategies with Mr. Hebert to address his reported difficulties with his memory.

7.    During the time that I have treated Mr. Hebert, Mr. Hebert has not complained to me about his mental health care.  Further, Mr. Hebert has not requested of me any accommodation related to his reported memory difficulties or any other difficulties to assist him in participating in any treatment program or service.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14th DAY OF DECEMBER, 2005.

_Paul Garrido_

Paul Garrido, L.M.H.C.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se*,
      Plaintiff,

v.

ROBERT MURPHY, *et al.*,
      Defendants.

AFFIDAVIT OF MARYANNE PERCUOCO

1.     I am a registered nurse and am licensed as a nurse in the Commonwealth of Massachusetts. Since approximately 2001, I have been employed at the Massachusetts Treatment Center ("Treatment Center"), in the position of Health Services Administrator. I have worked in managerial capacities in Department of Correction ("DOC") facilities since August, 1996. Prior to January, 2003, I was employed by prior vendors that contracted with DOC to provide medical and mental health services to DOC inmates/residents. On January 1, 2003, I began employment with UMASS Correctional Health Care Program ("UMASS"), the company that presently contracts with DOC for the provision of medical and mental health services to DOC inmates/residents.

2.     As part of my responsibilities as the Health Services Administrator, I supervise the maintenance of medical and mental health records for all inmates/residents housed at the Treatment Center. Sex offender treatment providers employed by Forensic Health Services, Inc. ("FHS"), cannot obtain information about or records relating to an inmate's or resident's medical or mental health unless the inmate or resident signs a release of information.

3.     I also review any Request for Reasonable Accommodation of Special Need(s) submitted by an inmate or resident pursuant to 103 DOC 207, <u>Special Accommodations for Inmates</u>. William Hebert has not submitted a request for any accommodation relating to his alleged memory difficulty or any other alleged mental condition or impairment.

4.     Mr. Hebert has received medical orders for physical limitations related to his stroke. Since shortly after his transfer to the Treatment Center in 2000, Mr. Hebert has been placed on light work status due to his history of stroke and left sided weakness. Beginning in February, 2005, Mr. Hebert has received additional medical orders for an ace bandage wrap and a left ankle brace due to a left ankle tear. He has also received a medical order to allow him to proceed to the dining hall ahead of the regularly scheduled time to reduce the amount of time he waits in line.

           —    Ex. 4        —

5.    Inmates and residents of the Treatment Center have the opportunity to submit grievances related to their mental and medical health care to UMASS. Mr. Hebert has not submitted a grievance related to his mental health care to UMASS. He also did not submit a grievance relating to his mental health care to the prior vendor, Correctional Medical Services since June, 2002.

6.    Inmates and residents of the Treatment Center have the opportunity to voice concerns or complaints about their medical or mental health care during administrative access hours which are typically held twice a week. During the administrative access hour, one or more representative of UMASS are usually present, along with other Treatment Center staff. This practice also existed under the prior vendor, Correctional Medical Services.

7.    Inmates and residents also may submit sick call slips to request medical or mental health care. They may also make such request of the nursing staff in the Health Services Unit.

8.    Mr. Hebert has not complained to me about the mental health treatment that he has received while at the Treatment Center.

9.    On November 18, 2005, Mr. Hebert participated in a neuropsychological assessment. The results of this assessment are expected to be received soon at which time the physician will review the results to determine what further treatment, if any, is appropriate.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14TH DAY OF DECEMBER, 2005.

Maryanne Percuoco

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT,
           Plaintiff,

v.

ROBERT MURPHY, *et al.*,
           Defendants.

### AFFIDAVIT OF JOSEPH MURPHY

I, Joseph Murphy, being duly sworn, do hereby depose and state as follows:

1. Since 1986, I have been employed by the Massachusetts Department of Correction ("DOC"). I currently hold the position of Deputy Superintendent of Treatment at the Massachusetts Treatment Center ("Treatment Center"). I have held this position since January, 2005.

2. In my capacity as Deputy Superintendent of Treatment, I serve as the Treatment Center's Institution ADA Coordinator for the purpose of coordinating and monitoring activities and procedures related to special accommodations and access to programs for inmates with disabilities at the Treatment Center. DOC has developed a written policy for such accommodations, 103 DOC 207, Special Accommodations for Inmates, a true and accurate copy of which is attached hereto.

3. Pursuant to 103 DOC 207.04, Requests for Reasonable Accommodations, an inmate or resident may submit a request for reasonable accommodation by either (1) submitting a request to medical staff for a medically prescribed accommodation, or (2) by completing a Request for Reasonable Accommodation of Special Need(s) form, Attachment A to 103 DOC 207, Special Accommodations for Inmates. The inmate or resident then submits the request to either medical staff or to me. See 103 DOC 207.04(1), (3).

4. William Hebert has not submitted a Request for Reasonable Accommodation of Special Need(s) form relating to his mental illness or other mental impairment to me. Further, I have reviewed records to determine if he has submitted such a form from June, 2002, to the present. I could not locate any such form from Mr. Hebert.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13TH DAY OF DECEMBER, 2005.

Joseph Murphy

Ex. 5

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
103 DOC 207

SPECIAL ACCOMMODATIONS FOR INMATES

TABLE OF CONTENTS

207.01   DEPARTMENT POLICY ..................................2

207.02   ARCHITECTURAL BARRIERS.............................2

207.03   AMERICANS WITH DISABILITIES ACT (ADA) COORDINATORS..4

207.04   REQUESTS FOR REASONABLE ACCOMMODATION..............4

207.05   INSTITUTIONAL PROCEDURES...........................5

207.06   INTER-INSTITUTIONAL TRANSFERS......................6

ATTACHMENT A   REQUEST FOR REASONABLE ACCOMMODATION OF SPECIAL
               NEED(S).........................................8

ATTACHMENT B   MEDICAL RESTRICTIONS FORM.......................9

ATTACHMENT C   ACCOMMODATION APPROVAL MEMORANDUM.............10

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION OF HEALTH SERVICES |
|---|---|
| SPECIAL ACCOMODATIONS FOR INMATES | 103 DOC 207 |

PURPOSE:          This policy is intended to address inmate requests
                  for special accommodations which may fall under the
                  Americans with Disabilities Act or other provisions
                  of state and federal law.

REFERENCES:       M.G.L. c. 124, §1 (c) and (q)
                  M.G.L. c. 22, §13A
                  42 U.S.C.A. §12132

APPLICABILITY: Inmates                          PUBLIC ACCESS: Yes

MAINTENANCE OF POLICY:    DOC Central Policy File
                          Superintendent's Office
                          Inmate Law Libraries
                          Audiotape and Braille Copy of Policy For
                          Visually Impaired Inmates in Inmate Law
                          Libraries

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY**
    - Director of Health Services
    - Director of Resource Management
    - Superintendents
    - Deputy Superintendents

**PROMULGATION DATE:** 03/14/2005      **EFFECTIVE DATE:** 04/14/2005

**CANCELLATION:**  This policy cancels all previous Department policy
                   statements, bulletins, directives, orders, notices,
                   rules, or regulations which are inconsistent with
                   this policy.

**SEVERABILITY CLAUSE:**       If any part of this policy is, for any
                               reason, held to be in excess of the
                               authority of the Commissioner, such
                               decision will not affect any other part
                               of this policy.

## 207.01     DEPARTMENT POLICY

1.  It is the policy of the Department to ensure that existing programs in established institutions and facilities under the direction of the Commissioner of Correction, are readily accessible and usable by inmates with special needs unless such accommodation would materially impair the safe and efficient operation of the program, present a safety hazard to the individual inmate or staff, threaten the security of the correctional institution/facility, or would otherwise cause undue hardship in the operation of the institution/facility.

2.  Programs, activities and services will operate in a manner which provides for the full and nondiscriminatory participation of an inmate with special needs in all areas which do not threaten the security of the institutions or the personal safety of the inmate with special needs.

3.  Inmate with hearing and/or speech disabilities, and inmates who wish to communicate with parties who have such disabilities, shall be afforded access to a Telecommunications Device for the Dear (TDD) or comparable equipment. Telephone with volume control shall also be made available to inmates with hearing impairments.

4.  Any inmate claiming a special need due to a physical or mental state, that amounts to a limitation or impairment in everyday activities, whether claimed as a disability under the Americans with Disabilities Act or not, should be considered for a reasonable accommodation for the limitation or impairment.

    Upon receipt of an inmate's Request For Reasonable Accommodation, the Superintendent will review the inmate's request within a reasonable time and either grant, modify or deny the request, stating the basis for his/her decision. Factors to be considered include safety, security, available alternatives and/or costs associated with the request. An inmate submitting a Request For Reasonable Accommodation Of Special Need(s) must expressly agree to cooperate with the institution in the handling of his/her request, which includes but is not limited to, agreeing to be interviewed and/or examined by appropriate institutional or medical staff in an effort to resolve the request. An inmate's refusal to expressly agree to such cooperation may result in the outright denial of his/her Request For Reasonable Accommodation.

## 207.02     ARCHITECTURAL BARRIERS

March 2005                                          207 - 2

1.   It is the policy of the Department, pursuant to M.G.L. Chapter 22, Section 13A, to ensure that new institutions/facilities are constructed in a manner to be accessible and usable by handicapped inmates.

2.   All plans for a new correctional institution/facility construction and plans for renovation of existing correctional institutions/facilities shall comply with the Massachusetts Building Codes and Architectural Barriers Board regulations as required, and to the extent that such compliance is consistent with essential security requirements.   The Director of Resource Management shall be responsible for monitoring compliance with this provision.

3.   The Department will pursue an objective of providing a barrier-free environment in all correctional institutions/facilities.  Each Superintendent is required to conduct a self-evaluation of his/her facility and its programs.  Each Superintendent shall develop a plan that will include but not be limited to:

     a.   The provision of shower, bath, and lavatory rails in those areas occupied and used by physically handicapped inmates, as described in M.G.L. Chapter 22, Section 13A.

     b.   The use of Department Classification procedures to explore options, such as transfer to a more suitable institution or a unit within an institution, which may be better equipped to deal with the needs of a particular handicap.  The Director of Health Services shall be responsible for ensuring that classification staff are familiar with this policy and the concerns presented by inmates with special needs.

     c.   Housing assignments of inmates to areas which will not place undue stress upon them because of their handicap (e.g., persons with serious heart problems, artificial legs, etc. should normally be housed on a lower tier or lower floor level whenever practicable and a medical order so requires).

     d.   The provision of ramps, elevators, or chair lifts, wherever practicable, to those authorized areas which would otherwise be inaccessible to handicapped inmates. Such authorized areas may include, but are not limited to:

          i.   Classrooms
          ii.  Visiting Rooms

March 2005                                              207 - 3

      iii. Health Services Unit
      iv.  Dining Room
      v.   Recreation Areas
      vi.  Work Areas
      vii. Chapels

## 207.03    AMERICANS WITH DISABILITIES ACT (ADA) COORDINATORS

1.  The Director of Health Services is designated as the Department ADA Coordinator for the purpose of coordinating and monitoring activities and procedures related to special accommodations and access to programs for inmates with disabilities on a department-wide basis.

2.  The Deputy Superintendent of Treatment or, in facilities with one Deputy, the Deputy Superintendent, is designated as the Institution ADA Coordinator for the purpose of coordinating and monitoring activities and procedures related to special accommodations and access to programs for inmates with disabilities at each correctional facility to include, but not be limited to the following:

    a.   ensuring the assignment of appropriately trained individuals to assist disabled offenders who cannot otherwise perform basic life functions; and

    b.   ensuring that education, equipment and facilities, and the support necessary for inmates with disabilities to perform self-care and personal hygiene in a reasonable private environment is provided.

## 207.04    REQUESTS FOR REASONABLE ACCOMMODATIONS

1.  An inmate's request for reasonable accommodation may be initiated in either of two ways:  (a) by a request to or from medical staff for a medically prescribed accommodation, or (b) by completion of a Request for Reasonable Accommodation of Special Need(s) form (Attachment A).

2.  If medical staff determines that a medically prescribed accommodation is warranted, he/she shall convey the medical order to the Institution ADA Coordinator via the Medical Restrictions Form (Attachment B) as per policy 103 DOC 630 and shall enter the order in the "Restrictions/Limitations/Special Needs" section of the "Medical Restrictions" screen of the Medical Module of the IMS.

    Under no circumstances shall correctional staff substitute their judgment for that of medical staff where a medical accommodation has been prescribed.  Medically prescribed accommodations may be reviewed only to address institutional

safety and security concerns.  Should a medically prescribed accommodation require a modification under these circumstances, the Institution ADA Coordinator shall notify medical staff of the safety/security concerns so that medical staff can appropriately modify the prescribed accommodation.

3.  When a request for reasonable accommodation is initiated by the inmate's completion of the Request for Reasonable Accommodation of Special Need(s) form, the form should be submitted directly to the Institution ADA Coordinator. The Institution ADA Coordinator shall evaluate the requested accommodation to determine whether it would present any safety or security concerns, whether it would fundamentally alter the nature of the service, program or activity, whether it would create an undue financial burden, and, if necessary, whether there are feasible alternative ways of accommodating the special need.  In making these determinations, the Institution ADA Coordinator shall consult with the appropriate correctional, medical and/or mental health staff.

4.  An inmate requesting a reasonable accommodation of special need(s), whether through medical staff or directly to the Institution ADA Coordinator, must expressly agree in writing to cooperate with the institution in the handling of his/her request. Cooperation shall include, but is not limited to, agreeing to be interviewed and/or examined by appropriate institutional or medical staff in an effort to resolve the request.  An inmate's refusal to agree to such cooperation may result in the outright denial of his/her Request for Reasonable Accommodation. Moreover, an inmate who refuses to cooperate in the handling of a request for accommodation through medical staff shall sign a medical treatment refusal form.

5.  Upon approval of a reasonable accommodation, regardless of how the request was initiated, the Institution ADA Coordinator will prepare and send an Accommodation Approval Memorandum (Attachment C) to the concerned inmate and distribute copies as indicated on the form and to whomever else the Institution ADA Coordinator deems necessary in order to properly implement the accommodation. Additionally, upon receipt of the Memorandum, the Health Services Administrator shall enter a brief but informative description of the accommodation(s) in the "Restrictions/Limitations/Special Needs" section of the "Medical Restrictions" screen of the Medical module of the IMS.

**207.05    INSTITUTIONAL PROCEDURES**

The Superintendent of each facility shall be responsible for

developing and implementing institutional procedures pursuant to this policy. Such procedures shall include at a minimum:

a. a description of the process used to identify new admissions with existing approved accommodations and to implement/modify those accommodations promptly;

b. a description of the process used to communicate across shifts approved accommodations to staff who may have responsibility for implementation; and

c. a designation of the locations where inmates may obtain the Request for Reasonable Accommodation form (Attachment A).

## 207.06     INTER-INSTITUTIONAL TRANSFERS

1. The Superintendent of each facility shall develop written procedures to ensure that the written and automated records of all admissions to the facility are reviewed for approved accommodations as part of the admissions process. Additionally, the facility's admission procedures shall include a mechanism by which the Institution ADA Coordinator, or shift commander during non-business hours, is notified of the arrival of inmates with approved accommodations or reviews the applicable screen(s) in IMS to determine such arrival.

2. Pending a review by the receiving facility's medical staff, all medically prescribed accommodations that were approved at the sending facility shall be honored at the receiving facility, subject to any adjustments made as a result of the initial medical screening process. Upon review, should medical staff determine that a modification or discontinuance of the medically prescribed accommodation is necessary, he/she shall convey such changes to the Institution ADA Coordinator pursuant to the procedure set forth in 103 DOC 207.04(2).

   Under no circumstances shall correctional staff at the receiving facility substitute their judgment for that of medical staff where a medical accommodation has been prescribed at the sending facility. Medically prescribed accommodations may be reviewed by the Institution ADA Coordinator at the receiving institution only pursuant to the extent permitted in Section 207.04(2).

3. Pending a review by the receiving facility's Institution ADA Coordinator, all accommodations, other than those medically prescribed, that were approved at the sending facility shall be honored at the receiving facility to the extent possible given the receiving institution's differing security level, rules and requirements. Upon review, the Institution ADA

Coordinator at the receiving facility may alter the accommodation in a manner consistent with Section 207.04(3) based upon factors or conditions at that facility. In doing so, the Institution ADA Coordinator should consult with the appropriate correctional, medical and/or mental health staff.

ATTACHMENT A

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION

Request For Reasonable Accommodation Of Special Need(s)

Name of Inmate: _____ # _____

Institution: _____

Describe your special need: _____
_____
_____
_____
_____

How does this special need limit your daily activities?_____
_____
_____
_____

What accommodation(s) are you requesting for your special need?_____
_____
_____
_____

I expressly agree to cooperate in the handling of my request, including but not limited
to, agreeing  to be interviewed and/or examined by institutional and/or medical staff,
as appropriate.

_____
              Printed Name

_____        _____
              Signature                                    Date

Received by:_____
              Printed Name

_____        _____
              Employee Signature                           Date

Please send completed form to: Deputy Superintendent at your institution

To be completed by Deputy Superintendent:

Request for accommodation of special need received on: _____
                                                            Date
Medical staff have been consulted regarding request (circle one):    YES      NO

    _____/_____/_____        _____
         Date                    Name of Medical Staff Consulted

A medical order exists concerning inmate's special need:    YES (please attach)   NO

Request for accommodation of special need is:  Granted ( ); Modified ( ); Denied ( )

Basis for decision: _____
_____
_____

Signature: _____        _____
              Deputy Superintendent, Institution ADA Coordinator        Date

March 2005                                     207 - 8

ATTACHMENT B

## MEDICAL SERVICE PROVIDER FORM
### MEDICAL RESTRICTIONS

_____
                                    INSTITUTION
_____    _____
         NAME              ID #         D.O.B.

_____
         DATE
TO:_____
         ((D.O.C. DESIGNEE)

The above named inmate has been determined to have the following
needs/restrictions due to a current medical condition:

TYPE                    DATE           (FROM)          (TO)

NO WORK STATUS          _____     _____      _____
LIGHT WORK STATUS       _____     _____      _____
BOTTOM BUNK             _____     _____      _____
SPECIAL EQUIPMENT (DESCRIBE BELOW)

_____       _____      _____
OTHER (DESCRIBE BELOW)

_____       _____      _____

TRANSPORTATION RESTRICTIONS:

MODIFIED RESTRAINTS TYPE:
_____       _____      _____

SEDAN:
WHEELCHAIR VAN:
                                       _____      _____
MEDICAL REASON:

_____
_____
_____

SUBMITTED BY: _____    DATE: _____  TIME: _____
                 MD/PA/NP
REVIEWED BY: _____    DATE: _____  TIME: _____
                  HSA
APPROVED BY: _____    DATE: _____  TIME: _____
             SITE MEDICAL DIRECTOR
REVIEWED BY: _____    DATE: _____  TIME: _____
             DEPUTY SUPT, IAC


March 2005                                    207 - 9

ATTACHMENT C

(ORIGINAL IN MEDICAL RECORD AFTER APPROVAL)
(COPY TO DOC DESIGNEE)

**TO:**    **INMATE**_____    **ID#**_____

**FROM:**    _____**, Deputy Superintendent, IAC**

**RE:**    **Reasonable Accommodations/Special Needs**

**DATE:**    _____

Be advised the above named inmate is authorized for the following
special accommodation(s) due to a limitation or impairment in one
or more major life activities.

LIMITATIONS:                                    Dates

1.    Work Program:                    From            To
      ( )  No Work                     _____       _____
      ( )  Light Work                  _____       _____
      ( )  No Heavy Machinery/Heights  _____       _____
      ( )  Other_____ _____       _____

2.    Physical Activity:               From            To
      ( )  Difficulty with Ambulation  _____       _____
      ( )  Prosthetic Device           _____       _____
      ( )  Other_____ _____       _____

SPECIAL NEEDS/ACCOMMODATIONS:

1.    Special Housing:                 From            To
      ( )  Close Proximity to H.S.U.   _____       _____
      ( )  H.S.U. Bed                  _____       _____
      ( )  Floor Level                 _____       _____
      ( )  Other_____ _____       _____

2.    Handicapped Accessibility:       From            To
      ( )  Wheelchair                  _____       _____
      ( )  Handicapped Cell            _____       _____
      ( )  Bottom Bunk                 _____       _____
      ( )  Other (e.g. Visual, Hearing)_____ _____  _____

3.    Special Items (Describe Below):  From            To
      ( )  Epi-pen_____ _____       _____
      ( )  _____   _____       _____
      ( )  _____ _____       _____

March 2005                                207 - 10

TRANSPORTATION RESTRICTIONS:              From            To

    ( )  Modified Restraint(s) due to:    _____    _____
       _____

    ( )  Sedan                            _____    _____
    ( )  _____
    ( )  Wheelchair Van                   _____    _____

COMMENTS:
_____
_____
_____
_____
_____

COPY:    Director,  Health Services
         Superintendent
         Deputy Superintendent of Operations
         Director of Security
         Shift Commanders, 7-3, 3-11, 11-7
         Health Services Administrator


         Institutional Assignment Officer
         Property O.I.C.
         Housing Unit Office
         Inmate's Six-Part Folder
         File

March 2005                              207 - 11

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT,
      Plaintiff,

v.

ROBERT MURPHY, *et al.,*
      Defendants.

**AFFIDAVIT OF ROBERT MURPHY**

I, Robert Murphy, being duly sworn, depose and state as follows:

1.      Since November, 1997, I have been the Superintendent of the Massachusetts Treatment Center ("Treatment Center"). I have been an employee of the Department of Correction ("DOC"), since 1976. I received my Bachelor of Science in Criminal Justice from Northeastern University in 1977. At that time, I was a Correctional Social Worker at MCI Cedar Junction. In 1979, I became a Correction Counselor at MCI Norfolk. In 1980, I became a Correction Counselor at MCI Concord and, in 1982, I became a Supervising Correction Counselor at MCI Concord. I held that position until 1985, when I became Director of Treatment at MCI Plymouth and then Director of Classification at MCI Shirley. In 1987, I was promoted to the position of Deputy Director of Classification Services for the entire Department. In 1988, I was appointed to be Deputy Superintendent of Patient Services at Bridgewater State Hospital ("BSH"). In 1992, I became the Deputy Superintendent of Treatment at MCI Framingham. While in that position at MCI Framingham, I received my Masters of Arts in Business Administration from Framingham State College in 1994. Subsequently, in 1996, I became the Deputy Superintendent of Treatment at MCI Concord, a position I held until I was promoted to my present position as Treatment Center Superintendent.

2.      Civilly committed resident William Hebert has not complained to me about either his sex offender treatment or his mental health treatment.

3.      Attached hereto is a true and accurate copy of the Amended Management Plan dated November 29, 1996 (without appendices), that was approved by the United States District Court in the federal consent decree litigation.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13th DAY OF DECEMBER, 2005.

Robert Murphy, Superintendent
Massachusetts Treatment Center

—    Ex. 6    —

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF CORRECTION

AMENDED MANAGEMENT PLAN

FOR THE

ADMINISTRATION OF THE

TREATMENT CENTER

November 29, 1996

## TABLE OF CONTENTS

INTRODUCTION TO AMENDED PLAN . . . . . . . . . . . . . . . . . . 1

PROGRAM GOALS AND SUMMARY . . . . . . . . . . . . . . . . . . . 4

I.    Management and Staffing  . . . . . . . . . . . . . . . . 4

II.   Clinical Treatment Program . . . . . . . . . . . . . . . 5

III.  Educational and Vocational Treatment . . . . . . . . . . 5

IV.   Behavior Management  . . . . . . . . . . . . . . . . . . 5

V.    Resident Management and Operations . . . . . . . . . . . 6

VI.   Community Access Program . . . . . . . . . . . . . . . . 7

VII.  Integration of the Treatment Center with
      the Prison Program for Sex Offenders . . . . . . . . . . 7

DETAILED PLAN DESCRIPTION . . . . . . . . . . . . . . . . . . . 8

I.    Management and Staffing  . . . . . . . . . . . . . . . . 8

II.   Clinical Treatment Program . . . . . . . . . . . . . . . 11

      A.    The Massachusetts Treatment Center's
            Comprehensive Sex Offender Treatment Program . . . 11

      1.    Introduction . . . . . . . . . . . . . . . . . . . 11

      2.    Treatment Model: The Integrative Approach . . . . . 12

      3.    The Therapeutic Community  . . . . . . . . . . . . 13

      4.    Unit Management  . . . . . . . . . . . . . . . . . 13

      5.    Assessment . . . . . . . . . . . . . . . . . . . . 13

      6.    Treatment Modalities . . . . . . . . . . . . . . . 14

      7.    Pre-Transition Programming . . . . . . . . . . . . 16

      8.    Transition Programming . . . . . . . . . . . . . . 18

      9.    Conclusion . . . . . . . . . . . . . . . . . . . . 18

      B.    Residents Who Refuse Treatment . . . . . . . . . . 19

III.  Educational and Vocational Treatment . . . . . . . . . . 23

      A.    The JRI Educational and Rehabilitation Program . . 23

1.  Educational Courses . . . . . . . . . . . . . . . . 24

2.  Vocational Program  . . . . . . . . . . . . . . . . 26

3.  Recreational Program  . . . . . . . . . . . . . . . 26

B.  The Resident Employment Program . . . . . . . . . . 26

1.  Assignment of Positions . . . . . . . . . . . . . . 26

2.  Wages . . . . . . . . . . . . . . . . . . . . . . . 27

3.  Woodshop and Printshop  . . . . . . . . . . . . . . 27

4.  Canteen Service Program . . . . . . . . . . . . . . 28

5.  The Staff Grill . . . . . . . . . . . . . . . . . . 28

IV.  Behavior Management  . . . . . . . . . . . . . . . . 29

A.  Behavior Review Committee . . . . . . . . . . . . . 29

B.  Crisis Unit and Minimum Privilege Unit  . . . . . . 30

C.  Transfer Board  . . . . . . . . . . . . . . . . . . 31

V.  Resident Management and Operations . . . . . . . . . 34

A.  Privilege System  . . . . . . . . . . . . . . . . . 34

B.  Property and Furnishings  . . . . . . . . . . . . . 35

C.  Funds . . . . . . . . . . . . . . . . . . . . . . . 36

D.  Visits  . . . . . . . . . . . . . . . . . . . . . . 36

E.  Mail  . . . . . . . . . . . . . . . . . . . . . . . 38

F.  Telephone . . . . . . . . . . . . . . . . . . . . . 39

G.  Resident Counts . . . . . . . . . . . . . . . . . . 41

H.  Complaints, Grievances and Investigations . . . . . 41

VI.  Community Access Program . . . . . . . . . . . . . . 44

VII. Integration of the Treatment Center
     with the Prison Program for Sex Offenders . . . . . . . 45

A.  Sex Offender Treatment in the Prisons . . . . . . . 45

B.  Management of an Expanded Treatment Center Population 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 48

INTRODUCTION TO THE AMENDED PLAN

On October 31, 1996 the Court issued a Memorandum and Order in Mitchell G. King v. Milton Greenblatt, M.D., et al. (Civil Action No. 72-788-ADM) and Harold G. Williams, et al. v. Michael Lesiak, et al. (Civil Action No. 72-571-ADM). A copy is attached at Appendix 1. The Memorandum and Order provides for modifications to the consent decrees and various related orders, and permits full implementation of the Commonwealth's September 26, 1994 plan for the administration of the Treatment Center. In light of changes over the last two years at the Treatment Center as well as to various provisions of the plan, the Memorandum and Order directs the Commonwealth to submit an updated amended plan. The Court will evaluate and monitor the amended plan's implementation for the next year, and at the end of the monitoring period, reconsider the Commonwealth's motions to vacate the consent decrees.

The introduction to the original plan need not be repeated, except to the extent necessary to provide the background for the developments since September 1994 warranting the submission of an updated plan. The original introduction begins by describing the evolution of sex offender treatment over the past four decades, which culminated in 1990 with the Legislature's decision to discontinue further civil commitments to the Treatment Center and to direct that the Department of Correction develop a program of voluntary sex offender treatment services in the prisons.[1] In 1991, in light of the first successful escape (October 1, 1989) from the new Treatment Center facility, the Legislature again amended G.L. c. 123A, providing the Departments of Correction and Mental Health a means to transfer to prison sentenced civilly committed individuals who remained "sexually dangerous persons," but whose behavior at the Center posed a danger to others.[2] In 1994, the Legislature enacted the most recent amendment to G.L. c. 123A,[3] placing administrative responsibility for the Treatment Center solely in the Department of Correction. The Commissioner of Correction is charged with maintaining a treatment program "for the care, custody, treatment and rehabilitation of persons adjudicated as being sexually dangerous," and the Department of Mental Health relieved of all responsibilities at the facility.

The consolidation of the administration of the Treatment Center in the Department of Correction and the implementation of the plan awaited judicial approval. On June 29, 1995, the Court allowed the Commonwealth's motion to modify the consent decrees to permit the transfer of authority and implementation of the plan. However, on July 31, 1995, the Court stayed the implementation of

---

[1] St. 1990, c. 150, § 104.

[2] G.L. c. 123A, § 9A & B, added by St. 1991, c. 454.

[3] St. 1994, c. 489.

2

the central components of the plan governing the Minimum Privilege Unit and Crisis Unit, Discipline, Resident[4] Management and Operations, the Community Access Program and the Transfer Board. The Court directed that the parties discuss the stayed aspects of the plan, agree where possible, and narrow the remaining issues. On August 1, 1995, the Department of Correction assumed sole administrative responsibility for the operation of the Treatment Center. With respect to the areas subject to the stay, the Department of Correction has operated the Treatment Center under the rules and polices in effect under the Department of Mental Health administration.

Since September 1994 the Department of Correction has implemented several significant changes in the operation of the Treatment Center and the Department of Correction prison sex offender treatment program. These changes are all geared to integrate treatment services in the Treatment Center and the correctional system to ensure the best utilization of all available resources and that the Treatment Center retain its vitality as a unique sex offender treatment institution.

* October 1994: The Department of Correction issued its policy governing the state-wide prison Sex Offender Treatment Policy, 103 DOC 446. An amended policy was issued in April 1996.

* March 1995: The intensive treatment phase (Phase IV) of the state-wide sex offender treatment program was relocated from the Southeastern Correctional Center to the D-2 Unit of the Treatment Center, which has been refitted to house up to sixty (60) state prisoners.

* September 1996: The Department of Correction commenced the construction of a 300-bed modular unit annex in the former main recreation yard of the Treatment Center. This unit, which will open the Spring of 1997, is expected to house 300 sex offenders participating in phases I through III of the Department's prison sex offender treatment program. A new recreational yard constructed behind the Treatment Center is expected to open in the next week.

* November 1996: Following a year of cooperative effort by Department of Correction and JRI staff, the Treatment Center earned accreditation from the American Correctional Association.

Finally, it is noted that in January 1996 the Superior Court expanded the unified session for hearing petitions under G.L. c.

---

[4] As used within this plan, the term "resident" refers to persons civilly committed to the Treatment Center pursuant to G.L. c. 123A as sexually dangerous persons.

3

123A, § 9 to hearings per month. This more than doubled the number of hearings held in a given year. Indeed, petitions filed in 1995 are being heard in early 1997.

Against this background, the salient features of the amended plan may be summarized as follows: First, all policies presented or described in the original plan which were stayed by order of the Court are presented in final form, incorporating, where applicable, any modifications agreed to by the Department of Correction. The planned implementation date for each policy is set forth in the implementation schedule (Appendix 2).

Second, the amended plan updates the material presented in the original plan, section by section, describing the changes which have occurred at the Treatment Center during the past two years and setting out the Department's ongoing plans for the administration of the facility and the integration of the Treatment Center program with the prison sex offender treatment program.

4

## Program Goals and Summary

The goals of the Department of Correction in formulating this document are the following:

1. Protection of the public safety by offering sex offenders at the Treatment Center and in the prisons the best current treatment methodology;

2. Integration of treatment services in the Treatment Center with those in the correctional system to ensure the best utilization of all available resources, and to enure that the Center will retain its vitality as a treatment institution;

3. Development of a management structure to integrate correctional and clinical administration to promote coordination and cooperation between correctional and clinical staff at all levels of operation; and

4. Development of a uniform set of precise and well-defined regulations and operational policies applicable to all civilly committed residents, designed to provide a safe and secure environment for treatment .

The Department's plan for the achievement of its goals focuses on seven main areas of program administration:

I.   Management and Staffing;
II.  Clinical Treatment Program;
III. Educational and Vocational Treatment;
IV.  Behavior Management;
V.   Resident Management and Operations;
VI.  Community Access Program; and
VII. Integration of the Treatment Center with the Prison Program for Sex Offenders.

The main elements for each plan component are summarized below, and then elaborated in detail within the body of this document.

I.   Management and Staffing

*   Designation of a Superintendent as the chief administrative officer of the Treatment Center;

*   Unification of the program and correctional administration by establishment of an Executive Management Team comprising Department of Correction and Justice Resource Institute ("JRI") program administrators which will formulate and implement policies and

5

procedures, assess and evaluate all areas of operation, and discuss management issues;

*   Unification of program and correctional line staff by implementation of a unit management system to foster professional working relationships and a common commitment to promoting treatment and maintaining a safe and secure environment;

*   Unification of program and correctional line staff by continuation of the mandatory in-service training program for correctional staff in the areas of sex offender treatment and the mandatory in-service training program for program staff in the areas of security management and procedures.

II.   Clinical Treatment Program

*   Continuation of the existing clinical treatment program currently provided by JRI;

*   Ongoing development of strategies for addressing the needs of residents who refuse treatment.

III.  Educational and Vocational Treatment

*   Continuation of educational, vocational and rehabilitation programs currently provided by JRI as part of the treatment program offered by the facility.

*   Ongoing conversion of existing work programs (print shop, wood shop, canteen, etc.) from charitable corporations and trusts to Department of Correction work and industries programs in order to increase the number of available jobs, expand the product lines and work skill levels, and secure access to the customer base served by Department of Correction work programs. In addition, development of methods to utilize preferential work program assignments as an incentive for treatment participation.

IV.   Behavior Management

*   Implementation of the new Observation of Behavior Reports Policy, 103 CMR 430A,[5] for all civilly committed

---

[5] The numerical designation of the Observation of Behavior Reports policy will be changed if the policy is submitted for promulgation as a regulation, since the system of nomenclature in the Code of Massachusetts Regulations does not permit designation as 430A. It is anticipated that the new designation will be 103 CMR 431.

6

residents, which is designed to complement a treatment philosophy emphasizing personal responsibility.

* Institution of separate approaches for addressing mental health and behavioral problems by the implementation of the new Crisis Unit Policy, 103 MTC 650, establishing guidelines for the treatment of residents in need of emergency psychological services, and the new Minimum Privilege Unit Policy, 103 MTC 423, establishing guidelines for housing residents who require close custody and separation from the general population.

* Implementation of the new Transfer Board policy, 103 CMR 422,[6] and establishment of a Transfer Board to effect the transfer to other correctional institutions of civilly committed residents with remaining criminal sentences who meet the statutory transfer criteria of G.L. c. 123A, § 2A, and to provide for periodic review of the progress of transferred residents and their suitability for return to the Center.

* Application of the Department of Correction Disciplinary Policy, 103 CMR 430, for all non-civilly committed prisoners admitted to the Treatment Center or to the modular expansion unit.

V. Resident Management and Operations

* Continuation of the existing system of differing levels of security and privileges in order that residents can be maintained in the "least restrictive conditions" of confinement.

* Implementation of modifications to the existing visitation, property, mail, and telephone access policies in order to address long-standing security deficiencies and to help make the Treatment Center safer for residents and staff.

* Implementation of the Department's count system to promote safety and security.

---

[6] The numerical designation of the Transfer Board policy will be changed if the policy is submitted for promulgation as a regulation. The Department of Correction already utilizes the "421" designation for another policy, 103 DOC 421. In order to avoid confusion, it is anticipated that the new designation for the Transfer Board Policy will be 103 CMR 460.

7

VI. <u>Community Access Program</u>

* Implementation of the revised, multi-phase community access program based upon the Department's reintegration model, designed with multiple levels of security to evaluate the ability of participants to function in the community.

* Continuation of the new pre-transition program to allow residents who are ready for a less restrictive environment to reside in the transition house.

VII. <u>Integration of the Treatment Center with the Prison Program for Sex Offenders</u>

* Continuation of the expansion of the mission of the Treatment Center to ensure that the institution will retain its role into the future and continue to provide treatment to sex offenders by the best available methodology.

* Continuation of the prison sex offender treatment program described in 103 DOC 446, with the intensive treatment phase now located at the D-2 Unit at the Treatment Center, and the earlier treatment phases to be relocated to the modular expansion unit expected to open in Spring, 1997.

8

DETAILED PLAN DESCRIPTION

I.    Management and Staffing

On August 1, 1995, the Department of Correction assumed sole responsibility for the management of the Treatment Center, ending the unwieldy split of administrative authority between two agencies with often differing missions and philosophies. Under Department of Correction management, the Superintendent appointed by the Commissioner of Correction pursuant to Chapter 489 exercises his authority as the sole chief administrative officer for the institution. The Superintendent bears the ultimate responsibility for overseeing both the security and the clinical components of the facility, with the goal of protecting the public safety and improving the quality of the therapeutic and rehabilitative treatment services. The Superintendent oversees and monitors the clinical vendor's compliance with its contract. The Superintendent's management staff now includes a Deputy Superintendent for Operations, a Deputy Superintendent for Programs and Treatment, a Director of Security and a Director of Classification and Programs, and a Director of Psychological Services and a Records Manager.[7] Copies of the Department's organizational charts for the Treatment Center are attached in Appendix 3.

The Department of Correction has unified the correctional and contract programs. At the managerial level, the Superintendent has developed an Executive Staff Management Team comprising key correctional security division heads and clinical, program and nursing directors. Specifically, the Executive Staff Management Team consists of the Superintendent, the Deputy Superintendents, the Director of Security, the Captains, the Director of Classification and Programs, the JRI Program Director, the JRI Clinical Director, the JRI Rehabilitation Director and the JRI Nursing Director. The Executive Staff Management Team conducts weekly meetings to discuss issues pertaining to the management of the Treatment Center, as well as to address the week's clinical, medical, staffing, rehabilitative, fiscal and security issues. The Executive Staff Management Team formulates and implements the institution's policies and procedures. In addition, the Executive Staff Management Team conducts a monthly review of the effectiveness of all areas of the institutional operation.

_____

[7]  The Director of Psychological Services, a full-time position, is held by licensed, Doctoral-level psychologist. She is assisted by two full-time psychologists. Their functions include membership on the Community Access Board ("CAB") and the provision of emergency psychological services, pursuant to 103 MTC 650.

9

At the line staff level, the Department of Correction will unify the correctional and clinical programs by implementing the concept of unit management. Unit management is utilized by the Department of Correction in its facilities to integrate the provision of care, treatment and custody. Essentially, each of the Treatment Center's four housing blocks is assigned a unit team, consisting of a Unit Director, three Unit Therapists, and a Corridor Sergeant. Accordingly, correctional management will establish a direct line of authority to monitor the administration of the units. Correction officers on the day (7 to 3) and evening (3 to 11) shifts assigned to the housing units will be directly supervised by the Corridor Sergeants, and function as members of the treatment teams.[8] By creating a working environment with shared responsibilities and common goals and expectations, the unit structure will integrate the security and clinical staff on each unit and will help to instill a sense of common mission.

To perform their many tasks, officers must be able to understand the philosophy and function of the facility and to communicate residents' actions, reactions and interactions to supervisors and to other treatment team members. Simple behavioral changes can signal progress resulting from positive treatment or can be indicative of tension that might lead to a disturbance or other resident problems. Therefore, a "synergistic" approach to training provides the officers a complete set of tools to facilitate better security and better treatment. The focus of the training is not only to facilitate proper and efficient management of the facility, but also to provide professional benefits to the officers; personal growth and development, development of sound judgment, greater knowledge of treatment issues, increased dignity and pride in performance, greater job satisfaction, and ultimately, enhanced opportunities for advancement in rank and salary.

As set forth in the original plan, the Department of Correction has initiated its enhanced training program for correctional staff. Dr. Barbara Schwartz and other JRI staff have now provided all correction officers on the day and evening shifts eight hours of intensive instruction on the nature and treatment of sexual aggression and on interpersonal relations and communication techniques. The institution has now established a Training Advisory Committee with representatives of all disciplines.

In sum, the Department of Correction and JRI have achieved institutional integration within the Treatment Center. Goals and directions of all departments have been unified to the benefit of the residents. The cooperative efforts of security staff and treatment staff came to fruition on November 20, 1996 when, for the

_____

[8] With respect to unit involvement, the Corridor Sergeants will perform essentially the same function as the Unit Team Supervising Sergeants described in the original plan.

10

first time, the Treatment Center achieved accreditation from the American Correctional Association ("ACA"), which reviewed administrative, correctional and treatment program operations. Indeed, the ACA accreditation team found that the Treatment Center achieved 100% compliance with the mandatory accreditation standards and 98.8% compliance with the non-mandatory accreditation standards.

11

II.  Clinical Treatment Program

The Department of Correction has continued the treatment program currently provided by JRI, which is described below. Maintenance of the existing program has ensured continuity in clinical treatment for the residents. Moreover, it is the view of the Department that the program represents the best means for addressing the treatment needs of the residents and protecting the public safety. Dr. Pithers has reviewed the program and has concluded that

> [t]he new treatment model being implemented at the Treatment Center at Bridgewater will gain public credibility. It is logical and tightly integrated. It challenges offenders to face the secrets central to their abusiveness and will be the hardest task that many of the residents in the program will have attempted. Careful evaluation, employing specialized assessment procedures, is employed to determine each client's areas of excess and deficit that may predispose sexual abusiveness. Based on identified needs, both specialized and some traditional treatment procedures are selected for implementation. The efficacy of therapeutic interventions is evaluated through continued assessment.[§]

Indeed, the Department of Correction has embraced the essential elements of this program, stressing relapse prevention, for the treatment of sex offenders within the prisons. Under a subcontract with Correctional Medical Systems, Inc., the vendor which provides health services within the Commonwealth's prisons, JRI has been running a comprehensive voluntary sex offender treatment program for state prisoners, more fully described in Section VII, below. Effective January 1, 1997, the Department of Correction will contract directly with JRI to provide the prison sex offender treatment program.

A.  The Massachusetts Treatment Center's Comprehensive Sex Offender Treatment Program

1.  Introduction

In July 1992 the Department of Mental Health contracted with Justice Resource Institute (JRI) to administer the new Treatment and Rehabilitation Program at the Massachusetts Treatment Center. Under the direction of Gregory Canfield, JRI assumed responsibility for the Clinical, Medical and Educational/Vocational departments of the Center. The recruitment of Dr. Barbara Schwartz brought to the Center one of the nation's foremost specialists in the clinical

---

[§] Report of Dr. Pithers, at 6-7, appended to the original plan.

12

treatment of the adult incarcerated sex offender. Dr. Schwartz quickly established a comprehensive state-of-the-art treatment model based on established techniques with demonstrated effectiveness. A unified treatment approach was implemented with identifiable, behavioral-based goals. Treatment records were instituted whereas previously only annual reports were conducted. Measurable treatment plans with periodic review of progress track each resident's progress. The administrative team of JRI's Rehabilitation and Treatment Program has experience in both mental health and corrections, and has been able to balance the concerns of both to provide a comprehensive treatment program within a secure environment. The treatment program described below is the program currently in operation at the Treatment Center.

The JRI clinical program at the Massachusetts Treatment Center follows a model for the treatment of incarcerated sex offenders, which is accepted and taught nationally at the National Academy of Corrections. It combines a cognitive behavioral base with a variety of treatments designed to address the various components of sexual deviance and is presented at appropriate cognitive levels. The program has been adapted to meet the needs of a variety of sex offenders including those with significant developmental disabilities and major mental illness. It is designed to be conducted in a secure setting and has been implemented in Department of Correction facilities around the country (Washington, Wisconsin, Vermont, Oregon, Idaho, and others). The program in its totality is designed to provide the sex offender with the tools and resources that may assist him in returning to the community as a productive citizen.

2.  <u>Treatment Model: The Integrative Approach</u>

Currently, sex offender treatment specialists throughout the country recognize not only the value of the cognitive behavioral model, but also the need to treat the multifaceted problem of sexual offending on a variety of sensory and emotional levels. This expansion of treatment venues allows for a therapeutic look at family dynamics, the role of past trauma, societal influences such as our culture's socialization patterns, and even the role of spirituality. As mentioned in the section on Assessment, the latest movement in the field seeks to identify specific types of sex offenders and to model treatment specifically for them. Another trend is to identify the levels of learning and to present treatment material on each of those levels.

The JRI model incorporates these current treatment approaches, coupled with proven cognitive behavioral treatments into Whole Systems Design, in what JRI calls the "INTEGRATIVE MODEL."

13

3.   <u>The Therapeutic Community</u>

The sex offender is an individual who has profound problems in
relating to other people. His interpersonal relations are marked by
distrust, fear of rejection, withdrawal, isolation, anger, and the
belief all relationships are power struggles. To be effective, sex
offender treatment, in an institution, must address the offender's
social interactions and, therefore, is best delivered in the
context of a therapeutic community. This is a living arrangement in
which a group of individuals are housed together for therapeutic
purposes. Their interactions outside of treatment are observed and
dealt with in a variety of therapeutic techniques. The treatment
staff and the correctional staff review observed behavior and
cooperate to improve the ways in which residents communicate and
interact. Residents learn through engaging in cooperative
activities to develop appropriate friendships, to improve
communication, and to learn how to reshape their social
interactions. In order to achieve this, the administration allows
participants to engage in activities such as social activities,
hobbies, and activities which might be viewed as merely "social"
outside of a therapeutic community. But in the case of a sex
offender, the monitoring of interactions and behaviors across a
broad spectrum of social venues can provide the most insightful
evidence of the degree to which he has internalized his treatment.

4.   <u>Unit Management</u>

In order to implement the Therapeutic Community concept more
effectively, the Department of Correction is implementing a unit
management system described in Part I, *supra*. JRI has trained
officers in behavioral observation. Officers complete observation
sheets which are an important part of treatment planning. Minor
behavioral problems and unit management issues are handled on the
unit level.

5.   <u>Assessment</u>

A vital component in the treatment of sex offenders is the
establishment of a clear, behavioral-based set of goals which serve
as the guide to all subsequent therapy. JRI has defined these goals
in their Treatment Goals Summary (Appendix 7 to original plan).
These are uniform goals for all sex offenders. At the beginning of
treatment the sex offender's baseline on those goals is
established. Every six months thereafter the participant is given
a Goal Attainment Scale which evaluates his performance on each
relevant goal and sets new goals for the next six months. His
progress is mathematically computed and the score he receives along
with other measures of treatment progress determines the offender's
level of privilege. Every six month the offender also meets with
the Biannual Review of Treatment ("BART") Board comprised of the
Program Director, the Clinical Director, and representatives from
Rehabilitation and Health Services. This meeting serves as a

14

quality assurance venue during which each resident's progress through the whole program (medical, clinical, vocational and educational departments) is reviewed. The resident and his therapist present their progress in the treatment process. A written overview of therapeutic accomplishments is presented. Additional information about the individual's specific treatment needs is also obtained from voluntary psychological testing.

    6.   Treatment Modalities

    There are six major types of therapeutic activities offered within the therapeutic community. These are:

            Primary Group
            Specialty Group
            Behavioral Treatment
            Experiential Therapy
            Psycho-educational Classes
            Community-building Activities

    Primary group is the core of the treatment program. Each participant is assigned to a Primary Group with his Treatment Coordinator typically serving as a co-facilitator in that group. The group serves as the hub of the therapeutic program with the participants bringing all work completed in other therapeutic activities and modalities into the Primary Group for review and for feedback from the other offenders in their therapeutic community and from their therapists. There are also special assignments which are accomplished in this group including:

            Autobiographies
            Clarification letters
            Deviant Cycle
            High risk situations/interventions
            Final work on the Comprehensive Relapse Prevention Plan
            Insight Paper

    Specialty groups exist to treat sub-populations of sex offenders with special problems. Specialty groups include:

            Substance abuse group
            Choices (a group for individuals with sexual identity issues)
            Survivors groups for victims of childhood sexual assault
            Lifer's Group (Spirit of Hope)

These groups can be time-limited or ongoing, open or closed. They meet once a week for up to two hours.

    Behavioral therapies consist of various types of pairing therapies, aversive therapies and satiation therapies. Behavioral therapy is done in conjunction with phallometric assessment,

15

which identifies areas and patterns of deviant arousal and monitors treatment needs. Behavioral treatments are usually done as homework assignments by the participants and are then processed once a week. Psychophysiological assessment is done to monitor treatment progress and determine the type of technique required.

Experiential therapies utilize various activities involving the whole person (all of the sensory modalities) to assist the individual in integrating what he has learned on a cognitive basis into the affective and behavioral domains. Expressive therapies (e.g., drama therapy) comprise this type of treatment. Experiential therapies are often utilized within the Primary Group.

Psycho-educational classes teach basic knowledge of issues related to sex offender treatment. While there are innumerable topics which can be covered, the classes offered in the therapeutic community will be prescriptive in nature and more advanced than the introductory courses given in the pretreatment segment. The participants will come into treatment having taken courses including:

            Clear Thinking About Sexual Assault (1 and 2)
            Developing Empathy
            Victim Empathy
            Advanced Victim Empathy
            An Introduction to Relapse Prevention
            Relapse Prevention II
            Relapse Prevention III
            Gender Differences in Communication
            Men's Work (An anti-violence curriculum)
            Clear Thinking
            Reasoning and Rehabilitation
            Understanding Addictions
            Family Dynamics
            Positive Sexuality and Positive Fantasy Training
            Spirituality and Recovery
            Stress Management
            Anger Management
            Peer Counseling
            Human Sexuality

Community-building activities are vital therapeutic experiences which assist the sex offender in developing appropriate social relations. Sex offenders have rarely experienced any type of normal interpersonal experiences. They have either been withdrawn and isolated or they have coped with social situations through the use of substances such as drugs and alcohol. Planning and participating in social events, ceremonies, clubs and hobbies teach the skills which these individuals will need to use as interventions when they are implementing their Relapse Prevention Plans in the community. These activities have a crucial therapeutic value which cannot be underestimated.

16

7.   <u>Pre-Transition Program</u>

<u>Purpose</u>

The purpose of the Pre-Transition Program (PTP) is to allow residents of the Massachusetts Treatment Center who are ready for a less restrictive environment to transfer their residence to the Transition House. This would not make them eligible for the Community Access Program, but would allow them to begin learning to live in a less structured and regimented environment. The PTP is run as a therapeutic community.

<u>Admission</u>

Residents are eligible to apply for the PTP when:
1. They are within four years of their criminal sentence or have a civil commitment only; and
2. Are not deemed a security risk by the Director of Security; and
3. They have completed a substantial percentage of their treatment goals, as determined by the Clinical Director in consultation with the residents' treatment teams. The resident will need the approval of this treatment team and primary treatment group before advancing.

Applications for the PTP are available from the resident's Treatment Coordinator. Completed forms are forwarded to the Clinical Director who will notify the Program Director. The resident and his Treatment Coordinator will appear before the Bi-Annual Review of Treatment (BART). The BART is chaired by the Clinical Director and includes at least three of the following JRI staff: Program Director, Division Director, Rehabilitation Director, Director of Nursing, or designees. The decision of the BART is forwarded to the Superintendent for final approval. The Superintendent's decision is final.

At times, residents may be approved without completing any part of the above process, if approved by the BART and the Superintendent or his designee.

<u>Program</u>

The participants in the PTP have access to the in-house (main facility) treatment and rehabilitation program while housed at the PTP.

While at the PTP residents are expected to:

1. Finish their treatment goals;
2. Complete any remaining criminal sentences;
3. Seek parole to the Treatment Center;
4. Seek approval for community access.

17

Each resident is expected to attend:

1. Primary Group twice a week for one and a half hours each session;
2. Psycho-educational courses including the Relapse Prevention IV course which focuses on transition issues;
3. Specialty groups including a Survivor's Group;
4. Drama therapy;
5. Behavioral treatment.

Educational courses are offered through the Rehabilitation Program at the Learning Center. All residents participate in work programs at the Treatment Center. The program is operated as a true therapeutic community with many of the activities such as recreation programs and social activities organized by the residents themselves under the supervision of staff, rather than provided solely by staff.

Monitoring at the Transition House

Problematic behaviors are addressed according to their severity. In accordance with the new OBR policy, level problems are handled at the program level with a verbal warning and remedial action through the house meeting. Higher level problems are handled through the OBR process. The Superintendent may order a resident's removal from the Transition House anytime he deems such a move in the best interest of the resident or to insure safe and secure operation of the Treatment Center.

Privileges

All privileges are subject to good behavior and continued progress in treatment. Privileges may be added, suspended, removed or revoked by house management with the approval of the Deputy Superintendent for Treatment and the JRI Clinical Director. The privileges are as follows:

1. Late Night. Residents of the House are allowed to set their own late night hours. Residents must be in their rooms for counts but may have use of the first and second floors during late night hours.

2. As funds become available, new computer equipment and software will be purchased for the House. These computers will be available for educational and leisure time use.

3. Canteen. Residents have the option of eating at the main dining room or cooking their own food. Residents are allowed additional food not available to non-PTP residents by special orders from the canteen.

4. Jobs. All residents are employed as part of their PTP.

18

Residents either keep their existing jobs or are given an equivalent job upon transfer to the PTP. As higher paying jobs become available, they will be made available to PTP residents.

5. Visits. Residents are allowed to visit with guests in the main visiting room with special family visiting twice a year. Special visits may be a meal shared with family. Special family visits, upon approval of the Superintendent, are allowed twice a year on the grounds of the Transition House.

6. Gardening. Residents are allowed to keep a seasonal garden and are allowed to keep the food grown (within reason and storage capacity).

7. Cookouts. Residents are allowed to cook out of doors with House management approval.

8. Roommates. Because of space limitations in the Transition House, most residents share rooms. Residents may choose roommates, subject to staff approval.

8.    Transition Programming

A slow, structured reentry into the community is the final stage of a comprehensive treatment program. The issues which sex offenders tackle in treatment are theoretical until the offender gets into the community. It is there that his ability to intervene in his pattern is tested. This gradual exposure to "real life" must be done within a therapeutic setting where the offender feels safe in sharing his fears, anxieties and temptations. In order to accomplish this, the residents at the Treatment Center who have completed their criminal sentences are eligible for a Community Access Program (see Section VI) which utilizes the Transition House which is located on the grounds of the Treatment Center and a specially trained staff to facilitate the reintegration process.

9.    Conclusion

The rehabilitation and treatment program offered by Justice Resource Institute is a state of the art sex offender specific treatment program which is tailored to the specific treatment needs of the men incarcerated at the Treatment Center. The model, as offered, is based on extensive research and offers the greatest possibility for the safe rehabilitation and eventual reintegration of the Center's population, while providing for the best means to ensure the public safety. The model was devised for operation in a correctional facility and will continue its development under the management of the Department of Correction. The model can be easily modified to accommodate new admissions.

19

B.    Residents Who Refuse Treatment

At the Treatment Center there are approximately thirty-five residents who refuse all components of the JRI treatment program. The JRI Program has utilized a wide variety of ways to encourage the participation of these individuals. However, before discussing specific methods employed, it is worth noting why these individuals refuse treatment. Some of these reasons include:

♦    The individual may have a natural life sentence with no possibility of release;

♦    The individual may be elderly, infirm, without family or friends and has chosen to spend the rest of his life in the security of the Treatment Center;

♦    The individual may be receiving treatment from an outside provider; and

♦    The individual may have been advised by his lawyer that refusing all treatment will leave the state with a minimum amount of information on which to base a case to prove ongoing sexual dangerousness.

♦    The individual may deny his sexual offense.

In many cases these are understandable reasons to refuse treatment. First of all, "offense-specific sex offender treatment" is not like the regular treatment which one might find in a state hospital. There, treatment primarily involves day-to-day adaptation to the environment with supportive efforts to deal with the underlying dynamics of the problem, but in a largely non-confrontational manner. It might indeed be hard to understand why a patient might not wish to engage in that type of interaction. However, sex offense specific treatment is not supportive; it is confrontational. It deals with the ugly realities of the harm one person can do to another person. It is also focused on how the individual will live his life in the community when he is released. For an individual to engage in this latter type of treatment when there is no possibility of release raises legitimate questions.

Many men in the Treatment Center have no support in the community. Their families have long since broken ties or died. They may never have developed any viable occupational skills or such skills are outdated. They may have chronic medical problems. They may lack financial resources to establish an independent living situation in the community. In short, they have no resources in the community and feel that participation in treatment places their chances to remain at the Treatment Center in jeopardy. Additionally, if they are never getting out, what is the reason to go through the painful process of treatment?

20

Several men in this facility are receiving treatment from an outside provider who is their former therapist and who is openly hostile to the treatment program. This individual offers to provide these men with highly supportive individualized treatment focusing on their own victimization. This type of treatment does not focus on their responsibility or on the pain and suffering of their victims, but allows them to feel that they are the victims. Since these men are continuously told that the JRI Program is ineffective by a person who has real referent power in their lives, it is almost impossible to reach the men who are continuing to interact with this person. JRI has been successful in convincing several men to either participate in both the JRI Program and with the outside provider or to shift entirely to the JRI Program. However, this person is actively recruiting any individual who is unhappy with his therapy because it is holding him responsible for his deviant behavior.

There are also men in this facility who have been advised by their lawyers that the more information the state has about them, the easier it is to prove that they are still "sexually dangerous." This has certainly proven to be the case in recent experience. Two of the three men who have been found by the courts to be no longer "sexually dangerous persons" were not in treatment at the time of the finding. In the recent past, men who were never in any treatment at all were released. In 1993, the Restrictive Integration Review Board ("RIRB") found a man "not sexually dangerous" when he was not in treatment, but after having rejoined treatment and developed additional insights into his behavior, he was then found "sexually dangerous" because he revealed some of those insights. This incident contributed to the misplaced notion that avoiding treatment can be in one's best interest. Therefore, the belief that avoiding treatment is in their best interest during the Section Nine process is not without foundation.

There are also clinical reasons why it is not sound clinical practice to be overly zealous in pushing treatment. Continually "begging" people to come into treatment simply reinforces the patient's stand by insuring that this individual will receive continuing individual attention for his refusal. In order for sex offender treatment to work, *there must be a level of personal motivation* to working through very difficult issues. If the focus of the program is simply to recruit and retain patients, then the program will be so watered down that it will be ineffective. It should be noted that the average drop-out rate for voluntary programs is from 1/4 to 1/3 of all participants. Additionally, the participation rate of other involuntary programs including programs in Washington State and New Jersey is less than one half of the residents.

21

Nevertheless, JRI has made a variety of attempts to recruit those who are refusing treatment. Among these are:

♦ A procedure by which men are offered six sessions of individual treatment if they will agree to sit in three group sessions with their therapist;

♦ Special programs such as "The Spirit of Hope" support group which are specifically designed for individuals with long sentences;

♦ Continuing contact with all individuals whether formally enrolled in treatment or not;

♦ Crisis intervention treatment available to all men;

♦ A level system designed to encourage participation in treatment by rewarding achievement of treatment goals with special rewards such as participation in the Pre-Transition Program, the "blue dot" grill, special movies, and room visits.

Additionally, special arrangements have been made to accommodate some of the most difficult cases. One such resident, for example, has been assigned an individual contact person, a therapist who has at least weekly contact with him. He has a specially written Goal Attainment Scale which allows him to earn a level where he can have certain privileges. Such cases are particularly challenging, as research shows that antisocial personalities are actually made worse by receiving individual treatment. Nonetheless, the Program has strived to accommodate this resident without sacrificing the integrity of the Program and without totally compromising what is in his best interest.

JRI will continue to encourage participation in treatment. It should also be recognized that for certain individuals, the most appropriate intervention is simply having a job or pursuing their education or participating in some type of hobby. In the case of some men, their best interest would be served by allowing them to transfer to a correctional facility where they would not be continually "hounded" about addressing therapeutic issues which may at this point be irrelevant to their actual situations.

Under the amended plan new strategies will be added to address the problem of treatment refusal. First, "professional visits" by outside treatment providers will be terminated. <u>See</u> Section V(D). Second, the Transfer Board will come into operation. <u>See</u> Section IV(C). Any resident with an outstanding criminal sentence will be subject to transfer to another correctional institution if in the judgment of the JRI Clinical Director of Treatment the resident has failed appreciably to participate in treatment or to achieve treatment goals during the previous six month period. For some residents, continued residency at the Treatment Center will become

22

an incentive for treatment participation. Third, consideration is being given to linking preferential job assignments with treatment participation. See Section III(B)(1). Fourth, the Department of Correction will continue the program begun last year of awarding earned good time for treatment participation. See Section V(A).

23

III. <u>Educational and Vocational Treatment</u>

Educational and vocational training are an integral part of the treatment program. The Treatment Center population includes a large number of residents with a history of school failure and special needs. The purpose of the program is to promote individual academic, personal and vocational skills, utilizing both traditional and innovative educational and vocational techniques. There are two components to in-patient educational and vocational treatment, (1) the educational and rehabilitation program, and (2) the resident employment programs.[9] The programs are administered by JRI. In Part A, below, the JRI programs are described. Section B contains a description of the Department of Correction plans for these programs.

A.    <u>The JRI Educational and Rehabilitation Program</u>

As part of its contractual responsibilities, JRI provides educational, vocational and rehabilitative programming to the residents. It is the intention of the Department of Correction to maintain the current programming, and where the opportunities arise, provide for additional programming. The JRI Educational and Rehabilitation Program:

SERVES a diverse intellectual audience composed of clients needing individualized and small group instruction;

DEVELOPS programs that provides residents with work place skills to maximize employment capabilities and potential job placement in the contemporary marketplace;

PROVIDES programs that develop awareness, skills, and appreciation of social skills;

PROVIDES individualized aptitude and educational testing with specialized assistance and guidance;

PROVIDES opportunities for residents to enjoy and develop artistic skills in the arts and humanities through drama therapy, art, literary and music programs;

PROVIDES general and legal library services with access to local, regional, and college libraries as well as library programs directed by a certified MLS and ALA librarian;

---

[9] Through the Community Access Program, described in Section VII, eligible residents will be able to continue to develop educational and vocational skills and experience in a community setting.

24

PROVIDES a recreational program that promotes individual development of sporting skills as well as providing for intramural group participation in recreational activities that include basketball, softball, and table games;

PROVIDES residents with a well-stocked canteen that also allows employment opportunities and training in distributive education for the service industry;

PROVIDES residents with an evening grill and courses in food preparation and short order/deli operations;

PROVIDES residents with independent living skills through an individualized educational program, Skills Activities for Independent Living ("SAIL");

PROVIDES vocational training in areas such as woodworking, printing, horticulture, and computer skills training;

PROVIDES a full spectrum of educational courses from pre-GED to college degree programs; and

PROVIDES employment opportunities for residents through a skills-oriented work program.

The JRI Educational and Rehabilitation Program has three components: (1) educational courses, (2) vocational programs, and (3) recreational programs.

1. Educational Courses

JRI offers the following educational courses:

PRE-GED COURSES These courses are designed to encourage learning among the residents who have a history of developmental and emotional educational issues. They teach languages, reading, mathematics, science, history, social studies, and consumer awareness to residents who have a record of school failure. The instructor, in addition to teaching the basic skills, encourages self-esteem and self-confidence in helping the residents obtain the necessary talents to achieve GED studies.

GED DIPLOMA COURSES These courses prepare the residents to succeed in passing the GED requirement for a high school diploma. The course features individualized instruction, test-training, and practice in writing essays and computing skills.[10]

_____

[10] As of the enrollment period commencing September 18, 1994, Congress discontinued Pell Grants to state and federal prisoners. Pub.L. 103-322, Title II, § 20411(a), (b), 108 Stat. 1828. Because of the elimination of these grants, the Treatment Center can no longer offer college level courses. However, some

25

COMPUTER PROGRAM The Learning Center sponsors a series of computer courses that provide theoretical and hands-on instruction in computing skills that are fundamental in vocational and business enterprises. Offerings include WordPerfect, MS-DOS, Windows, Pre-Programming, Pascal and specialized skill development in computer science operations such as databases and spreadsheets.

STRESS REDUCTION This program teaches basic stress reduction methods for the purpose of helping residents with stress management and to improve health practices.

MUSIC PROGRAM This is a resident-operated program overseen by a staff member of the Learning Center. This program stimulates residents to develop personal skills in musical instruments and glee club activities. The program sponsors a seasonal holiday program as well as a variety show for the residents performed by residents. Residents are required to learn to read music and/or show proficiency in musical skills.

TUTORIAL PROGRAM This is a resident-teach-resident program. The program prompts reluctant students to team up with a "mentor", under the supervision of a teacher, to promote learning and develop personal growth. The Newspaper Club is an example of one aspect of success in this program as it encourages men to visit the Learning Center and read the newspaper on a daily basis.

NEWSLETTER/JOURNALISM COURSE Written and printed by residents under staff supervision, the newspaper produced by the Newsletter and Journalism course teaches fundamental writing, formatting, and publication skills toward providing professional employment in the publishing or newspaper field. The newsletter appears four times a year.

LIBRARY In addition to traditional library services (i.e., general and law libraries), the library offers periodic evening programs. Readings and video travel series provide residents with an opportunity to learn more about the world and its cultures.

ART AND DRAMA THERAPY COURSES These courses encourage residents to use expressive arts to develop self-confidence, self-esteem, and self-awareness through art, drama, and craft skills.

CULINARY ARTS This course features cooking skills in various formats. For developmentally challenged residents, the emphasis is upon learning how to prepare, cook, and clean-up. Other residents have the opportunity to take courses in microwave or short order cooking.

---

residents are able to take college courses at their own expense by correspondence.

26

### 2.    Vocational Program

The JRI Educational and Rehabilitation Program offers the following vocational programs:

AVOCATIONS WOODWORKING PROGRAM This program offers residents the opportunity to learn woodworking skills.

HORTICULTURE PROGRAM This program offers Transition House residents the opportunity to learn about the basic fundamentals of gardening and horticulture through a "Community Garden."

SEWING PROGRAM The program will features sewing skills in an employment-like setting that aims to develop skills for the needle-trade industry.

ELECTRONICS PROGRAM This course of study utilizes instructor-led classes to teach basic AC, DC, and digital logic.

WORK PROGRAM An institutional-wide program, this aspect of the Learning Center provides residents with in-house employment that encourages self-discipline and skill development in food services, sanitation, and janitorial services. This program prepares residents for employment in the hotel and service industry.

JOB SKILLS COURSE This course provides in-class instruction on finding and applying for jobs. It features letter and resume writing as well as interviewing techniques.

### 3.    Recreational Program

The JRI Educational and Rehabilitation Program also includes a recreational program, which offers residents an opportunity to learn individual skills in a wide variety of sports from basketball to volleyball to physical fitness programs prescribed by a medical physician and administered by one of the JRI staff.

### B.    The Resident Employment Program

There are two types of job programs currently provided at the Treatment Center, (1) paid institutional work assignments and (2) "workshop" positions, i.e., positions in the print shop, wood shop, and canteen. Currently, approximately 176 residents hold paid positions. It is the intention of the Department of Correction to continue to make employment opportunities available to the residents with the following programmatic modifications:

### 1.    Assignment of Positions

The Department of Correction will endeavor to maximize the number of paid positions for residents. As explained more fully below, the immediate effect of the proposed programmatic

27

modifications will increase in the number of paid positions. It is expected that funds will be made available. Residents committed under G.L. c. 123A will receive job assignment preference over D-2 Unit and modular unit prisoners for jobs within the main building. The Department of Correction and JRI are also considering ideas for tying preferential job assignment or allowable work hours to treatment participation.

    2.   <u>Wages</u>

    As set forth in the original plan, the Department of Correction will bring the employment program under the aegis of the Division of Inmate Training & Education, and establish a wage scale consistent with the wages paid at other Department facilities.

    The Department of Correction utilizes two wage scales, one for institutional work assignments and one for its industries positions.[11] The Department selects the wage based upon the degree of knowledge, skills and trustworthiness required by each position. The institutional wage scale is based upon a daily rate of $1.00, $1.50, $2.00, $2.50 or $5.00 per day, depending on the position and level of skill. The industries wage scale ranges from $.50 per hour to $1.50 per hour. The Department of Correction regulations governing Correctional Industries (103 CMR 455) is attached as Appendix 4 and the regulations governing inmate funds (103 CMR 405[12]) containing the wage scales (103 CMR 405.07) is attached as Appendix 5.

    3.   <u>Woodshop and Printshop</u>

    The Department of Correction will continue to operate a wood shop but the structure will change from a non-profit corporation (Avocations, Inc.) to a component of the Department of Correction Industries program. The Department of Correction will also operate a print shop, but the structure will change from a non-profit corporation (S & D Printing, Inc.) to a component of the Department of Correction Prison Industries Program. The wood and print shops were incorporated under G.L. c. 180 as non-profit corporations. The former Department of Mental Health Administrator of the Treatment Center, in his capacity as Chairman of the Board of Directors of these organizations, will exercise his authority to initiate dissolution of the corporate entities and liquidation of the corporate assets. JRI will staff these programs. The Department of Correction will determine whether to purchase new equipment or to

---

    [11] The industries programs are light manufacturing programs which produce goods for sale to the public and to other state agencies. Hence, the program is similar in nature to the wood and print shop programs at the Treatment Center.

    [12] Effective December 27, 1996, 103 CMR 405 will be rescinded as a regulation and reissued as a policy designated 103 DOC 405.

28

acquire the wood and print shop's existing tools and equipment based on fair market value assessments from independent assessors.

### 4.  Canteen Service Program

The canteen had been administered as a charitable trust by the Department of Mental Health. On June 7, 1996, the Treatment Center Canteen Associates Charitable Trustee, by the Trustee, sold the Trust's inventory and non-monetary assets to the Department of Correction. JRI continues to manage the canteen. The Canteen is open five days a week, Monday through Friday. Since the Canteen is in effect the "general store", a wide variety of products are offered for sale. The JRI staff manage the three residents who work in the Canteen. Residents are paid from Canteen profits.

### 5.  The Staff Grill

The Staff Grill is an integral part of the Canteen operation. Resident workers (3) have been trained as cooks and customer service. The Grill offers a complete "fast food" menu as well as two daily specials. The Grill is supervised by JRI contract employees.

Although no longer operated as a charitable trust, the Staff Grill continues to function on a day-to-day basis essentially as it did under the old organization. The resident employees are paid from Canteen income. The Grill is run similar to an "outside" business enterprise. Staff pay hard currency for their breakfast or lunch, residents handle the money and ring in the sales on the cash register. There are currently plans to extend the vocational training experience beyond the three current employees.

The Department of Correction and JRI intend to add a culinary arts program which will again train up to five residents per class in food preparation. This certificate program will also have measurable outcomes which will provide proof that each resident is able to complete a menu from ordering to service. Again, this is an area which will provide residents with skills which are readily transferable to the outside economy upon release.

29

IV.  Behavior Management

The Department of Correction is revamping the area of behavior management by implementing entirely new policies governing observation of behavior reports, the Minimum Privilege Unit, the Crisis Unit (i.e., emergency psychological intervention), and the Transfer Board.

A.  Behavior Review Committee

The new Observation of Behavior Reports policy, 103 CMR 430A, appears in Appendix 6. It shares some basic features with the observation of behavior policy utilized during the period of dual management. Under the old and the new systems, residents who engage in inappropriate behavior and rules violations may be issued an Observation of Behavior Report ("OBR") by staff. The Behavioral Review Committee ("BRC") is convened to consider the appropriate disposition after the issuance of an OBR. The resident is afforded notice, hearing and the opportunity to call witnesses. If the BRC finds that the OBR is valid, it can impose sanctions Committee membership under the old policy consists of three members, one each from the Department of Mental Health, the Department of Correction and JRI. Under the new policy, the Committee consists of three persons appointed by the Superintendent; one security staff member, one clinician and one program staff member.

The provisions of 103 CMR 430A also differ in very significant ways from the old policy. First, at the suggestion of JRI, the policy incorporates a defined list of offenses and sanctions developed by JRI.[13] JRI has found that the old system is neither fair nor therapeutic. The fundamental defect in the old system is the absence of clearly defined rules and clearly defined repercussions for rules breaking. Therefore, it is unfair because it cannot be administered evenly. More importantly, it is counter-therapeutic because it does not help the residents to take responsibility for their actions. Inasmuch as the major goal of the cognitive behavioral clinical treatment program is to help the residents to accept personal responsibility for their actions and for their treatment, inclusion of specific offenses and sanctions will create a behavioral system which will complement the other elements of the treatment program. JRI believes that clearly

---

[13] Depending on the severity of the offense and the existence of mitigating or aggravating circumstances, the possible sanctions include a warning, a suspended sanction, Minimum Privilege Unit for a term of days, loss of related privileges for a term of days, restitution, recommendation for good time credit forfeiture, loss of or suspension of job, room restriction for a term of days, unit confinement for a term of days, and community services for a period of hours. The outcome may also include referral to the Transfer Board in appropriate cases.

30

defined rules with clearly defined sanctions will be viewed as more equitable by residents, officers and therapists, and will foster responsibility while discouraging manipulation.

A second new element of 103 CMR 430A is that minor behavioral infractions be handled informally either directly by the staff member or by referral to the resident's unit team for resolution. This approach, which is utilized successfully in the prisons, fosters personal responsibility by holding the individual accountable in the first instance to his unit team manager, with whom he must maintain an ongoing relationship. Moreover, it helps to prevent the BRC from being overwhelmed with hearings in minor matters which could better be resolved informally. On an informal basis, an infraction may be resolved by a warning, or by some means to achieve immediate correction of an inappropriate behavior (e.g. clean up a messy room, address a hygiene problem, return to the unit if outside the unit without permission, etc.) Informal handling does not include the imposition of room restriction. If the resident refuses to cooperate with or rejects informal handling, the matter is then referred to the BRC by way of an OBR, and a hearing is held.

The final new element of 103 CMR 430A is that its procedural elements are far more clearly defined than in the old policy. Indeed, many of the enhanced procedural elements were adopted from the prison disciplinary policy, 103 CMR 430. Affording residents better procedural protections will help to foster a greater respect for the behavioral process.[14]

B.  Crisis Unit and Minimum Privilege Unit

The new Minimum Privilege Unit policy, 103 MTC 423, is reproduced at Appendix 7. This policy governs the admission and discharge of residents from the Minimum Privilege Unit, which is a temporary, secure housing assignment for those who require close custody and separation from the general population. There is no "Crisis Unit" policy as such. Instead, a new policy called the Emergency Psychological Services Policy, 103 MTC 650 (Appendix 8),

---

[14] The discipline of all new prisoners admitted to the D-2 Unit of the Treatment Center or to the new modular expansion unit will be governed exclusively by the Department of Correction disciplinary regulations, 103 CMR 430, to the new prisoners. The Department of Correction views application of 103 CMR 430 as an essential tool. Obviously, any new prisoner entering the Treatment Center will have volunteered for treatment, completed the preliminary phases of the sex offender treatment program, and passed screening for his suitability to reside at the Treatment Center. Nonetheless, to further ensure that such prisoners will behave appropriately at the Center and not be tempted to engage in any behavior which could be detrimental to residents and staff, the Department intends to subject such individuals to the full panoply of prison disciplinary sanctions, including disciplinary isolation, forfeiture of statutory good time, and referral to the Departmental Disciplinary Unit ("DDU") at MCI-Cedar Junction, in addition to immediate removal from the Treatment Center.

31

provides guidelines for the triage and treatment of residents at
risk to themselves or others by reason of mental illness. Taken
together, the two policies reflect the philosophy that a security
response is the appropriate means to address intentional acts of
behavior posing risks to the safety of others and of the
institution, while a clinical response is appropriate where the
acts of harm to self or others are the result of a mental illness.
Hence, under the 103 MTC 423, the Minimum Privilege Unit, as a
secure separate housing unit, serves two major security purposes.
First, the MPU is a placement for residents serving a disciplinary
sanction if so imposed by the BRC. Second, where the resident's
conduct warrants housing separate from the general population, the
MPU will house residents awaiting action status pending an OBR
hearing, an investigation, a criminal prosecution or a Transfer
Board hearing.[15] In all instances, the matter of MPU placement,
review and discharge is based upon security assessments subject to
clear criteria set forth in the policy.

In contrast, if the resident's problem is a direct product of
mental illness, the appropriate response is a clinical
determination made solely by a clinician. Under 103 MTC 650,
emergency psychological services include all manner of emergency
psychological intervention, including crisis room placement, close
monitoring,[16] treatment with medications or outside
hospitalization. Referral for emergency psychological services may
come from any person including the resident. In addition, as a
special safeguard, all residents admitted to the Minimum Privilege
Unit will be screened by nursing and by psychological services
clinicians. If mental illness is determined to be an issue of
concern, a crisis status protocol will then be followed.

C.   Transfer Board

The new section 2A of chapter 123 provides that

[a]n individual committed as sexually dangerous and who has
also been sentenced for a criminal offense and said sentence
has not expired may be transferred from the treatment center
to another correctional institution designated by the
commissioner of correction. In determining whether a transfer
to a correctional institution is appropriate the commissioner
of correction may consider the following factors:

(1)   the person's unamenability to treatment;

---

[15] A third purpose to Minimum Privilege Unit placement under the new policy
is for temporary housing apart from general population when necessary for the
protection of the resident's safety pending resolution of such situation.

[16] A new crisis status mental health watch form replaces the form
originally provided.

32

    (2)  the person's unwillingness or failure to follow treatment
        recommendations;
    (3)  the person's lack of progress in treatment at the center
        or branch thereof;
    (4)  the danger posed by the person to other residents or
        staff at the Treatment Center or branch thereof;
    (5)  the degree of security necessary to protect the public.

This statute also provides that:

    [t]he commissioner of correction shall make available to the
    remanded individuals a program of voluntary treatment
    services. An annual review shall be conducted of the current
    sexual dangerousness of each transferred individual and a
    report prepared which shall be admissible in a hearing under
    section nine of this chapter.

    The Department of Correction believes that it is essential to
be able to transfer persons to prison who have proven inappropriate
candidates for residency in a treatment environment. An unfortunate
legacy of the civil commitment process is that the sole criteria
for commitment and retention in the Center was the finding that the
individual was a "sexually dangerous person." Accordingly,
commitment decisions were made without regard to the person's
suitability for the facility or amenability to treatment. Until the
enactment of sections 9A and 9B in 1991, persons committed to the
Center could not be removed even if they engaged in criminal
activity.[17]

    Section 2A of chapter 123A provides that the Department of
Correction

    shall promulgate regulations establishing a transfer board and
    procedures governing transfer, including notification of
    hearing, opportunity to be heard, written decision,
    notification of decision, opportunity for appeal, and periodic
    review of placement.

The policy governing Transfer Procedures, 103 CMR 422, is
reproduced at Appendix 9. The salient features of the policy
include an elaboration of the statutory bases for transfer, the
inclusion of voluntary transfer criteria, detailed procedures
governing Transfer Board referrals and the conduct of the transfer
proceeding, a special provision for emergency transfers, subsequent
review and tracking of transferred residents, and provision for
return of transferred residents to the Treatment Center. Of

---

[17] The Transfer Board replaces the provisions of sections 9A and 9B of
chapter 123A, which had provided for a means or returning a sentenced person to
prison "who poses a substantial threat of physical harm to staff or other
patients or a substantial risk of escape."

33

particular note is that the initiation of the transfer process for
residents who are unamenable to treatment, unwilling or failing to
follow treatment recommendations, or lacking progress in treatment,
is solely the prerogative of the Clinical Director of Treatment.

34

## V.   Resident Management and Operations

The resident population of the Treatment Center consists of persons with and without criminal sentences. All residents share the common denominator of having been convicted of crime, determined by the superior courts to be "sexually dangerous persons," and civilly committed to the Center for Treatment. It is the position of the Department of Correction that all civilly committed residents should be subject to common policies and procedures governing daily living and activities within the facility. The policies and procedures that are appropriate for the Treatment Center and its population are those which will best ensure a safe and secure environment for treatment. However, it has been the Department's experience that in many areas, existing policies and procedures have proven inadequate to prevent repetitive and disruptive instances of substance abuse, strongarming, inappropriate and coercive sexual activity, and unlawful activities directed at members of the public. Documentation of numerous examples are appended to the original plan and summarized in margin. At this juncture, they need not be reproduced herein. It is sufficient to reiterate that such behavior is not only harmful to the victims, but it saps the time and resources of staff, and distracts and diverts the residents from concentrating on their essential clinical and rehabilitative programming. Having thoroughly examined the major areas of operation governing daily living activities, the Department of Correction sets out its policies below.

### A.   Privilege System

In order to achieve quality treatment and to promote the efficient management of the resident population, the Treatment Center has established a three-level privilege system to differentiate among levels of programmatic involvement and reward success in meeting program treatment and behavioral goals. Each resident's level of privilege is established, monitored and reviewed by his unit team. See Appendix 13 of the original plan. The determination to add or remove privileges is currently made by the agreement of the Superintendent and the JRI Program Director.

The Department of Correction will maintain the existing privilege system and policy, with the following revisions to the privilege list:

1.   The original plan presented security reasons for limiting small yard usage as a privilege. In light of the construction of the modular expansion facility in what used to be the main yard and the completion of an entirely new yard on the grounds behind the Treatment Center, the issue of small yard utilization is moot. Although small yard access will no longer be a privilege, they will

35

continue to be available for supervised unit functions and for therapy groups, where JRI staff will be present.

   2.   The Department of Correction will modify room visits, which is currently a level 2 and 3 privilege. Room visits have presented a problem for the facility. In a treatment facility where residents are sent to learn to control their inappropriate and often violent sexual impulses, it is simply counterproductive to provide them unlimited opportunities to engage in sexual activity contraindicated by their treatment regimens. The practice of permitting residents in each others' rooms has facilitated sexual coercion and rape, strongarming, assaults, substance abuse, escape[18] and other illicit and harmful activities. The Treatment Center has taken the first step in addressing these problems by making room visits a privilege. Moreover, room visits have been limited to visits within one's own housing unit; residents cannot visit the rooms of residents in other housing units. During room visits, the doors must remain open. The Department will continue the effort to make room visits safer by requiring that any resident visiting the room of another check in with a unit officer before entering and after exiting the room. The officer will be better able to monitor room visits and ensure that only those approved for room visits enter the rooms of others. Also, the unit officer will note the visit in the unit log. This will make it more difficult for a resident who is assaulted in a room or who engaged in inappropriate behavior in a room to deny that he was in the room.

   3.   Preferential job assignment and/or job hours will be considered as a privilege to be awarded for treatment participation.

   4.   Although not a specific function of privilege level, it is noted that since 1995, earned good time has been awarded for treatment participation.

   B.   Property and Furnishings

   The original plan documented significant safety and security problems with the existing room furnishings and the existing property policy. The problems and the Department's plans to remedy these issues are summarized as follows:

   1.   To improve fire safety standards, the Department will replace the wooden room furnishings with metal furnishings as funding becomes available.

---

[18] The three individuals who escaped from a room on the Minimum Privilege Unit on October 1, 1989, took advantage of the room visit privilege to work together in breaking out of the room.

36

2.   The Department of Correction will replace existing property rules with the Department's property policy, 103 CMR 403 (Appendix 10). However, because of the unique nature of the institution and its civilly committed population, a special institutional Property Policy Statement, 103 MTC 403 (Appendix 11) will issue at the same time for the purpose of to authorizing property for retention by Treatment Center residents in addition to the property approved for retention pursuant to 103 CMR 403.

C.   Funds

As set forth in the original plan, the Department of Correction has found significant safety and security problems with certain existing practices for handling inmate funds and financial transactions, including unlimited expenditures on canteen items, unrestricted property transfers among residents, and the utilization of credit cards. Such practices have resulted the creation of a "black market" economy, strongarming, extortion, gambling, drug purchases, and mail-order fraud.

The Department of Correction will implement its Inmate Funds policy, 103 CMR 405 (Appendix 5). Utilization of this policy will result in the following: First, resident-to-resident transfer of funds will be eliminated. Second, credit card usage will be prohibited, except for participants of the transition program. Third, weekly canteen expenditures will be restricted to $60.00 per resident. Canteen expenditures will be made by direct transfer of funds from the resident's account, eliminating the use of tickets.

D.   Visits

The Department of Correction will implement the visitation regulations at 103 CMR 483 (Appendix 12), with a procedural statement addressing any special institutional procedures.[19] The following changes in existing visitation rules will occur:

1.   Treatment Center policy currently permits "professional visits," which allows the residents on their own to retain the services of private clinicians and therapists. This practice will be eliminated since it is incompatible with the goals of providing quality care and treatment. First, it is a fundamental principle of quality assurance in any in-patient setting that only persons who have been granted staff privileges may practice at the facility. Staff privileges are granted only to persons who meet the facility's credentialing criteria. No reasonable facility permits outsiders to walk in off the street and practice on its patients. Second, there can be no clinical accountability and quality assurance without complete clinical records. Under the current

---

[19] Separate regulations for attorney access, 103 CMR 486, are attached in Appendix 13.

37

practice, "walk-in" therapists are neither obliged nor generally willing to share any information with the treatment staff. This is of special concern in a facility treating dangerous individuals, since staff is deprived of critical information needed to make or oppose discharge recommendations. Third, clinicians should not practice without clinical supervision from senior clinicians. "Walk-in" therapists are unsupervised by facility staff. Fourth, no clinician should be practicing who has not had all training and continuing education required by the facility. Fifth, it is essential that the Treatment Center utilize a uniform approach to treatment. JRI has developed a state-of-the-art program which can only be jeopardized by outside therapists. Outside therapists may promote treatment methods that directly conflict with the facility's program. In one particular case, a therapist has attempted to turn residents against the program. Moreover, residents who partake of outside therapy generally refuse to participate in the facility's program. Sixth, it is unfair to the residents to permit outside therapists into the institution. Unless and until Treatment Center staff are satisfied with the person's treatment progress, they cannot possibly recommend participation in community access.

The Department of Correction recognizes that clinical consultation from outside clinicians may be a useful tool. Such consultations should occur only at the request of clinical staff, on the conditions set by clinical staff, and with the approval of the clinical administration. Finally, the elimination of outside professional visits will not pertain to attorney visits or to outside clinicians retained by the resident or counsel for the purposes of performing an independent evaluation in preparation for a court hearing.

2.    The original plan contemplated reducing the visiting days from seven days a week to five days a week by eliminating two weekdays to permit the use of the visiting room for boards, meetings, staff training and other functions, and eliminate visiting between the hours of 4:00 and 5:30 p.m., which is when the major count will be performed and supper served. In light of the increased population because of the admission of new prisoners to the D-2 Unit and the anticipated admission of 300 prisoners to the modular expansion unit, there are no current plans at this time to reduce visiting days.

3.    To ensure the safety of children in a facility where the majority of the residents are pedophiles, any minor visitor accompanied by anyone other than a parent must be approved in advance by the Superintendent.

4.    The visitor entrance procedures in place at the Treatment Center are similar to those utilized in correctional facilities. The Department of Correction will make certain refinements in the manner in which visits are processed in order to enhance security

38

and to prevent the flow of contraband, in particular controlled substances, into the facility. First, in addition to emptying their pockets as is done now, all visitors will have to turn their pockets inside out so that security staff may look for holes, which may indicate an intention to transfer contraband. Second, the facility will adopt the "search of the day." Essentially, the Shift Commander will order on random days that each visitor or each "nth" visitor submit to an additional search procedure, either a pat frisk or a metal detector wand search, or both. Third, all residents who request to use the rest room during a visit will be strip searched prior to its use, in order to ensure that items are not concealed on the resident's person to bring into the institution. Fourth, visitors will no longer be permitted to bring items of property for delivery to the residents. All property must be delivered by the mail and handled in a manner consistent with the Department of Correction mail policy. <u>See</u> Section V(E), below. Fifth, visitors desiring to provide funds to a resident may only leave checks and money orders, and only for the resident visited. This practice will help to verify the source and recipient of deposited funds, and will prevent resident-to-resident financial transfers through visitors. Finally, dress codes for residents and visitors will help ensure that staff will be able to identify residents without difficulty.[20]

    5.    Routine visits in the health services unit by outside visitors and by other residents will be discontinued. The visitor's safety may be compromised by movement through the facility, and his or her health may be compromised by entering the health services area. In exceptional circumstances, such as terminal illness, on a case-by-case basis, the Superintendent, at his discretion, will approve visits to persons in health services.

    6.    Currently, photography in the visiting room of residents and their visitors is a resident business. This will change to become a resident work assignment in order to prevent resident-to-resident financial transactions by visitors leaving funds for the resident photographer.

    E.    <u>Mail</u>

    To address safety and security problems in the current system for processing residents' mail, the Department of Correction will adopt its regulations governing mail, 103 CMR 481 (Appendix 14). The new mail procedures will differ from the current practices at the Treatment Center as follows:

    1.    Under the current Treatment Center policy, indigent residents receive eight stamps monthly plus unlimited postage for

---

[20] Residents' dress will be determined by the property policy discussed above.

39

legal mailings. The current Department of Correction policy provides three one ounce first class letters weekly at institutional expense plus postage for legal mailings to residents who meet the Department's indigence standard at 103 CMR 481.06. 103 CMR 481.10.

2.   The current policy provides for the opening and inspection of outgoing non-privileged mail at the discretion of the Superintendent. The new policy describes the circumstances in which the Superintendent may authorize the inspection of non-privileged outgoing mail. 103 CMR 481.14.

3.   Currently, incoming non-privileged mail is opened for inspection by staff. Incoming privileged mail cannot be inspected unless the Superintendent believe that it contains contraband. Then the resident is required to open the mail in the presence of staff. Under the Department of Correction policy, incoming non-privileged mail will continue to be opened for inspection by staff, and all incoming privileged mail will be opened by staff in the presence of the resident. Under the current system, it is a simple matter to smuggle contraband into the facility under the guise of privileged mail. The facility has had instances of drugs, cash and checks detected in privileged mail. Weapons, maps and pornography may enter the facility in privileged mail. It is not difficult to obtain or print envelopes with legal return addresses. A resident's relative or acquaintance working for a law firm could mail contraband to the facility. Routine inspection of the content of all mail will eliminate these risks.

4.   The Department of Correction requires return addresses on all outgoing mail, including mail from the Treatment Center. This practice  serves to discourage residents from mailing threatening letters or engaging in fraudulent business schemes. Moreover, without return addresses, the post office cannot return anything to the sender where delivery is not possible. This mail ends up in a dead file and the resident may complain that the mail officer had failed to post it.

F.   Telephone

The Treatment Center currently has twenty-two (22) telephones for use by the residents. There are two types of telephones, collect call only telephones and coin operated phones. The collect call telephones permit the user to make collect calls out of the institution and do not accept incoming calls. The coin operated telephones are standard pay telephones which can place and receive calls. The collect call telephones are located as follows: two in each of the eight general population housing units; one in the Crisis/Minimum Privilege Unit; and one in the Health Services Unit. The main corridor of the Treatment Center and the Transition House each has two coin operated telephones.

40

As documented in the original plan, the coin operated telephones have long been a source of problems, due both to their location and to the nature of their operation. Residents tend to loiter in the corridors while waiting to use the coin operated telephones. This makes it difficult in an emergency when staff must pass through quickly to respond to emergencies. Moreover, the main corridor telephone area serves as an ambush point where stronger residents intimidate and take grocery items away from weaker residents who must pass by on the way from the canteen to their housing units.

Use of the corridor telephones requires currency. A resident sits outside the telephone with coins to provide to the residents who wish to makes calls. This system funnels currency into the population, contributing to the safety and security problems of a token economy described in the property and funds sections, above. Stronger residents take advantage of the telephone system by intimidating others into giving over their currency. Any resident who desires currency simply pretends to place a call and then walks away with the money.

The Department of Correction has been attempting to respond to the intimidation and strong arming problem by reviewing telephone transfers and closely monitoring the telephone areas. Unfortunately, efforts to control the situation have been thwarted due to a lack of cooperation by the victims, who fear that revealing information will subject them to repercussions.

Since the coin operated telephones permit residents to place direct dial calls, they have enabled some residents to use the telephone system for inappropriate and criminal activities. The Department of Correction has investigated numerous instances of nuisance and threatening telephone calls made to persons in the community. Residents have used direct dial calls to effect fraudulent schemes, such as obtaining telephone calling cards in another person's name or placing orders using another person's credit card. In one scheme the individual called a business number and pretends to be a telephone repair person in order to gain access to the business' internal telephone lines purportedly to check the system. Then he used the business' lines to place expensive long distance calls.

Using the coin operated telephones, residents are not restricted as to where they may call, and may place calls which directly jeopardize the security of the facility. For example, a resident could attempt to acquire information by calling the institution and assuming a false identity. By placing direct calls to a hospital or a courthouse, a resident could attempt to find out when he is scheduled to be transported; information which the Department does not provide its inmates. The coin operated telephones can also receive calls. One resident has taken advantage of this feature during a trip to an outside hospital by telephoning

41

in messages to other residents.

The Department of Correction plans to address the telephone problems in the first instance by eliminating all coin operated telephones, and relocating the two corridor telephones to a more suitable areas. In the second phase, the Department of Correction plans to upgrade the entire resident telephone system to take advantage of new technology which has become available for telephones in secure institutions. The new system, recently installed in the correctional facilities, serves to restrict outside calls to legitimate purposes by limiting the total number of places each person can call. Essentially, the collect call telephones will be replaced by security telephones. Each resident will be provided a Personal Identification Number ("PIN") which he can use to place calls. Each PIN holder will be allowed to select ten personal telephone numbers plus five legal telephone numbers. Using his PIN, he will be able to place calls only to the selected numbers. The system will afford residents adequate opportunity to speak with friends, family and their legal representatives, while curtailing nuisance and illicit telephone calls. The system will further enhance safety and security by permitting the Department to record non-legal telephone calls, after a recorded notification is provided to the parties. The Department of Correction telephone access policy, 103 CMR 482, is reprinted at Appendix 15.

G.    Resident Counts

The Treatment Center currently utilizes the Department of Correction "accountability" system, with the exception of stand-up counts. The Department of Correction will implement stand-up counts. The purpose of this process is to enhance safety and security by ensuring that staff have several opportunities each day to observe that each individual is where is should be within the institution, and that each is well. The Department of Correctional Inmate Accountability Policy, 103 DOC 513, will be implemented.[21]

H.    Complaints, Grievances and Investigations

An essential component of a resident management system is the provision of meaningful avenues for residents to convey problems and complaints to the administration, and for the administration to investigate problems arising within the facility. The Department of Correction recognizes that systematic and appropriate responses to resident problems at the Treatment Center are especially critical in light of the Center's turbulent history. The Department of Correction provides a multi-tier system of addressing residents' concerns.

---

[21] Because 103 DOC 513 describes security procedures which cannot be shared with inmates and residents, no copy is appended.

42

The Department of Correction views the Treatment Team as the first and most important level at which residents and staff communicate and resolve most issues regarding treatment and administration. The Department's unit team system serves to enhance communication and coordination between clinicians and security staff, but also between staff and residents. The Superintendent will personally assign experienced corridor Sergeants to supervise the unit officers to ensure that there will be appropriate interactions between residents and unit correction officers. Moreover, unit officers function as members of the treatment teams. Monthly house meetings currently conducted on the units will continue to provide a forum for residents.

The Department of Correction will continue to employ its existing grievance policy to provide all residents access to an administrative remedy for redress of legitimate complaints concerning incidents, conditions, and application of Department policies. The process emphasizes informal resolution in the first instance, by encouraging residents to communicate directly to the staff person responsible in the particular problem area, then to their case managers or supervising officers. Formal processing is best reserved when all informal means have been exhausted. The resident may obtain an institution grievance form and send his complaint to the designated institutional grievance officer. If the resident is not satisfied, he may appeal directly to the Superintendent's office. If appropriate, the Superintendent can assign the grievance for a formal investigation by the Inner Perimeter Security Team.

For conducting investigations of all types of incidents and allegations at the Treatment Center, the Department of Correction has established two investigatory offices; Inner Perimeter Security and the Investigative Division of the Department. A full time Inner Perimeter Security ("IPS") team is located directly at the Treatment Center. IPS officers are specially trained and experienced investigators. The purpose of IPS is to monitor the security of the institution, make recommendations concerning security matters, and provide intelligence information to the administration. At the direction of the administration, IPS officers will investigate all types of incidents and events concerning the safety and security of residents, staff and the facility.

The Office of Investigations is located at the Department's central office. The Director of Investigations reports to the Deputy Commissioner of Correction. The office's staff will investigate the most serious instances involving the safety and security of staff and inmates at all of the Department's facilities.

Finally, the role of the new management team must be noted. For the first time, the facility has a Superintendent, Deputy

43

Superintendents and other senior administrative positions. As is the practice in all Department institutions, Department management personnel routinely tour the facility, spend time within the security perimeter, and speak with residents on an informal basis. Two days a week, the Superintendent, department heads and key officers (e.g., property and mail officers) are available at a scheduled time outside the dining hall. Any resident with an issue can speak with staff on an informal basis. These types of direct informal contact between senior managers and the residents has helped to ease the tensions and anxiety brought by the enactment of Chapter 489. This practice will continue to provide a means for residents to voice their concerns and make their views known to the administration.

44

VI.  <u>Community Access Program</u>

It is clear that the Treatment Center, which has existed at the intersection of the correctional and mental health systems, lacks one characteristic common to both systems; a multi-layered system of separate institutions at graduated levels of security. For example, in the mental health system, Bridgewater State Hospital provides maximum security, and the facilities of the Department of Mental Health offer a graduated system from locked forensic units down to community halfway houses. Within the correctional system, graduated levels of security are provided by maximum security, medium security, minimum security and pre-release levels of confinement. Movement of patients or prisoners through these systems involves independent assessments by different evaluators at each and every step along the route.

For persons committed under Chapter 123A, the Treatment Center is the sole institution, and therefore, it must encompass all levels of security within one facility. One method of providing for this is through the system of differing levels of privileges. Ultimately, discharge determinations for civilly committed residents must be based upon assessments of the individuals' progress in treatment and their likelihood of repeating their offenses in the community. Hence, for residents who have been assessed as suitable to community access, a properly structured community access program must serve as the final source of data collection for those ultimately making discharge recommendations. Therefore, the community access program must be multi-level, with independent evaluations and assessment at each and every stage of progress. In Appendix 16 the Department sets out its plan for a community access program designed to serve the treatment needs of residents and to provide for the safety of the community.

45

VII.   Integration of the Treatment Center with the Prison
       Program for Sex Offenders

The Department of Correction  well along the road to completing a
plan which will not only ensure that the Center can continue to
serve as a unique treatment institution, but will give the
Commonwealth one of the most advanced systems in the country for
the treatment of sex offenders. The benefits of consolidating the
administration of the Center in the Department of Correction and
making the resources of the Center available to provide intensive
inpatient treatment for state prisoners are significant. For those
persons committed under Chapter 123A, consolidation guarantees the
vitality of their facility and their opportunities to continue
receiving the best possible treatment.

     The original plan   contained   (1) a description of the
Department's prison based treatment program for sex offenders; (2)
the proposed role of the Treatment Center as an in-patient
treatment unit in the correctional treatment program; and (3) a
description of housing changes at the Center to enable the
Department to implement this plan. In light of ongoing changes in
the prison program, the opening of the D-2 Unit to new prisoners
and the construction of the modular expansion, this material is
updated below.

     A.   Sex Offender Treatment in the Prisons

     The Department of Correction prison sex offender treatment
program is fully described in the sex offender treatment policy,
103 DOC 446 (April 1996), attached at Appendix 17.   For the
purposes of program eligibility, an inmate will be determined to be
a sex offender on the basis of any one of four criteria: (1) The
inmate is serving a governing or concurrent sentence for a sex
offense; (2) The inmate has a past conviction for a sex offense;
(3) There are sexual overtones in the reading of the official
version of a crime for which the inmate may have been charged and
sentenced for another type of offense not sexual in nature; or (4)
The inmate has displayed behavior, sexual in nature, within the
institutional setting that has resulted in a disciplinary offense
for which he or she has been found guilty. 103 DOC 446.02(1).
Program participation is entirely voluntary. However, those
identified as sex offenders will not be classified below medium
security without having successfully completed the treatment phases
offered in the secure institutions. 103 DOC 446.01. Sex offenders
who then "graduate" to minimum security and pre-release are
required, as a condition of placement, to participate in the sex

46

offender treatment aftercare program. 103 DOC 446.01.[22] Inmates "in denial" of their sex offenses may participate in the program through Phase III, but no inmate "in denial" may advance beyond Phase III. 103 DOC 446.02(D)(4).

Over 500 prisoners currently participate in this voluntary program. At medium security, the program is located at the Southeastern Correctional Center, MCI-Concord and the North Central Correctional Center. At minimum security, the program is located at the Pondville Correctional Center, the Southeastern Correctional Center (minimum), MCI-Shirley (minimum) and the Northeastern Correctional Center. In addition, a sex offender program for women is run at MCI-Framingham.

B.    Management of an Expanded Treatment Center Population

The original plan contemplated that prisoners enrolled in the intensive treatment phase of the prison sex offender program could be brought into the Treatment Center if the institution instituted double bunking for some civilly committed residents as well as for the new admissions. However, due to the gradual decline of the civilly committed population in conjunction with the space freed up by the opening of the pre-transition program, it was possible to relocate the intensive treatment phase (Phase IV) of the prison sex offender treatment program from the Southeastern Correctional Center into the D-2 Unit of the Treatment Center. New furnishings permit double bunking in D-2. At this juncture, no double bunking is contemplated for civilly committed residents. If this option were to become desirable at some time in the future, the Department of Correction will follow the protocols described in the original plan.

With the anticipated opening of the modular expansion unit in the Spring of 1997 and the admission of 300 new sex offenders, the challenge is no longer to find bed space but to utilize the existing resources in the most efficient manner to ensure that program opportunities for civilly committed residents will be fully maintained, while providing for the needs of the new population. By

---

[22] The policy excluding untreated sex offenders from community access will be memorialized in statute. St. 1996, c. 239, § 3 (signed August 5, 1995 and effective November 3, 1996), amends G.L. c. 127, § 49, governing participation of inmates in programs outside correctional facilities, as follows:

The first paragraph of section 49 of chapter 127 of the General Laws, as so appearing, is hereby amended by adding the following two sentences:- No sex offender in the custody of the department of correction shall be eligible to participate in an program outside a correctional facility established under section forty-eight unless he has completed the department's voluntary sex offender treatment program. The voluntary sex offender treatment program shall be administered pursuant to the rules and regulations of the department.

47

affidavit, Superintendent Walsh has presented his plan to the Court describing how the institution may manage meals, visits, clinical and therapeutic treatment, academic and vocational education, recreation and library access for an expanded population. Appendix 18.

It is important to note the Department of Correction's procedure for selecting, admitting and retaining new prisoners at the Treatment Center is specifically geared to maintaining the safety of all concerned; residents, staff and new admittees. In accordance with longstanding Department practices for institutional placement, each inmate will be seen by a classification board, which will determine his suitability for placement at the Treatment Center. Among the factors considered by the classification board are the individual's sentence structure, his disciplinary history, his history of program involvement at other institutions, his degree of adjustment at other institutions, and the existence of any identified "enemies" within the institution. Each individual admitted to the Treatment Center will be a sex offender. Each will have volunteered to participate in the sex offender treatment program. Obviously, the incentive for a sex offender to successfully complete the program is great, as it is the Department's policy that no sex offender will be considered for lower security placement without having successfully completed the sex offender treatment program. Finally, the Department retains absolute discretion to remove any individual from the Center for reasons of program failure or disruptive behavior. Each inmate entering the Center does so with the knowledge that failure carries the consequences of higher custody placement and a diminished likelihood of favorable parole consideration.

48

CONCLUSION

The field of sex offender treatment in the Commonwealth is not static. The seven year period since the Governor's Special Advisory Panel issued its recommendations has been marked by sweeping changes. The Legislature has halted civil commitments of sex offenders, the Department of Correction has developed and instituted a state-wide sex offender treatment program for the prisons, the Treatment Center has instituted a treatment program based upon expanded cognitive behavioral therapy, and the Department of Correction has assumed sole responsibility for management of the facility. It is clear that a pragmatic and flexible philosophy is the key to managing this unique facility in a changing environment, so that residents and inmates may receive meaningful treatment in a safe and secure setting. The amended plan herein described offers significant improvements over the original plan offered two years ago. It is the Department's intent that by assessing and refining the elements of the plan as they are implemented over the next year, the policies and practices that emerge will be better still.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se*,
        Plaintiff,

v.

ROBERT MURPHY, *et al.*,
        Defendants.

### AFFIDAVIT OF GLENN EDINGTON

I, Glenn Edington, being duly sworn, do hereby depose and state as follows:

1.  Since 1984, I have been an employee of the Massachusetts Department of Correction ("DOC"). I currently hold the position of Institutional Grievance Coordinator at the Massachusetts Treatment Center ("Treatment Center"). I have held that position for 2 years. My responsibilities include maintaining logs of all grievances filed within the institution.

2.  I checked the grievance logs and files as far back as 2000. William Hebert has not filed a grievance.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14TH DAY OF DECEMBER, 2005.

Glenn Edington

— Ex. 1 —

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT,
       Plaintiff,

v.

ROBERT MURPHY, *et al.*,
       Defendants.

### AFFIDAVIT OF NANCY CONNOLLY, PSY.D.

I, Nancy Connolly, Psy.D., being duly sworn, depose and state as follows:

1. I am a psychologist licensed to practice in the Commonwealth of Massachusetts. I am also a Designated Forensic Psychologist. I also have a master's degree in social work and was a licensed clinical social worker. Some of my professional experience is summarized as follows: From 1983 to 1986, I worked as a clinical social worker in the Law and Psychiatry Program in the McLean/Bridgewater Program. In this capacity, I provided group, individual and family therapy for mentally ill offenders, including sex offenders at Bridgewater State Hospital. From 1993 until 1995, I served as the chairperson of the Restrictive Integrative Review Board ("RIRB") at the Massachusetts Treatment Center ("Treatment Center"). The RIRB was the statutory predecessor to the Community Access Board ("CAB"). The RIRB's responsibilities included annually reviewing civilly committed Sexually Dangerous Persons ("residents"), making recommendations for treatment for residents, evaluating residents for community access and providing reports and testimony to the Superior Court in connection with G.L. c. 123A, § 9 petitions for discharge. I also developed treatment plans for residents, evaluated residents who were placed in the crisis unit and participated in the Department of Mental Health's administrative boards. Between 1995 and approximately late 2001, I occasionally sat as a member of the CAB. The CAB's responsibilities include annually reviewing residents, making recommendations for treatment for residents and providing reports and testimony to the Superior Court in connection G.L. c. 123A, § 9 petitions for discharge. From 1995 to the present, I have been employed by Forensic Health Services, Inc. ("FHS"). From 1995 to 2002, I worked as a forensic psychologist in the district courts in Southeastern Massachusetts, primarily in the Falmouth and Plymouth District Court clinics. In this capacity, I conducted evaluations under G.L. c. 123 and provided assessments of dangerousness related to mental disorders and substance abuse, competency to stand trial and criminal responsibility. I provided expert testimony on mental health and substance abuse issues. From 1998 to 1999, I conducted research and provided expert witness testimony for Criminal History Systems Board and the Sex Offender Registry.

Ex. 8

2. Effective July 1, 2002, FHS has contracted with the Department of Correction ("DOC") for the provision of sex offender treatment to residents and sex offenders who are not civilly committed but are serving state prison sentences. Since July 1, 2002, I have served as the Program Director for FHS' sex offender treatment program. My office is located at the Treatment Center.

3. Each resident is assigned to a primary group, which usually consists of eight to ten residents s one or two therapists. Primary group provides residents with the opportunity to practice skills and concepts learned in psycho-educational classes. It also provides residents with the opportunity to address issues related to their sexual offending. Further, through primary group, the therapists maintain contact with the residents to provide clinical oversight of their individualized treatment plan and to provide guidance in an effort to maximize treatment opportunities. Psycho-education classes are didactic in nature and provide a method by which residents learn new concepts and address specific areas related to sexual offending, behavior management and other issues. Psycho-educational classes offer residents the opportunity to learn the basic components and concepts of sex offender treatment. Residents are then expected to practice these concepts and skills in their primary group and in their daily living. Specialty groups are offered to address specific needs within the resident population. For example, there is a survivor's group designed to help residents address their own histories of trauma. Unit meetings are designed to promote pro-social aspects of the therapeutic community. These meetings are typically held on a weekly basis on the housing unit.

4. Specialized programming is offered for residents who have cognitive limitations or mental illness on the A housing unit. Residents with such limitations are placed in one of two primary groups where the pace is geared to the functional abilities of the group members. Thus, while the treatment areas remain the same as for all residents, the material is reviewed repeatedly to assist these residents in understanding it. Since some of these residents are unable to read or write, instruction includes verbal discussion and review. Residents who have cognitive limitations or mental illness are encouraged to participate in programs offered to all residents, including psycho-educational classes. In addition, psycho-educational classes and specialty groups are offered on A unit for residents with cognitive limitations or mental illness. The psycho-educational classes on A unit address the same types of materials as other psycho-educational classes but usually at a slower pace and presented in a manner suitable to the individual's learning style.

5. William Hebert is assigned to one of the two primary groups described in the preceding paragraph. In my opinion, it is appropriate for Mr. Hebert to be assigned to such a primary group.

6. Individual sex offender treatment plans are prepared approximately every six months for residents. A treatment review panel, consisting of senior sex offender treatment program staff, reviews each resident's treatment plan periodically. As program

director, I usually participate in such reviews.  I have reviewed the sex offender treatment plan for William Hebert.  In my opinion, Mr. Hebert's treatment plan is appropriate for him.

7.  Attached hereto are true and accurate copies of documents from Mr. Hebert's sex offender treatment record:  (a) June 3, 2003 contact note by Anne E. Johnson, Ph.D., then Director of Assessment; (b) May 23, 2003 Annual Treatment Review; (c) May 7, 2004 Annual Treatment Review; and (d) April 25, 2005 Annual Treatment Review.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14th DAY OF DECEMBER, 2005.

*Nancy Connolly, PsyD*

Nancy Connolly, Psy.D.

 Forensic
Health
Services
Incorporated

### Sex Offender Treatment Program
### Massachusetts Treatment Center
### <u>CONTACT NOTE</u>

Name _____ Hebert, William _____ M14707 _____          Unit # ____ A-1 ____

Date and Time _____ June 3, 2003 _____

Description: (D):

Met with Mr. Hebert on this date in regards to completing psychological testing for his Comprehensive
Assessment. I explained the purpose of testing to assess for reading and comprehension skills, memory,
and some historical material. Mr. Hebert presented as polite and pleasant but very psychotic. He spoke in
metaphors. He was able to communicate, very indirectly, that he was not interested in psychological
testing as he did not want to have any thing held against him legally. He placed a check mark in both
sections that called for his name (both the acceptance line and the refusal line), but otherwise declined to
sign his name in either place.

Assessment (A):

Psychotic. Currently refusing testing

Plan: (P):

Refer to treatment team.

Name: _____ Anne E. Johnson, Ph.D., Director of Assessment

Signature _____

6/2002



**FHS** Forensic Health Services Incorporated

## ANNUAL TREATMENT REVIEW

| | | |
|---|---|---|
| **RESIDENT:** | William Hebert | **COMM#** M-14707 |
| **DATE OF BIRTH:** | January 25, 1959 | |
| **REVIEW DATE:** | May 19, 2003 | |
| **REPORT DATE:** | May 23, 2003 | |
| **DATE OF LAST REVIEW:** | NOT APPLICABLE (First Report) | |
| **TREATMENT TEAM:** | Ruth A. Kevghas, M.A. | |
| | Nancy H. Hartzog, D.Min, M.Div. | |
| | Alessia Amico, M.A. | |

**Identifying Information:**

Mr. Hebert is a forty-four-year-old, divorced Caucasian male who was committed to the Massachusetts Treatment Center on June 21, 2002, as a Sexually Dangerous Person under the Massachusetts General Laws, Chapter 123A.

Mr. Hebert is serving a day to life civil commitment after completing his prison sentence of eight concurrent terms of 8 to 10 years for each of three counts of Rape of A Child With Force, for one count of Assault With Intent to Rape a Child Under Sixteen, and each of four counts of Indecent Assault and Battery on a Child Under Fourteen. Mr. Hebert's known sexual offenses involved incestuous acts with his daughter between June of 1989 and April of 1990, or possible over a longer span of time. The records reflect conflicting time frames and Mr. Hebert reportedly "told staff at Franklin Medical Center that he had abused the victim over the course of four years" (Commonwealth of Massachusetts vs. William Hebert, Case No. 00-650, page 2). The assaults ranged from fondling, masturbation, and oral sex and attempted anal penetration, and threats to gain compliance. The victim reported that the assaults took place when she was eight to ten years of age. Also included in Mr. Hebert's records are reports that he exposed himself to his sister's friends when he was between the ages of fourteen and sixteen.

1

Massachusetts Treatment Center • 30 Administration Road • Bridgewater, Massachusetts 02324
Phone (508) 279-8100 • Fax (508) 697-6376

According to the records, Mr. Hebert suffered a stroke in 1993. Reports indicate that his illogical, bizarre speech may be a result of his stroke.

## Circumstances of the Annual Treatment Review

This Review is being conducted as a part of the treatment review process mandated by Massachusetts General Laws Chapter 123A. This report is being prepared for presentation to the Community Access Board (C.A.B.). In preparing this report, this resident's progress in treatment has been assessed through a review of his Admission and/or Intake Summary, all available official versions of documented sexual offenses, R.I.R.B./C.A.B. Reviews, Qualified Examiner reports, Section Nine decisions, previous Annual Treatment Reviews, Treatment Goal Summary Forms and Goal Attainment Scales (G.A.S.), Clinical and Administrative Review Team (C.A.R.T.), Treatment Review Panel (T.R.P.), relevant psychological testing and group, class and treatment progress notes. Mr. Hebert chose not to participate in his Annual Review.

## Lamb Warning

Since Mr. Hebert declined to attend his Annual Review of Treatment, a Lamb Warning was not issued. Mr. Hebert was informed that his progress in accomplishing his treatment goals was being evaluated and informed that a report would be submitted to the C.A.B. It is unclear to this writer whether Mr. Hebert had a lucid understanding of what it meant to make the decision not to meet with the Treatment Team and the importance of the report that would be submitted to the C.A.B. Mr. Hebert did not indicate whether he would participate in his C.A.B.

## 2002 Community Access Board Goal Recommendations

At this time, the Community Access Board has made no recommendations for Mr. Hebert. This is his first Annual Treatment Review at the Massachusetts Treatment Center since being found as a Sexually Dangerous Person under the Massachusetts General Laws, Chapter 123A.

## Review of Treatment/Progress

1. **Primary Group Assignment, Percentage of Attendance and Participation Level**
   Mr. Hebert was transferred to the A1 Unit in February of 2003 and assigned to the A1-B Primary Group led by Nancy H. Hartzog, D.Min, M.Div. (9/16/02 to present), Ruth A. Kevghas, MA, (7/02/02 to 4/28/03), and Paul Fredericks, MSW, LCSW, (4/28/03 to 5/16/03). As of the writing of this report, he has not attended any Primary Group sessions on A Unit and had not attended any on the D Unit prior to the move.

2

**2. Psycho-educational Classes**
The Treatment Team had not yet recommended any psycho-educational classes for Mr. Hebert to participate in and complete.

Mr. Hebert did not enroll in or attend any psycho-educational classes during this review period.

**3. Specialty Group**
The Treatment Team has not recommended any Specialty Group work at this time.

Mr. Hebert did not attend any Specialty Groups during this review period.

**4. Unit Community Meeting**
The Treatment Team had not made any specific recommendations for attendance at Unit Community Meetings, however, had encouraged Mr. Hebert to attend all scheduled meetings.

Mr. Hebert has attended 10 out of 14 Unit Community Meetings on the A 1 Unit since his move for an attendance rate of 71 percent.

**5. Other Therapeutic Activities**
The Treatment Team did not recommend Mr. Hebert to attend any Other Therapeutic Activities.

Mr. Hebert did not attend any Other Therapeutic Activities during this review period.

**6. Progress on 2002 Community Access Board Goal Recommendations**
At this time, the Community Access Board has made no recommendations for Mr. Hebert. This is his first Annual Treatment Review at the Massachusetts Treatment Center since being found as a Sexually Dangerous Person under the Massachusetts General Laws, Chapter 123A.

**7. Review of Rehabilitation Progress**
Please refer to attached Rehabilitation Report.

**8. Review of Health Issues**
Mr. Hebert chose not to meet with the Treatment Team for his Annual Review and has not signed a Release of Information with Health Services during this review period for access to his current medical information.

According to the Intake Report written by David Cerce, M.Ed. on August 21, 2002;

3

Mr. Hebert's records show that in April 1990, he was admitted to Franklin County Hospital for suicidal ideation, and received outpatient treatment. He was diagnosed with Adjustment Disorder with Disturbance of Mood and Chronic Alcohol Abuse. While in prison, Mr. Hebert completed three out of four phases of Sex Offender treatment offered by DOC. This author discovered that Mr. Hebert is being seen regularly by the Mental Health staff at the MTC for his psychological problems. Neither the exact nature of his psychological problems, nor if Mr. Hebert is currently taking any medications is known to this author.

According to the records, Mr. Hebert suffered a stroke in April 1993. Reports indicate that his illogical, bizarre speech may be a result of his stroke. There is no additional information regarding Mr. Hebert's physical/medical history in the records (pp. 2-3).

**Summary of Progress in Major Areas of Clinical Focus/Treatment Plan:**

1. **Cognitive Restructuring**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

2. **Identification of Sexual Assault Cycle**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

3. **Identification and Modification of Deviant Sexual Arousal**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

4. **Relapse Prevention**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

5. **Accountability and Accepting Responsibility**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

6. **Drug and Alcohol Abuse Treatment**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

7. **Anger Management and Stress Management**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

4

8. **Victim Empathy**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

9. **Understanding Human Sexuality**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

10. **Social Skills Training**
    **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center. Mr. Hebert received two Observation of Behavior Reports during this review period, demonstrating difficulty in following institutional rules and poor interpersonal skills. Mr. Hebert recently began attending Unit Community Meetings on the A1 Unit. He has attended 10 out of 14 Unit Meetings since moving to the Unit in early February of 2003.

11. **Adult Life Skills Training**
    **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

12. **Release Planning and Transition Into the Community**
    **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

**Disciplinary Action:**

| DATE | OBR # | BEHAVIOR | SANCTION |
|------|-------|----------|----------|
| 3/05/02 | 02-098 | A 11: Conduct which disrupts or interferes with the security or orderly running of the institution when this poses a threat to life or a threat of serious bodily harm or furthers a prohibited act of the Greatest Severity category. A 6: Possession of a weapon or ammunition. B 17: Conduct which disrupts or interferes with the security or orderly running of the institution. D 2: Use of obscene, abusive or threatening language, actions or gestures to any resident, staff or visitor. | Guilty to A 11, A 6, & D 2. 10 Days MPU. Dismissed B 17. |
| 9/11/02 | 02-305 | B 17: Conduct which disrupts or interferes with the security or orderly running of the institution. C 7: Refusing a direct order. D 7: Failure to follow safety or sanitary regulations including failure to maintain living quarters in a tidy and sanitary manner. | Guilty D 7. Mental Health referral. Dismissed B 17 & C 7. |

5

| 5/21/03 | 03-169 | B 17: Conduct which disrupts or interferes with the security or orderly running of the institution.<br>C 12: Threatening another person with bodily harm including sexual assault.<br>D-1: Possession of anything not authorized.<br>*[Mr. Hebert threatened the Unit CO; "If you interfere with me cleaning my room again I will hit you." The Unit CO had confronted him about misuse of cleaning supplies.]* | Hearing pending; Mr. Hebert is currently being held in MPU. |

**Recommended Treatment Plan Goals:**

Please refer to the attached Treatment Plan written May 19, 2003.

**Clinical Formulation:**

Mr. Hebert has not availed to participate in sex offender treatment since being civilly committed to the Massachusetts Treatment Center on June 21, 2002. He has begun attending the Unit Community Meetings on a frequent basis and has spoken at a few of the meetings. On occasions when Mr. Hebert chose to speak to his new community, he had difficulty communicating what he wanted to say to the other residents and they in turn had no apparent understanding of what he was saying. His discourse consisted of many metaphors and loosely strung together concepts about how he hoped he was being able to fit well within his new community. Unfortunately, many of the residents that he wanted to communicate with had brushed off his comments as unintelligible.

Until Mr. Hebert engages in sex offender treatment, any treatment he gained from the DOC program remains questionable at best. He needs to begin with some of the fundamental psycho-educational classes and gain a rudimentary understanding of the basic concepts of treatment. He needs to participate in a baseline phallometric assessment and any follow-up recommendations. He needs to work with Mental Health and his Treatment Team to coordinate services that will assist him in being able to communicate effectively in a group setting.

Ruth A. Kevghas, M(A) (Author)
A-Unit Treatment Unit Coordinator

Nancy H. Hartzog-Devlin, M. Div.
A-Unit Asst. Treatment Unit Coordinator

Alessia Amico, M.A.
A-Unit Therapist

6

Attachments:
      Rehabilitation Report
      Treatment Plan

xc:    F.H.S. Clinical File
        C.A.B. Members
        F.H.S. Clinical Director
        D.O.C. Deputy Superintendent of Treatment/Classification
        Treatment Coordinator
        D.O.C. File
        Resident

7

 Forensic
Health
Services
Incorporated

# ANNUAL TREATMENT REVIEW

**RESIDENT:**                    William Hebert  # M14707

**DATE OF BIRTH:**          January 25, 1959

**REVIEW DATE:**          May 7, 2004

**REPORT DATE:**          May 7, 2004

**DATE OF LAST REVIEW:**    May 19, 2003

**TREATMENT TEAM:**       Deirdre A. White, LICSW
                               Danielle Rousseau, M.A.
                               Heather  Dumais, M.A.
                               Alessia Amico, M.A.

**Identifying Information:**

Mr. William Hebert is a forty-five-year-old, divorced Caucasian male who was committed to the Massachusetts Treatment Center on June 21, 2002, as a Sexually Dangerous Person under the Massachusetts General Laws, Chapter 123A. Mr. Hebert was sentenced for his governing offense on March 15, 1991. He received eight concurrent terms of 8 to 10 years for each of three counts of Rape of a Child with Force, for one count of Assault with Intent to Rape a Child Under Sixteen, and each of four counts of Indecent Assault and Battery on a Child Under Fourteen. Each of the governing offenses involved Hebert's biological daughter over the course of one to two years (approximated between 1988-1990), while the victim was between eight to ten years old. However, there are conflicting reports that suggest the abuse may have occurred over a longer span of time (approximately four years). The assaults ranged from fondling, masturbation, and oral sex and attempted anal penetration, and threats to gain compliance. Mr. Hebert's records also indicate that he had exposed himself to his sister's friends when he was between the ages of fourteen and sixteen.

1

**Circumstances of the Annual Treatment Review**

This Review is being conducted as a part of the treatment review process mandated by
Massachusetts General Laws Chapter 123A. This report is being prepared for
presentation to the Community Access Board (C.A.B.). In preparing this report, this
resident's progress in treatment has been assessed through a review of his Admission
and/or Intake Summary, all available official versions of documented sexual offenses,
R.I.R.B./C.A.B. Reviews, Qualified Examiner reports, Section Nine decisions, previous
Annual Treatment Reviews, Treatment Goal Summary Forms and Goal Attainment
Scales (G.A.S.), Clinical and Administrative Review Team (C.A.R.T.), relevant
psychological testing and group, class and treatment progress notes. Mr. Hebert chose
not to participate in his Annual Review.

**Limits of Confidentiality Warning**

Since Mr. Hebert declined to attend his Annual Treatment Review, a Limits of
Confidentiality Warning was not issued. Mr. Hebert was informed that his progress in
accomplishing his treatment goals was being evaluated and informed that a report would
be submitted to the C.A.B. Mr. Hebert indicated that he would not participate in his
C.A.B.

**2003 Community Access Board Goal Recommendations**

In referencing the Community Access Board Annual Review of June 17, 2003 written by
Frederic Krell, Ph.D., the following recommendations were made:

- Mr. Hebert needs to participate in Sex Offender Treatment, which would include
  attending Primary Group and Psycho-educational classes.
- Mr. Hebert needs to participate in a baseline Phallometric Assessment and follow
  any behavioral recommendations that flow from that assessment.
- Mr. Hebert's Treatment Team needs to put together a thorough and detailed
  chronology of his psychiatric symptoms in order for a neurological examination
  referral to be submitted.
- Mr. Hebert needs to comply with psychotropic medications and if he is not able
  to do so, consideration should be made for a Rogers to be filed.

**Review of Treatment/Progress**

1. **Primary Group Assignment, Percentage of Attendance and Participation
   Level:**
   The Treatment Team recommended that Mr. Hebert attend 80% of scheduled
   Primary Group sessions and participate in the group discussions. According to
   the records, Mr. Hebert has not attended any Primary Group sessions since or
   before May 20, 2003.

2

2.  **Psycho-educational Classes:**
    The Treatment Team recommended that Mr. Hebert enroll in and pass the
    following psycho-educational classes: Relapse Prevention I, "Managing Anger"
    (anger management), and Living in Community I.  Mr. Hebert chose not to enroll
    in these recommended classes or any other psycho-educational classes offered on
    the Pro-Social Unit or in the Learning Center this review period.

3.  **Specialty Group:**
    The Treatment Team made no specific recommendations that Mr. Hebert attend a
    Specialty Group this review period.

    Mr. Hebert did not attend any Specialty Groups during this review period.

4.  **Unit Community Meeting:**
    The Treatment Team recommended that Mr. Hebert attend 85% of his Unit
    Community Meetings and chair at least one meeting.  Mr. Hebert attended only
    67% of the scheduled Unit Community Meetings.  He did not chair any of the
    meetings he attended and generally does not participate.  Mr. Hebert tends to
    stand on the outer periphery from the other residents.

5.  **Other Therapeutic Activities:**
    The Treatment Team made no specific recommendations that Mr. Hebert
    participate in other therapeutic activities this Review Period.

    Mr. Hebert did not attend any Other Therapeutic Activities during this review
    period.

6.  **Progress on 2003 Community Access Board Goal Recommendations:**
    Mr. Hebert needs to participate in Sex Offender Treatment, which would include
    attending Primary Group and Psycho-educational classes.
    **Status:**  Mr. Hebert did not address this goal.

    Mr. Hebert needs to participate in a baseline Phallometric Assessment and to
    follow any behavioral recommendations that flow from that assessment.
    **Status:**  Mr. Hebert did not address this goal.

    Mr. Hebert's Treatment Team needs to put together a thorough and detailed
    chronology of his psychiatric symptoms in order for a neurological examination
    referral to be submitted.
    **Status:**  Mr. Hebert's Treatment Team has initiated contact with Health Services
    regarding a neurological examination.

    Mr. Hebert needs to comply with psychotropic medications and if he is not able to
    do so, consideration should be made to have a Rogers filed.

                                                                              3

**Status:** Mr. Hebert is not taking medication at this time. He is currently being evaluated by Health Services to determine whether or not a Rogers is necessary.

7. **Review of Rehabilitation Progress:**
   Please refer to the attached Rehabilitation Report if available.

8. **Review of Health Issues:**
   Mr. Hebert chose not to meet with the Treatment Team for his Annual Review and has not signed a Release of Information with Health Services during this review period for access to his current medical information.

## Summary of Progress in Major Areas of Clinical Focus/Treatment Plan:

1. **Cognitive Restructuring**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

2. **Identification of Sexual Assault Cycle**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

3. **Identification and Modification of Deviant Sexual Arousal**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

4. **Relapse Prevention**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

5. **Accountability and Accepting Responsibility**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

6. **Drug and Alcohol Abuse Treatment**
   **Status:** No progress. Mr. Hebert has not attended either Primary Group or any Psycho-educational classes since being civilly committed to the Treatment Center.

7. **Anger Management and Stress Management**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

8. **Victim Empathy**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

4

9. **Understanding Human Sexuality**
   **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

10. **Social Skills Training**
    **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center. Mr. Hebert received four Observation of Behavior Reports (OBR) during this review period, demonstrating an ongoing difficulty in following institutional rules and poor interpersonal skills. Mr. Hebert does attend Unit Community Meetings on his housing unit (A-1). He has attended 67% of community meetings since his last review period.

11. **Adult Life Skills Training**
    **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

12. **Release Planning and Transition Into the Community**
    **Status:** No progress. Mr. Hebert has not attended Primary Group since being civilly committed to the Treatment Center.

**Disciplinary Action:**

| DATE | OBR # | BEHAVIOR | SANCTION |
|------|-------|----------|----------|
| 5/21/03 | 03-169 | B17: Conduct which disrupts or interferes with the security of orderly running of the institution. C12: Threatening another person with bodily harm including sexual assault. D1: Possession of anything not authorized. | Guilty to B17. 5 Days MPU. Combine C12 and D1. 5 Days Room Restriction. |
| 5/31/03 | 03-178 | B17: Conduct which disrupts or interferes with the security of orderly running of the institution. C11: Destroying, altering or damaging government property or the property of another person having a value of $100.00 or less. | Dismissed B17. Guilty to C11. 5 Hours Extra Duty. |
| 6/10/03 | 03-184 | A11: Conduct which disrupts or interferes or the security or orderly running of the | Dismissed A11. Guilty to D2. 5 Days Loss of Yard. |

| | | | |
|---|---|---|---|
| | | institution when this poses a threat to life or a threat of serious bodily harm or furthers a Prohibited act of the Greatest Severity category. D2: Use of obscene, abusive or threatening language, actions or gestures to any resident, staff or visitor. | |
| 4/19/04 | 04-131 | B17: Conduct which disrupts or interferes with the security or orderly running of the institution. D2: Use of obscene abusive or threatening language, actions or gestures to any resident, staff or visitor. | Guilty to B17 and D2. 5 Days MPU. |

**Recommended Treatment Plan Goals:**

Please refer to the attached Treatment Plan.

**Clinical Formulation:**

Mr. Hebert is a forty-five year old Caucasian male who was adjudicated as a Sexually Dangerous Person on June 21, 2002. Mr. Hebert's governing offense includes Rape of a Child With Force (3 counts), Assault with Intent to Rape a Child Under Sixteen (1 count), and Indecent Assault and Battery on a Child Under Fourteen (four counts). The victim of these offenses was his biological daughter. His records indicate that the known abuse and victimization of his daughter occurred approximately between a two to four year period of time.

According to Mr. Hebert's records, he completed three out of four phases of Sex Offender Treatment while serving time. However, since being civilly committed, he has been uninvolved in treatment. Mr. Hebert's Treatment Team has been unable to assess whether or not he gained from previous treatment due to his lack of participation at the Massachusetts Treatment Center. Although he was diagnosed in 1990 with Adjustment Disorder with Disturbance of Mood and Chronic Alcohol Abuse, Mr. Hebert is not currently taking medication. He has been unwilling to sign any waiver in order for Mental Health Services and his Treatment Team to coordinate services that will assist him in being able to actively participate in treatment. Mr. Hebert will be encouraged by

6

both Mental Health Services and members of his Treatment Team to consider working
with staff so he can be appropriately treated and begin to address the Treatment Team
goals outlined by the CAB and his Treatment Plan.


Deirdre A. White, LICSW                          Danielle Rousseau, M.A.
A-Unit Treatment Coordinator                     A-Unit Asst. Treatment Coordinator
(Author)


Heather Dumais, M.A.                             Alessia Amico, M.A.
A-Unit Therapist                                 A-Unit Therapist


Attachments:
      Rehabilitation Report
      Treatment Plan

xc:    F.H.S. Clinical File
      C.A.B. Members
      F.H.S. Clinical Director
      D.O.C. Deputy Superintendent of Treatment/Classification
      Treatment Coordinator
      D.O.C. File
      Resident

7



Forensic
Health
Services
Incorporated

# ANNUAL TREATMENT REVIEW

| | | |
|---|---|---|
| **RESIDENT:** | William Hebert | **COMM#** M-14707 |
| **DATE OF BIRTH:** | January 25, 1959 | |
| **REVIEW DATE:** | April 22, 2005 | |
| **REPORT DATE:** | April 25, 2005 | |
| **DATE OF LAST REVIEW:** | May 7, 2004 | |
| **TREATMENT TEAM:** | Deirdre A. White, LICSW | |
| | Shawn Thomas, M.Ed. | |
| | Heather Dumais, M.A. | |
| | Kim Curtis, M.S. | |

## Identifying Information:

Mr. William Hebert is a forty-six-year-old, divorced Caucasian male who was committed to the Massachusetts Treatment Center on June 21, 2002, as a Sexually Dangerous Person under the Massachusetts General Laws, Chapter 123A. Mr. Hebert was sentenced for his governing offense on March 15, 1991. He received eight concurrent terms of 8 to 10 years for each of three counts of Rape of a Child with Force, for one count of Assault with Intent to Rape a Child Under Sixteen, and each of four counts of Indecent Assault and Battery on a Child Under Fourteen. Each of the governing offenses involved Mr. Hebert's biological daughter over the course of one to two years (approximated between 1988-1990), while the victim was between eight to ten years old. However, there are conflicting reports that suggest the abuse may have occurred over a longer span of time (approximately four years). The assaults ranged from fondling, masturbation, and oral sex and attempted anal penetration, and threats to gain compliance. Mr. Hebert's records also indicate that he had exposed himself to his sister's friends when he was between the ages of fourteen and sixteen.

1

**Circumstances of the Annual Treatment Review**

This Review is being conducted as a part of the treatment review process mandated by Massachusetts General Laws Chapter 123A. This report is being prepared for presentation to the Community Access Board (C.A.B.). In preparing this report, Mr. Hebert's progress in treatment has been assessed through a review of his Admission and/or Intake Summary, all available official versions of documented sexual offenses, R.I.R.B./C.A.B. Reviews, Qualified Examiner reports, Section Nine decisions, previous Annual Treatment Reviews, Treatment Goal Summary Forms and Goal Attainment Scales (G.A.S.), Clinical and Administrative Review Team (C.A.R.T.), Treatment Review Panel (T.R.P.), relevant psychological testing and group, class and treatment progress notes. Mr. Hebert chose to participate in his Annual Review.

**Limits of Confidentiality**

Mr. Hebert was informed that the review meeting was not confidential, and that he could choose whether or not to answer any question(s) during the course of the meeting. Mr. Hebert was further informed that a report would be submitted to the C.A.B. and that anything he said may be written in the report which would be placed in his record where it may be reviewed by the various boards at the Treatment Center, by a Qualified Examiner, or by any court. Mr. Hebert demonstrated to the satisfaction of the Team that he understood the above, and the Review proceeded on this basis. Mr. Hebert indicated that he would participate in his C.A.B.

**2004 Community Access Board Goal Recommendations**

In referencing the Community Access Board Annual Review of June 1, 2004, written by Frederic Krell, Ph.D., the following recommendations were made:

- Mr. Hebert needs to have a thorough physical examination including neurology and psychiatry and a determination needs to be made about whether his mental illness which is becoming increasingly obvious makes participation in the program impossible or at least very difficult
- Mr. Hebert needs to meet with his treatment team to discuss possible Primary Group attendance
- Mr. Hebert need to discuss in his Primary Group the official police report versions of his offenses and the differences that exist between his description and those of the victim
- Mr. Hebert needs to discuss the events and situations that were occurring in his life prior to his offenses against his daughter
- Mr. Hebert needs to work on his understanding of low, medium, and high risk situations
- Mr. Hebert needs to discuss with his treatment team the possibility of examining his Deviant Sexual Arousal and request a phallometric assessment as a baseline

2

- Mr. Hebert needs to begin Relapse Prevention I on the unit and bring some of that information back into Primary Group and eventually start putting together a Relapse Prevention Plan
- Mr. Hebert needs to attend to his past use of substances and how they contributed to his offending behaviors and needs to enroll in the Substance Abuse psycho-educational class while in the facility
- Mr. Hebert needs to complete and pass the Managing Anger psycho-educational class
- Mr. Hebert needs to engage with his Primary Group to discuss his appreciation of the impact of his behavior on his victims and other exercises in victim empathy which may be facilitated by enrolling in the psycho-educational class of that name
- Mr. Hebert needs to enroll and complete Living in Community I and to attend Unit Community Meetings at least eighty-five percent of the time and chair at least one meeting
- Mr. Hebert needs to maintain appropriate hygiene and room cleanliness and to work with his treatment team to assess the impact of his stroke and mental illness

### Review of Treatment/Progress

1. **Primary Group Assignment, Percentage of Attendance and Participation Level** During this review period, Mr. Hebert agreed to begin attending Primary Group. He was assigned to the A1-B Primary Group, which is currently co-facilitated by Deirdre A. White, LICSW and Shawn Thomas, M.Ed., and started attending group as of August 2, 2004. Since that time his attendance has been fairly consistent with an attendance rate of ninety-two percent. While he is willing to address his own sex offender issues, he struggles with re-calling certain events and attributes this to the stroke he suffered in 1993. However, he is able to give feedback to his peers and participate in group discussions. His participation includes discussing his perceptions of treatment, his family & re-establishing relationships with them, and his expressing concerns about his "disposition". He has acknowledged that he looks to the group to provide him with "structure" and "support".

2. **Psycho-educational Classes**
   The Treatment Team recommended that Mr. Hebert enroll in and pass the following psycho-educational classes: Relapse Prevention I, Twelve-Step, Managing Anger, Victim Empathy, and Living in Community I.

   Mr. Hebert completed and passed the Victim Empathy I psycho-educational class. According to the evaluation, "Mr. Hebert completed the required materials needed to pass the class and showed a beginning intellectual understanding of victim empathy, however doe not denote demonstration of emotional empathy". He also enrolled in a Social Skills psycho-educational class during the review period. However, he did not complete the class and did not pass due to too many absences

3

and failure to take the final exam.  Mr. Hebert is currently enrolled in a Twelve-Step psycho-educational class.

Mr. Hebert did not enroll in the other recommended classes.  However, it should be noted that Living in Community I was not offered over the review period.

**3. Specialty Group**
The Treatment Team made no recommendations for Mr. Hebert in regards to a specialty group.

Mr. Hebert has not joined any specialty groups during this review period.

**4. Unit Community Meeting**
The Treatment Team recommended that Mr. Hebert attend eighty-five percent of his Community Unit meetings, as well as chairing one of these meetings this review period.

Mr. Hebert attended fifty-six percent of Unit Community meetings and chaired four of these meetings.

**5. Other Therapeutic Activities**
The Treatment Team did not recommend any other therapeutic activities.

Mr. Hebert participated in the following therapeutic activities: AA and SLAA.

**6. Progress on 2004 Community Access Board Goal Recommendations**

- Mr. Hebert needs to have a thorough physical examination including neurology and psychiatry and a determination needs to be made about whether his mental illness which is becoming increasingly obvious makes participation in the program impossible or at least very difficult
  **Status:** Although Mr. Hebert is unwilling to sign the Release of Information form with Mental Health to review his psychiatric and/or mental health records, he speaks openly about taking psychotropic medication, including Risperdal and Cogentin.  While Mr. Hebert was unable to identify what specific illness he suffers from, he acknowledged that the medications help him with "the voices" and that "they stabilize my thinking". He has also talked about a family history of mental illness.  Mr. Hebert has a tendency to become loose at times when speaking in Primary Group, but overall has adjusted to the treatment program without difficulty.  He reports that the support he receives from staff as well as his peers within his Primary Group is helpful.

4

- Mr. Hebert needs to meet with his treatment team to discuss possible Primary Group attendance
  **Status:** Mr. Hebert approached his treatment team during the month of July 2004 & reported that he was willing to attend Primary Group. Mr. Hebert started Primary Group as of August 2, 2004. According to a group note from October 1, 2004:

  > "Mr. Hebert expressed concern regarding his treatment. He said he worries about the long-term effects of his stroke. He says that he feels "emptiness" & "detached" from the group. He acknowledged that he had joined the group initially because he recognized the support that others get from being involved. He said he is struggling over "fight or flee" from treatment/group but said that the support he receives keeps him coming back. He said that he is aware of his tendency to pace & upon inquiry, attributed his pacing to anxiety".

- Mr. Hebert need to discuss in his Primary Group the official police report versions of his offenses and the differences that exist between his description and those of the victim
  **Status:** Mr. Hebert has not reviewed the official police report versions of his governing offense within Primary Group. However, he has acknowledged that he was committed to the MTC "for pedophilia" (9/27/2004). He later contradicted himself by stating "that he didn't see himself as a pedophile" (10/27/2004) but admitted that the victim of his governing offense was his daughter.

- Mr. Hebert needs to discuss the events and situations that were occurring in his life prior to his offenses against his daughter
  **Status:** While Mr. Hebert has not gone into great detail about the events precipitating his offenses against his daughter, he has been able to discuss some of his perceptions of what was going on his life at the time. In addition to talking about his drinking, Mr. Hebert "believes his crime was the cause of damaged relationships…claims that his situation was unique in that he was 'seeking sexual satisfaction' from adult women but identified that it was 'too difficult to seek out women in the community'. He reported that with his daughter (his victim) that he was 'confusing sex for love'" (10/27/2004). Mr. Hebert acknowledged that he had distorted thinking at the time of his offending. (His distortions will be reviewed below under **Cognitive Restructuring**).

- Mr. Hebert needs to work on his understanding of low, medium, and high risk situations
  **Status:** Mr. Hebert has yet to address this recommendation within his Primary Group.

- Mr. Hebert needs to discuss with his treatment team the possibility of examining his Deviant Sexual Arousal and request a phallometric assessment as a baseline
  **Status:** Mr. Hebert did not address this recommendation during the past review period.

5

- Mr. Hebert needs to begin Relapse Prevention I on the unit and bring some of that information back into Primary Group and eventually start putting together a Relapse Prevention Plan
  **Status:** Mr. Hebert did not enroll in and/or attend Relapse Prevention I. He has yet to develop a Relapse Prevention Plan.

- Mr. Hebert needs to attend to his past use of substances and how they contributed to his offending behaviors and needs to enroll in the Substance Abuse psycho-educational class while in the facility
  **Status:** Mr. Hebert is currently enrolled in a Twelve-Step Substance Abuse psycho-educational class. He also attends AA meetings on a regular basis.

- Mr. Hebert needs to complete and pass the Managing Anger psycho-educational class
  **Status:** Mr. Hebert did not enroll in Anger Management or the Managing Stress, Anger and Depression psycho-educational classes during the past review period.

- Mr. Hebert needs to engage with his Primary Group to discuss his appreciation of the impact of his behavior on his victims and other exercises in victim empathy which may be facilitated by enrolling in the psycho-educational class of that name
  **Status:** Mr. Hebert completed and passed the Victim Empathy I psycho-educational class. Mr. Hebert's participation in Primary Group has included his addressing the impact he must have had on his daughter secondary to his offending. According to a group note, dated September 20, 2004:

  > "He said that he has a lot of remorse for offending his daughter at the age she was (10 years old) in that she was approaching that stage of her life (adolescence)".

- Mr. Hebert needs to enroll and complete Living in Community I and to attend Unit Community Meetings at least eighty-five percent of the time and chair at least one meeting
  **Status:** Mr. Hebert attended only fifty-six percent of his Unit Community Meetings during the review period. However, he chaired four of these meetings. Living in Community I was not offered during the review period.

- Mr. Hebert needs to maintain appropriate hygiene and room cleanliness and to work with his treatment team to assess the impact of his stroke and mental illness
  **Status:** Mr. Hebert has not received any OBR's related to hygiene room cleanliness. His hygiene appears adequate. He continues to utilize group discussions within Primary Group to talk about his stroke and his ongoing concerns to his current "disposition".

6

7. **Review of Rehabilitation Progress**
Please refer to attached Rehabilitation Report.

8. **Review of Health Issues**
During the Annual Review, Mr. Hebert did not agree to request a Release of Information from Mental Health and HSU for his Treatment Team to have access to what medications he is currently taking and what they are prescribed for. He stated that he would prefer not to unless he could consult with his lawyer. However, he was able to report that he is taking Risperdal & Cogentin. Upon inquiry, he said that he took these medications to "stabilize my thinking" and to help "with sleep and the voices". He also identified that he takes Aspirin in light of the stroke he suffered in 1993. He claims that currently he is taking medication for a "breathing problem", which seems to be related to a "cold and flu". He acknowledged that he meets with staff from Mental Health approximately once a month.

### Summary of Progress in Major Areas of Clinical Focus/Treatment Plan:

1. **Cognitive Restructuring**
**Status:** Mr. Hebert's treatment goals included: Meet with Treatment Team to discuss possible Primary Group (PG) attendance; begins writing an autobiography, focusing on his psycho-sexual development; and begin presenting sections of his autobiography, and remain open to questions and concerns raised by staff and group members. As noted earlier, Mr. Hebert started attending Primary Group as of August 2, 2004. He attempted to present his autobiography to his group on September 20, 2004. According to the note from that session:

> "Mr. Hebert presented some of his autobiography in group today. He talked about the lack of communication in his own family & how it was unclear to him whether he should have gotten sex education at home or at school. He talked about how adolescence was such a difficult time for him as well as for people in general. He said he has a lot of remorse for offending his daughter at the age she was (10 years old) in that she was approaching that stage of her life. He talked about his family & how growing up he had felt that "children should not be seen or heard". He said that he felt wrong for masturbating. He said that he dropped out of school in the 9th grade to help out the family financially. He got a job as a mason & also worked as a dishwasher. He identified that he felt a lot of shame while in school due to his being diagnosed with ADHD. He said he didn't know how to communicate and described himself as an introvert. He said that he has 4 sisters and 1 brother".

7

Mr. Hebert has yet to complete presenting his autobiography to be signed and filed.

**2.  Identification of Sexual Assault Cycle**
    **Status:** Mr. Hebert was encouraged to discuss the events/situations that were occurring in his life prior to his sexual offenses against his daughter and demonstrate an understanding of the differences between low, medium, and high-risk situations. Mr. Hebert did not discuss his understanding of the difference between low, medium, and high-risk situations within Primary Group. However, he did identify that he was dealing with "damaged relationships" prior to his offending. His group note from February 11, 2005 indicated:

> "Mr. Hebert offered good feedback and referenced his own offending and some of the understanding he had developed regarding what motivated his offense. He talked about relationship problems with his wife and distorted thinking he had at the time about how best to keep his family together. Mr. Hebert stated that in a distorted way he was trying to stay connected, protect his child and keep his family together. He then stated 'ironically that is exactly the opposite effect' that his crime had on him and his family".

**3.  Identification and Modification of Deviant Sexual Arousal**
    **Status:** Mr. Hebert's treatment team recommended that he explain what "deviant" means to him, and compare it with the definition used in treatment; give at least one example of a past deviant fantasy and one example of a current fantasy; and request to participate in a phallometric assessment. While Mr. Hebert has not discussed his deviant fantasies in great detail, he has been able to speak of his fantasies in relation to his deviant cycle. According to a group note from February 18, 2005:

> "When asked, Mr. Hebert discussed his sexual fantasies and masturbation practices. He stated that he hasn't masturbated in years and explained that he made the choice to abstain from the practice due to religious conviction and because masturbation played a part in his sexual assault cycle. Mr. Hebert was receptive of feedback that not all aspects of human sexuality need to be eliminated from his behaviors, just the ones that play a part in his sexual assault cycle. He explained that he had taken inventory of his sexual experiences and decided that he would eliminate those practices that he felt contributed to a maladaptive cycle of soothing. Mr. Hebert referenced oral sex as another outlet that he looks back on with regret. He stated that when someone is giving oral sex that they "...can't even breathe. I wouldn't want that for myself so why should I entertain asking it of another." Mr. Hebert

8

participated in further group discussion about controlling one's sexual impulses".

4. **Relapse Prevention**
   **Status:** Mr. Hebert's treatment goals in this clinical focus area included that he: Meet with treatment team to discuss possible Primary Group attendance as well as appropriate psycho-educational classes; enroll in and complete Relapse Prevention I on the unit, using the workbook, *Who Am I & Why Am I in Treatment?* and discuss at least two homework assignments from RPI, and listen to feedback. Shortly after joining Primary Group, Mr. Hebert "asked about psycho-educational classes and what would be appropriate for him to take in the upcoming quarter. He identified that he is looking for the group and/or classes to provide him with structure" (8/9/2004). Mr. Hebert has enrolled in Victim Empathy I, Social Skills, and a Twelve-Step (substance abuse) psycho-educational class. While he completed and passed Victim Empathy I, he did not complete or pass the Social Skills psycho-educational class due to too many absences and failure to take the final exam. He is currently involved in the Twelve-Step class. It should be noted that all of these classes are appropriate for Mr. Hebert's treatment. He has yet to enroll in or complete a Relapse Prevention class.

5. **Accountability and Accepting Responsibility**
   **Status:** Mr. Hebert was asked to attend eighty-percent of his Primary Group sessions and to participate in group discussions. He was also encouraged to discuss the official police report versions of his offenses and what he agrees with and doesn't agree with. Mr. Hebert has attended ninety-two percent of his Primary Group sessions, yet expressed ambivalence about treatment. According to a group note, dated October 1, 2004: "He said he is struggling over 'fight or flee' from treatment/group but said that the support he receives keeps him coming back". He remains involved in group both working on his own sex offender issues as well as providing his peers with feedback. He has yet to discuss the official police report versions of his offenses, but does not deny his charges or tend to minimize his behaviors.

6. **Drug and Alcohol Abuse Treatment**
   **Status:** Mr. Hebert was asked to discuss how his past use of substances contributed to his offending behaviors and to enroll in a substance abuse (Twelve Step) psycho-educational class. Mr. Hebert has identified that he attends AA meetings. While he has not elaborated on how his past use of substances contributed to his offending, he is currently enrolled in a Twelve Step psycho-educational class.

7. **Anger Management and Stress Management**
   **Status:** It was recommended that Mr. Hebert complete and pass the Managing Anger psycho-educational class and to talk about one of his assignments within

9

his Primary Group. Mr. Hebert has yet to enroll in a psycho-educational class related to anger management.

8. **Victim Empathy**

**Status:** Mr. Hebert was to enroll in Victim Empathy as well as consistently acknowledge that he harmed his victim. Mr. Hebert completed and passed Victim Empathy I. According to the evaluation from December 2004: "Mr. Hebert completed the required materials needed to pass the class and showed a beginning intellectual understanding of victim empathy, however does not denote demonstration of emotional victim empathy. The level of his victim empathy will be evaluated in Primary Group". Mr. Hebert has talked about his daughter and the harm that he has caused her on several occasions within Primary Group during the past review period. In addition to expressing remorse for his having offended against his daughter, he also talked about the impact of his offenses on both of his children, now that he is attempting to re-establish relationships with both of them. On January 3, 2005, Mr. Hebert's group note indicated:

> "He said he was grateful for an opportunity to re-establish relationships with his family members. He identified that he is more concerned for his children's happiness and that as much as he wants a relationship with them, he recognizes the need to take it slow and at their pace. He expressed concern in that he wonders what re-establishing a relationship might "stir up" for them (his children)".

Again, on February 14, 2005:

> "Mr. Hebert talked about his attempts to write a letter to his daughter (who was his victim). He admits that he became overwhelmed when working on the letter. He was asked if he has had contact with her via phone as was previously discussed in a group. He admitted that he has not had the opportunity. He again expressed concern for his children, both his son and daughter. He said that he worries how much they might be impacted by the re-establishment (if any) of a relationship with him as their father. He said he is concerned that he would cause them to regress in that they have both had to deal with his incarceration as well as why he is at the MTC. He seems to recognize how it is different for his son than his daughter in that she was his victim. He said he wonders if his daughter has anger towards him and/or fear. He also wonders if she has forgiveness for him. He made an analogy of having to choose whom he would save first if there were five people drowning. He said that he would look to save his children before anyone else."

10

9. **Understanding Human Sexuality**
   **Status:** Mr. Hebert's treatment plan identified that he needed to enroll in and complete Living in Community I and discuss what he learned and how these things related to his offending. Mr. Hebert has yet to address this goal. However, it should be noted that Living in Community I was not offered over the past review period. During a group session, on February 18, 2005, Mr. Hebert did discuss some of his beliefs regarding sexuality. According to the note:

> "He stated that he hasn't masturbated in years and explained that he made the choice to abstain from the practice due to religious conviction and because masturbation played a part in his sexual assault cycle. Mr. Hebert was receptive of feedback that not all aspects of human sexuality need to be eliminated from his behaviors, just the ones that play a part in his sexual assault cycle. He explained that he had taken inventory of his sexual experiences and decided that he would eliminate those practices that he felt contributed to a maladaptive cycle of soothing. Mr. Hebert referenced oral sex as another outlet that he looks back on with regret. He stated that when someone is giving oral sex that they "...can't even breathe. I wouldn't want that for myself so why should I entertain asking it of another."

10. **Social Skills Training**
    **Status:** The treatment team identified the following treatment goals for Mr. Hebert in this clinical focus area: Attend Unit Community Meetings at least eighty-five percent of the time and chair at least one meeting; demonstrate improved social interactions on the unit by having less than two reports of problem behavior with other residents during this time period; and comply with institutional rules by receiving no Observation of Behavior Reports. Mr. Hebert only attended fifty-six percent of the Unit Community Meetings but was able to chair four of those meetings. Mr. Hebert has not received any OBR's since his last review period. He appears to struggle with social interactions with his peers but appears to be attempting to work on these issues both on the unit and within his Primary Group. On November 19, 2004, Mr. Hebert expressed concern with his inability to interact with his peers. The group note from that session indicated the following:

> "Mr. Hebert talked about owning his first television in six years. He talked about now recognizing the degree to which he relied on television to fill an emotional void for him. Mr. Hebert talked about how he sees himself as an introvert, and that in the past television had provided him with surrogate families and friends. Today, he explained, being informed on current events helps him to feel more confident amongst his peers on the unit who often discuss current events. Mr. Hebert talked about how up until recently he felt alienated from his peers because he was not well

11

> informed on current events and did not know what his peers were
> talking about when they discussed new television shows".

According to a group note from December 20, 2004:

> "He then responded to his peer who talked about a poor interaction
> they were both involved in while in the medication line. Mr.
> Hebert talked about his thoughts and feelings related to the
> incident, and stated that he considered the issue settled shortly after
> it occurred. He then made it a point to express that he harbored no
> ill will toward his peer. It the group discussion that followed, the
> other man was asked to leave the group. Mr. Hebert was involved
> in further group discussion and seemed to identify with this peer
> who was dealing with his recent civil commitment. Mr. Hebert
> was appropriate and respectful of his peer both while his peer was
> present, and after his peer left the room".

Again, on January 7, 2005:

> "He discussed one of the issues that pertained to a
> misunderstanding between both him and his peer in the medication
> line. Mr. Hebert stated to his peer that he had let the issue go
> shortly after it had occurred, but since it seemed to still bother his
> peer he was willing to apologize to his peer for any of his actions
> that his peer had viewed as intimidating or otherwise
> inappropriate".

**11. Adult Life Skills Training**
**Status:** Mr. Hebert was encouraged to enroll in at least one class on his housing
unit and to maintain appropriate hygiene and room cleanliness. While Mr. Hebert
did not enroll in any classes on his unit, he was able to participate in psycho-
educational classes offered in the Learning Center. He also has obtained and
maintained a job on his housing unit within the past review period. As noted
earlier, he has not received any OBR's in regards to his room cleanliness and his
hygiene appears to be adequate.

**12. Release Planning and Transition Into the Community**
**Status:** The following treatment goals were included for Mr. Hebert in this
clinical focus area: Talk about the impact of his stroke/mental illness has had on
his life; request that his treatment coordinator and Mental Health Services meet
periodically to coordinate services; sign appropriate waivers in order for the
treatment team and the Heath Services Unit (HSU) to treat him more
appropriately; and comply with the recommendations from HSU and Mental
Health, including medication compliance. While Mr. Hebert has yet to sign a
waiver in order for his treatment team to consult with the staff in HSU and/or

12

Mental Health, he was able to identify during his Annual Review that he does take medication and meet with staff from Mental Health monthly. He also has discussed his concerns about the impact of his stroke and/or mental illness within his Primary Group throughout the review period. Shortly after joining his Primary Group, Mr. Hebert spoke about his stroke. According to the note, dated August 9, 2004:

> "He identified that when another group member approached him about an incident that had occurred between them recently, he was not aware of the event. The group offered that this was prior to his transfer to MPU as well as how he seems to have improved since being compliant with medications. He did say that he was not always coherent and might not have been appropriate secondary to stress. He talked about his stroke in 1993 and said that it was the 'scariest thing in my life'…"

On October 22, 2004, another note documented the following:

> "He described feeling that he is going to experience a 'nervous breakdown'. He also worries that he no longer has the same 'reciprocal' relationship with other residents and/or staff, which he felt initially upon joining treatment. He said that he struggles with feelings of depression. He shared his other concerns regarding double bunking and his fear of being institutionalized. He acknowledged that he has a hard time articulating his concerns. He claims that he feels that other people 'sense (he's) better than I perceive'. He reported that he feels rushed during his meetings with mental health staff. He identified that he worries about his family history of mental illness in that his grandmother was mentally ill. Additionally, he seems unclear about the impact of his stroke (in 1993) on his functioning."

Again, on December 13, 2004:

> "He talked about adjusting to his new job, and talked about the weaker side of his body (from a prior stroke). Mr. Hebert talked about muscles that he hasn't used in a while feeling sore. He then talked about his diminished capacity with regard to his short and long term memory, writing ability, etc. He talked about not being able to keep a journal about his daily activities because when he sat down to write, his mind would go blank and he would not be able to write anything. Mr. Hebert then engaged."

13

On January 10, 2005, Mr. Hebert would talk about is medication in response to one of his peers. According to the note:

> "When another group member talked about side effects from medication, Mr. Hebert acknowledged that he finds some of the side effects 'intimidating' but recognized that his blood is tested to monitor his 'chemical imbalance'.

Most recently, on March 4, 2005, Mr. Hebert "talked about what his life has been like since his stroke. He talked about his pacing on the unit and how that served as a distraction of some kind. Mr. Hebert explained to the group that he now finds it difficult to allow his mind to wander, or to 'get into' many television programs. He talked about how awkward certain physical exercise is and how 'from day to day without rhyme or reason' he sometimes has difficulty writing and then other days his handwriting is smooth. Mr. Hebert talked about how some days his handwriting is shaky and he is not sure why this is so".

**Disciplinary Action:**

Mr. Hebert did not obtain any Observation of Behavior Reports in the past review period.

**Recommended Treatment Plan Goals:**

Please refer to the attached Treatment Plan.

**Clinical Formulation:**

Mr. William Hebert is a forty-six-year-old, divorced Caucasian male who was committed to the Massachusetts Treatment Center on June 21, 2002, as a Sexually Dangerous Person under the Massachusetts General Laws, Chapter 123A. Mr. Hebert was sentenced for his governing offense on March 15, 1991. He received eight concurrent terms of 8 to 10 years for each of three counts of Rape of a Child with Force, for one count of Assault with Intent to Rape a Child Under Sixteen, and each of four counts of Indecent Assault and Battery on a Child Under Fourteen. Each of the governing offenses involved Mr. Hebert's biological daughter over the course of one to two years (approximated between 1988-1990), while the victim was between eight to ten years old. However, there are conflicting reports that suggest the abuse may have occurred over a longer span of time (approximately four years). The assaults ranged from fondling, masturbation, and oral sex and attempted anal penetration, and threats to gain compliance. Mr. Hebert's records also indicate that he had exposed himself to his sister's friends when he was between the ages of fourteen and sixteen.

Mr. Hebert has made significant progress since the past review period. He has joined Primary Group and is participating in psycho-educational classes. He has been behaviorally stable as evidenced by his not incurring any Observation of Behavior

14

Reports. He also has been able to obtain and maintain a job on his housing unit. Mr. Hebert's progress appears to be related to his willingness to comply with his medications. Mr. Hebert has started to address many issues related to his sex offender treatment as well as talking about pertinent personal issues, including his family and his health concerns. The treatment team encourages him to remain involved in treatment and to continue to work on the goals outlined by the Community Access Board and within his treatment plan.


Treatment Unit Coordinator,
Deirdre White, LICSW


Assistant Treatment Unit Coordinator
Shawn Thomas, M.Ed.


Treatment Team Member
Heather Dumais, M.A.


Treatment Team Member
Kim Curtis, M.S.


Attachments:
     Rehabilitation Report
     Treatment Plan
     Achievement Matrix


xc:     F.H.S. Clinical File
     C.A.B. Members
     F.H.S. Clinical Director
     D.O.C. Deputy Superintendent of Treatment/Classification
     Treatment Coordinator
     D.O.C. File
     Resident

15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT,
    Plaintiff,

v.

ROBERT MURPHY, *et al.,*
    Defendants.

## AFFIDAVIT OF DONNA SWANSON

I, Donna Swanson, being duly sworn, do hereby depose and state as follows:

1. I am the records custodian for the Department of Correction at the Massachusetts Treatment Center ("Treatment Center"), located in Bridgewater, Massachusetts. I have held this position since January, 1996.

2. As the records custodian for the Treatment Center, I am responsible for maintaining, in the regular course of business, all criminal, administrative and treatment files pertaining to Treatment Center residents.

3. To my knowledge, William Hebert, is civilly committed to the Treatment Center pursuant to the provisions of G.L. c. 123A.

The following documents are true and accurate copies of certain observation of behavior reports contained in Mr. Hebert's files: Nos. 01-436, 02-098, 02-307, 02-308, 02-153, 03-184, 03-169, 04-131, 04-179.

Signed under the penalties of perjury this 14th day of December, 2005.

Donna Swanson

Ex. 9

Attachment A

OBR  No. _01-430_

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name _William Hebert_    Comm. No. _M-14707_ Unit _D-1_

Date _12-15-01_    Time _8:45 PM_    Reporting Staff _CO LORI Brown_

Behavior Observed _(B-17) Conduct which disrupts (C-12) Threatning behavior_ Code No. _____
_(D-2) obscene gestures and actions (C-7) Refusing a direct order_
Witness (if any) _CO patrick park_

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

On Saturday 12-5-01 at approx 8:45 pm I Co L. Brown
while working D-1 unit was approached by Resident
William Hebert M-14707 regarding a cell Search of his room.
This officer proceeded to tell this resident he should
Speak with the South corridor Sgt if he has Complaints.
At This Time this resident Said "Oh yeah I can do
whatever I want" and placed both hands on the button
and Zipper of his pants and proceeded to try and unbutton
them. This officer gave a direct order for him to stop and
get back to his cell, after the Second direct order to get
back to his room he finally Complied. At That point I
notified South corridor Sgt. Co Elliott of the Situation. upon
Arrival of Corridor Lt. Sgt. Beneawit this Resident was Taken To MPU.

Has the resident been placed on pre-hearing restriction? No _____ Yes _X_ Approved By _Sgt. Murphy_

Type of restriction(s) _____

Reporting Staff signature _Lori Brown_    shift/days off _3-11 Th/Fri_

Shift Commander signature _Lt. Mark Benjamin_

Finding and sanction if any _GP 5 day MPU_

Appeal results _____

Reviewing Authority _X.J. XXX_

Attachment A

OBR No. 01-456

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name _WILLIAM HEBERT_     Comm. No. _M-14707_ Unit _D-1_

Date _12-15-01_     Time _8⁵⁰pm_     Reporting Staff _COI ELLIOTT_

Behavior Observed _THREATENING STAFF_     Code No. _CH2 C-7_
_D-2 B-17_

Witness (if any) _C.O BROWN   CO. PARK_

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

ON SAT 12-15-01 AT APPROXIMATELY 8⁵⁰pm I CO ELLIOTT (113) WAS APPROACHED BY RESIDENT WILLIAM HEBERT (M-14707) STATING HE HAD A PROBLEM WITH OFFICER BROWN'S ROOM SEARCH OF CELL #5. WHILE DISCUSSING THE SITUATION RESIDENT HEBERT BECAME VERY AGGITATED AND BELLIGERENT TOWARDS MYSELF AND OFFICER BROWN. THIS RESIDENT APPROACHED ME IN A THREATNING MANER STATING "DO YOU WANT ME TO SMASH YOUR FUCKING HEAD OPEN WITH THAT DOOR OR WHAT". RESIDENT HEBERT WAS ORDERED TO RETURN TO HIS UNIT AND (109) WAS NOTIFYED OF THIS INCIDENT. AT SGT DENEAULT'S ARRIVAL RESIDENT HEBERT WAS HANDCUFFED AND ESCORTED TO M.P.U VIA HSU. E.O.R.

Has the resident been placed on pre-hearing restriction? No _____ Yes _✓_ Approved By _Supt. Murray_

Type of restriction(s) _____

Reporting Staff signature _Richard Elliott COI_ shift/days off _3x11 THUR/FR_

Shift Commander signature _____

Finding and sanction if any _Consolidate w/ 01-436_

Appeal results _____

Reviewing Authority _____

Attachment A

OBR No. _02-098_

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name _HEBERT WILLIAM_    Comm. No. _M14702_ Unit _D-1_

Date _3·5·02_    Time _5 45/pm_    Reporting Staff _C.O. POLSON_

Behavior Observed _THREATENING STAFF_    Code No. _A-6, A-11 / B-19, D-2_

Witness (if any) _____

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

AT APPROX 5 45/pm ON 3·5·02 I C.O. POLSON WHILE
COVERING THE I.D.R. WAS APPROACHED BY INMATE/RESIDENT
HEBERT, WILLIAM M14702 WHO STATED THAT " IF SHE DISRESPECT
ME AGAIN LIKE THAT I WILL TAKE HER OUT". AS RESIDENT
HEBERT WAS MAKING THE ABOVE STATEMENT HE SEEMED
HIGHLY AGGITATED AND WAS POINTING AND WAVING HIS DINNER
FORK AT C.O. LORI BROWN. CORRIDOR O.I.C. LT. DUBE NOTIFIED
OF INCIDENT.

ESCORTED IN CUFFS TO HSU, TO MPU WITHOUT INCIDENT (NR)

Has the resident been placed on pre-hearing restriction? No _____ Yes _✓_ Approved By _DEPUTY MICHEAL_

Type of Restriction(s) _PLACED IN MPU PENDING HEARING_

Reporting Staff signature _Earl Polson_    Date _3·5·02_ shift/days off _3·11_

Shift Commander signature _William Dube Capt_    Date _3-5-02_

Finding and sanction if any _G A11, A6, D2, dismiss B19    10 days MPU_

Appeal results _____

Reviewing Authority _____    Date _2/27/02_

Attachment A

OBR No. 0 2 - 3 0 7

# MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name _Hebert, William_          Comm. No. _M-14707._ Unit _D-2_

Date _9/13/02_          Time _9:26 Am_          Reporting Staff _SGT Michael Antunes_

Behavior Observed _Assault on Staff, Refuse a direct order, Conduct which disrupts_ Code No. _A-11, B-1 + C-7_

Witness (if any) _SGT Glenn Edington_

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

On 9/13/02 approx 9:26, I, SGT Michael Antunes, while attempting to serve an (OBR) Observation of Behavior Report to Civil William Hebert M-14707, was pushed by him. An Emergency was called via radio and Force was used to subdue and apply restraints.

Civil Hebert was given several orders to stay in the room and stop struggling being disruptive, Civil Hebert stated, "God is telling me to leave!" He then pushed me, SGT Edington + I then placed placed Hebert against the wall. Civil Hebert began to struggle and Force was used. Several injuries were sustained to SGT Edington, myself and Civil Hebert.

Has the resident been placed on pre-hearing restriction? No _____ Yes _X_ Approved By _Shift Commander_
_Capt Claflin_

Type of Restriction(s) _Placed in MPU_

Reporting Staff signature _SGT Michael Antunes_ Date _9/13/02_ shift/days off _7-3 MT_

Shift Commander signature _____ Date _9/13/02_

Finding and sanction if any _G, A-11 - B-1 - C-7  30 DAYS MPU - TIME SERVED  7 DAYS_
_13 DAYS REMAINING - SUSPEND 10 DAYS MPU FOR 90 DAYS_

Appeal results _____

Reviewing Authority _____ Date _10/11/__

Attachment A

OBR No. *02 - 308*

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name *William Hebert M14707*     Comm. No. _____     Unit *D-2*

Date *9-13-02*     Time *9:26 A.m.*     Reporting Staff *Sgt. Glenn Edington*

Behavior Observed *Conduct which disrupts, possess a threat to severe bodily injury*
*Failure to comply to a direct order*     Code No. *A11, B1, C7.*
*Assaulting another person.*

Witness (if any) _____

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

On 9-13-02 at 9:26 A.m. while in the D-2 Therapy Room (D-19) this writer proceeded to restrain Civil Commit William Hebert after he had placed his hands on Sgt. Michael Antunes chest, in an attempt to defy a direct order by Sgt. Antunes. This writer proceeded to restrain Hebert's arms and ordered him not to resist placement into handCUFFS. He did not comply and physically resisted and struggled against the attempted handcuffing. A violent struggle ensued, an emergency was declared, Hebert was subdued and transferred to MPU via the H.S.U. Sgt. Antunes, Co. Camara, and myself sustained various minor Lacerations. Use of force was necessary and was used. ✓

Has the resident been placed on pre-hearing restriction? No _____ Yes ✓ Approved By *Cpt. Clefn*

Type of Restriction(s) *Placed in MPU*

Reporting Staff signature _____     Date *9-13-02* shift/days off *Mon/Tue*

Shift Commander signature _____     Date *9-13-02*

Finding and sanction if any *CONSOLIDATE WITH OBR # 02-307*

Appeal results _____

Reviewing Authority _____     Date *18/11/-*

Attachment A

OBR No. *02-153*

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name *Hebert, William* _____ Comm. No. *M14707* Unit *D-1*

Date *4-18-02* _____ Time *9:00 Am* _____ Reporting Staff *C.O. Joseph P. Machachek*

Behavior Observed *Making a Threat and Unusual behavior* _____ Code No. *A-11 B-17*
*C-12*

Witness (if any) _____

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

On the above date 4-18-02 and Time appx. 9:00 Am, while this writer was covering a work detail between the Main building and Modular Building, did observe and heard Inmate Hebert, William M14707 Threaten Inmate ████████. This writer observed Hebert pointing at and yelling at Inmate ████ that he was going to smash ████ head in, Note that ████ was seated in a chair by D-1 Lower window near emergency exit door and Inmate Hebert was standing abut 2' in front of ████ Inmate Hebert STATED "I am going to smush your head in" and this writer heard Inmate ████ STATE "Get away from me, I don't even know you, I just got here yesterday". When Inmate Hebert noticed this writer approaching the window, Hebert pointed at this writer and stated "It is him, he is in his body". D-Unit C.o. Singleton notified, Sgt Sgt. Kinkade and Coricvin Lt. Gifford. Inmate was escorted to HSU for evaluation.

Has the resident been placed on pre-hearing restriction? No ✓ Yes _____ Approved By _____

Type of Restriction(s) _____

Reporting Staff signature *Joseph P. Machachek* _____ Date *4-18-02* shift/days off *Fri/Sat*.

Shift Commander signature *Timothy A. Clef* _____ Date *4-18-02*

Finding and sanction if any *G. 3 days MPU sus/60 days, dismiss All*

Appeal results _____

Reviewing Authority _____ *A.C.* _____ Date *5/3/02*

Attachment A

OBR No. 03 - 184

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident's Name  William Hebert

Comm. N0. M 14707    Unit MPU # 5

Date: June 10, 2003  Time: 8:20 p.m.

Reporting Staff: CO John Dankievitch

Behavior Observed: Conduct which disrupts the orderly running of the institution when it poses a threat to serious bodily harm.. Threatening another resident..      Code No. A-11, D-2

Witness (if any) _____

Referred to District Attorney _____

Type or print in INK your report of the noted behavior.  Use the reverse if more space is necessary.

======================================================================

On June 10, 2003, at 8:20 pm, I IPS Officer John Dankievitch, concluded through self admission that resident William Hebert while in the IDR, threatened to kill resident ▓▓▓▓▓▓

Resident Hebert stated, "the conversation took place, but since it was an accident it never existed."  Resident Hebert made that statement in regards to him stating to resident ▓▓▓▓▓▓ "you know those paint cans you walk around with, well one day I'm gonna shove it up your ass.  You see this, one day there gonna go back to metal and when they stick you with it and kill you."  Resident Hebert was referring to a plastic butter knife.

Has the resident been placed in pre-hearing restriction? No ___  Yes ✓  Approved by DEPKY MACEACHERN

Type of Restriction(s) _~~_____  PLACED IN MPU 15 MIN WATCH DANKE

Reporting Staff Signature    John Dankievitch

Shift Commander Signature  W.T _____ Captain    Date: 6/10/03  Shift/Days off: 2-10 fri/sat _____

Finding and Sanction if any  Guilty / Dismiss A.11 / D2- 5 Days loss of Yard.

Appeal Results  _____ Lawson _____

Reviewing Authority _____            8/20/03

*Page 1 of 2*

*S/pp*

Attachment A

OBR No. *03-169*

# MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name *HEBERT, WILLIAM*    Comm. No. *M14767*    Unit *A-1*

Date *05/21/03*    Time *7:35 AM*    Reporting Staff *CO. PAUL BOURASSA*

Behavior Observed *THREATENING STAFF — UNAUTHORIZED USE OF CLEANING SUPPLIES* Code No. *B17-C12-D-*

Witness (if any) *SGT. CHARTIER*

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

*ON WEDNESDAY 05/21/03 @ 7:35 AM I CO. BOURASSA
OBSERVED RESIDENT HEBERT ENTER THE TOXIC, CAUSTIC STORAGE
AREA WITHOUT AUTHORIZATION AND REMOVE A CAN OF
CLEANSER. THIS RESIDENT HAS BEEN WARNED NUMEROUS
TIMES ABOUT THIS ISSUE, SINCE RESIDENT HEBERT HAS
BEEN OBSERVED BY THIS REPORTER MISUSING CLEANING
SUPPLIES. AT THIS POINT SGT. CHARTIER (14) WAS CALLED
BY RADIO TO UNIT SINCE A-2 CO. MATTHEWS WAS OFF
UNIT COVERING CHOW. UPON ENTERING RESIDENT
HEBERT ROOM, THIS REPORTER OBSERVED A LARGE AMOUNT
OF CLEANSER IN THE TOILET. AT THIS POINT I ALONG WITH
SGT. CHARTIER BEGAN TO VERBALLY REPRIMAND RESIDENT
HEBERT ABOUT THE MISUSE OF CLEANING SUPPLIES *Continue
Page #2**

Has the resident been placed on pre-hearing restriction? No _____ Yes *X* Approved By *Capt. Breault*

Type of Restriction(s) *A-SPH*

Reporting Staff signature *CO. Paul Bourassa*    Date *5/21/03* shift/days off *7-3 SAT-SUN*

Shift Commander signature *Capt. W. Breault*    Date *5-21-03*

Finding and sanction if any *G B17-5 DAYS M.P.U/Combine C12, D1-5 DAYS Room-Restriction*

Appeal results *Appeal WAIVED 5/28/03*

Reviewing Authority *M.H. & Son*    Date *6/6/03*

*Page 2 of 2*

Attachment A

OBR No. *03-169*

### MASSACHUSETTS TREATMENT CENTER
### OBSERVATION OF BEHAVIOR REPORT

Resident Name *HEBERT, WILLIAM*     Comm. No. *M14707*  Unit *A-1*

Date *05/21/03*    Time *7:35 AM*   Reporting Staff *C.O. PAUL BOUNASSA*

Behavior Observed *THREATENING STAFF UNAUTHORIZED USE OF CLEANING SUPPLIES* Code No. *B17-C12-D1*

Witness (if any) *SGT. CHANTIEN*

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

*AT WHICH TIME RESIDENT HEBERT STATED TO THIS REPORTER "IF YOU INTERFERE WITH ME CLEANING MY ROOM AGAIN I WILL HIT YOU" FOLLOWED BY SOME PSYCOTIC RAMBLINGS.*

*LT. GIFFORD & CAPT. BRAULT WERE NOTIFIED OF SITUATION. AT WHICH TIME CAPT. BRAULT ORDERED RESIDENT HEBERT TO MPU. RESIDENT HEBERT WAS HANDCUFFED WITHOUT INCIDENT AND ESCORTED TO HSU AND THEN MPU BY LT. GIFFORD & SGT MACKIEWICZ WITHOUT INCIDENT.     — END OF REPORT —*

Has the resident been placed on pre-hearing restriction? No _____ Yes _X_ Approved By *Capt. Brault*

Type of Restriction(s) *ASPH*

Reporting Staff signature *C.O. Paul Bounassa*    Date *5/21/03* shift/days off *7-3 SAT-SUN*

Shift Commander signature *Capt. W. Brault*    Date *5-21-03*

Finding and sanction if any *G. B17-5 DAYS M.P.U. / Combine C12, D1-5 Days Room. Restriction*

Appeal results _____

Reviewing Authority *R.H. & Cox*     Date *6/6/03*

Attachment A

OBR No. O4- 131

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident's Name  William Hebert        Comm. No.  M14707    Unit MPU

Date:  4-19-04      Time:  11:00 a.m.      Reporting Staff:    R. Clauss

Behavior Observed:   Conduct which disrupts... Use of obscene, abusive or threatening language, actions or gestures to any resident, staff or visitor. Code No.  B17, D2

Witness (if any) _____

Referred to District Attorney _____

Type or print in INK your report of the noted behavior.  Use the reverse if more space is necessary.

On Monday, April 19, 2004, Officer Robert D. Clauss, IPS, concluded through the interview process, the following:

It was determined that resident William Hebert has been making indirect threatening statements toward other residents who currently reside on Alpha One unit. Resident Hebert has been heard making statements that referred to "cutting", "sticking" or "stabbing" people on several different occasions.

Has the resident been placed in pre-hearing restriction? No___ Yes  X   Approved by ___

Type of Restriction(s)
Reporting Staff Signature _____ Date: 4-19-04      Shift/Days off:  7x3 S/M

Shift Commander Signature _____ Date: 4-19-04

Finding and Sanction if any  Guilty  5 dys  D.D.  Time Served

Appeal Results  NONE REQUESTED  5-30-04
Reviewing Authority
_____ 6/7/04

Attachment A

OBR No. *O4-179*

## MASSACHUSETTS TREATMENT CENTER
## OBSERVATION OF BEHAVIOR REPORT

Resident Name *William Hebert M14707*     Comm. No. *M14707*     Unit *A1 #15*

Date *5/28/04*          Time *10:10 am*     Reporting Staff *Todd Baptista*

Behavior Observed *Conduct which disrupts, Threatening inmates*   Code No. *B17-C12*

Witness (if any) _____

Referred to District Attorney _____

Type or print in **INK** your report of the noted behavior. Use the reverse if more space is necessary.

*On Friday, May 28, 2004 @ approx 10:10 am Based on Independent, Corroborating informant information I, C.o Todd Baptista, determined that Resident William Hebert M14707 did Threaten Resident ▓▓▓▓▓▓▓▓▓▓▓ with a pencil in a Jabbing motion. end of Report*

Has the resident been placed on pre-hearing restriction? No _____ Yes _____ Approved By _____

Type of Restriction(s) _____

Reporting Staff signature *Todd Baptista*     Date *5/28/04*   shift/days off *7x3 Sat/Su*

Shift Commander signature *Brad Couru, C/O*     Date *5/28/04*

Finding and sanction if any *Guilty/Combine B17,C12 - 5 Days Room Restriction*

Appeal results *Waived 6-14-04*     *Sus/2 Days For 90 Days*

Reviewing Authority _____     Date *6/28/04*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se,*
      Plaintiff,

v.

ROBERT MURPHY, *et al.,*
      Defendants.

AFFIDAVIT OF JOHN RULL

    I, John Rull, being duly sworn, do hereby depose and state as follows:

1.  Since June, 1976, I have been an employee of the Massachusetts Department of Correction ("DOC"). I currently hold the position of Captain at the Massachusetts Treatment Center ("Treatment Center"). One of my responsibilities includes serving as the Housing Captain. In this capacity, I oversee all of the bed assignments at the Treatment Center.

2.  Since July 29, 2005, William Hebert has been assigned to a single cell at the Treatment Center.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13TH DAY OF DECEMBER, 2005.

John Rull

Ex. 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11324-PBS

WILLIAM HEBERT, *pro se,*
                Plaintiff,

v.

ROBERT MURPHY, *et al.,*
                Defendants.

### AFFIDAVIT OF PETER HEFFERNAN

I, Peter Heffernan, hereby depose and say:

1.      Since July, 2005, I have been the Acting Director of Health Services for the Department of Correction ("DOC"). From April, 2003, until July, 2005, I was the Deputy Director of Health Services for DOC. Before becoming Deputy Director of Health Services, I was a Regional Health Services Administrator from September 6, 1992, to April 12, 2003.

2.      The DOC contracts with a private health services contractor to provide medical, mental health and dental services to persons incarcerated at DOC facilities. From July 1, 1994, until December 31, 2002, Correctional Medical Services ("CMS") was the DOC's health services contractor for medical and dental services. University of Massachusetts Medical Services ("UMMS") was the DOC's mental health services contractor for a portion of this time period. From January 1, 2003, to the present, UMMS has been the Department's sole health services contractor.

3.      To ensure that all health care decisions are made by qualified medical, mental health and dental professionals, the Department's contract with UMMS provides in pertinent part that:

> [t]he Contractor shall be solely responsible for making all decisions with respect to the type, timing and level of services needed by inmates covered by the program, including, without limitation, the determination of whether an inmate is in need of clinic care, hospitalization, admission to a clinic, referral to an outside specialist or otherwise needs specialized care.

The Department's contract with CMS contained a similar provision.

4.      The principle that medical professionals should exercise independent professional judgment is memorialized in the Department of Correction Health policy governing clinical contract personnel and the role of the Department of Correction Health Services Division, 103 DOC 610.00 *et seq.* Section 610.01 provides in pertinent part:

*Ex. 11*

1

Matters of medical, mental health and dental judgment are the sole province of the responsible physicians, psychiatrists or dentists.

5.     Neither I, nor any DOC employee, has any direction or control over UMMS and its employees in the manner in UMMS medical professionals determine the appropriate medical or mental health treatment for persons in DOC's custody.  This was also true with respect to DOC's contractual relationship with CMS.

SIGNED UNDER THE PENALTIES OF PERJURY THE 13TH DAY OF DECEMBER , 2005.

Peter Heffernan
Acting Director of Health Services

2

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 94-2170-C

GORDON O'BRIEN

vs.

L.E. DUBOIS, et al

MEMORANDUM OF DECISION AND ORDER

The defendants, L.E. Dubois, Commissioner of the Department of Corrections, and John Marshall, Superintendent of the North Central Correctional Institution at Gardner, have moved to dismiss and alternatively for summary judgment. For the following reasons, the defendants' motions are allowed.

BACKGROUND

The plaintiff is an inmate at the North Central Correctional Institution in Gardner. He brings this action pursuant to M.G.L. c. 12, §11 and M.G.L. c. 231A and c. 30A. The plaintiff also brings an action pursuant to 42 USC §1983. The plaintiff seeks injunctive relief and declaratory judgment to redress what he alleges are constitutional violations of his rights pursuant to the terms of his incarceration.

In his complaint, the plaintiff makes numerous allegations with respect to the conditions that exist at the North Central Correctional Institution. Specifically, the plaintiff complains of the failure of the Department of Corrections to launder pillows properly, to provide

$Ex. 12$

Worcester Civil Action        -2-              No. 94-2170-C

washcloths, and to provide clean mattresses as well as numerous complaints involving the bathroom facilities. The plaintiff further alleges that the drinking water at the facility is not of acceptable quality and that the premises subject him to the possibility of contracting communicable diseases. The plaintiff further alleges that the living area space is insufficient to comply with the code of Massachusetts regulations. As redress for these conditions, the plaintiff seeks a declaration that the conditions at the facility constitute cruel and unusual punishment, or that they are a violation of his civil rights guaranteed by the United States Constitution and the Constitution of the Commonwealth of Massachusetts. The plaintiff further alleges a failure of the Department of Corrections to follow its own regulations as found in the code of Massachusetts regulations.

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, "and [further] that the moving party is entitled to judgment as a matter of law," Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent's case or "by demonstrating that proof of that element is unlikely to be forthcoming at trial." Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410

Worcester Civil Action

Mass. 706, 716 (1991). "If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion." Pederson, supra, 404 Mass. at 17. "(T)he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." LaLonde v. Eissner, 405 Mass. 207, 209 (1989).

Massachusetts General Law, c. 111, §21 is the enabling statute providing for the rules that govern "houses of correction, prisons and reformatories, regarding...general health and safety of a detainee." The Department of Public Health is charged with the responsibility of maintaining compliance with rules and regulations promulgated to insure safe conditions at prisons. These Department of Public Health regulations, however, do not provide a private cause of action. Rather, the Department of Public Health Commissioner is vested with discretion in establishing the rules for the running of prisons. A reading of 105 CMR 451.00 et seq. makes it clear that broad discretion is left to the Commissioner of the Department of Public Health in regulating the health standards at correctional facilities. If the Commissioner believes that there are conditions which are dangerous to the public health constituting an emergency, the Commissioner shall notify the Commissioner of Corrections, the Secretary of Human Services and the Governor, and request that the Governor declare that an emergency exists which is detrimental to the public health. This authority vested in the Department of Public Health Commissioner carries with it, by inference, the right to seek judicial relief through declaratory judgment. Such a right is shared by

the Attorney General of the Commonwealth as the chief law officer of the Commonwealth. Nowhere in c. 111, §21 is there a private cause of action. Nor does 105 CMR 451.00 et seq. provide for a private cause of action. Rather, the provisions provide for the minimum health and sanitation standards at correctional facilities. The proper party to address public health issues therefore is the Attorney General or the Commissioner of the Department of Public Health.

## The Civil Rights Claim

The plaintiff has further claimed that his civil rights have been violated by the conditions which he alleges are present at the North Central Correctional Institution. The Massachusetts civil rights act does provide a private cause of action if a person alleges that their civil rights have been interfered with by "threats, intimidation or coercion". The prerequisites to maintaining such an action, however, are the elements of threats, intimidation or coercion. Absent one of these three elements, the claim will not stand. The plaintiff has failed to allege facts sufficient to meet the threshold of "threats, intimidation or coercion." Even assuming that the threat of contracting communicable diseases through contact with other inmates or through ingestion of impure drinking water were to be proven by the defendant, such facts alone would be insufficient to show a civil rights violation. Similarly, the plaintiff's cause of action pursuant to 42 USC §1983 must fail. The allegations as made by the plaintiff, even if taken as true, fail to set out a federal civil rights violation.

Worcester Civil A__ion          -5-              No. 94-2170-C

**The Due Process Issue**

The plaintiff argues that the very language of 105 CMR 451.00 et
seq. provides for mandatory action by the correctional facility and,
therefore, failure to comply with these mandates constitutes a violation
of the plaintiff's due process rights.  105 CMR 451.100 provides that
"Each correctional facility shall comply with the minimum health and
sanitation standards set forth in 105 CMR 451.101 through 105 CMR
451.214."  This language, although appearing to explicitly mandate
compliance by all correctional facilities, must be read in context of the
entire section of 105 CMR 451 et seq.  The remedies provided for non-
compliance are to be found in 105 CMR sections 401 through 410.  These
sections clearly vest the Department of Public Health with the
responsibility to inspect correctional facilities and to seek compliance
so as not to allow conditions to exist which would pose a serious threat
to the health or safety of inmates or employees of correctional
facilities.  These responsibilities carry with them a great deal of
discretionary power.  The provisions of 105 CMR 451.100, therefore, do
not explicitly mandate conditions that must exist at correctional
facilities.  Rather, in the context of the entire section, they provide
guidelines which the Department of Public Health, in its discretion should
seek to obtain.  Absent a clearly mandated requirement to provide minimal
conditions, the due process claim must fail.  Kentucky Department of
Corrections v. Thompson, 109 S. Ct. 1904 (1989).

The plaintiff's complaints, in sum, refer to the manner in which the
North Central Correctional Institution is run.  These complaints have
centered on the alleged public health deficiencies.  The administration
of penal institutions is best left to those professionals who are trained

Worcester Civil Action          -6-                No. 94-2170-C

and most knowledgeable of the proper manner in which the correctional
facility should be run.  It has been noted that prison officials "should
be accorded wide-ranging deference in the adoption and execution of
policies and practices that in their judgment are needed to preserve
internal order and discipline and to maintain institutional security".
Bell v. Wolfish, 441 U.S. 520, 540-547 (1979) quoted in Nelson v.
Commissioner of Correction, 390 Mass. 379, 392 (1983).  The defendants'
motion for summary judgment is, therefore, ALLOWED.

                                    Judd J. Carhart
                                    Justice of the Superior Court

DATED:  March 3ᵈ, 1995
[s.d.]

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

81

SUPERIOR COURT
CIVIL ACTION
NO. 94-4686

WAYNE ALEXANDER, and others[1]

vs.

LARRY E. DUBOIS, and others[2]

<u>MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS'</u>
<u>MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT</u>

Plaintiffs, present and past inmates of the
Department of Correction, formerly housed at the New Line facility
at MCI-Concord ("New Line"), brought this action alleging civil
rights and health violations. Plaintiffs claim that the failure of
prison officials to replace window screens in their former cells at
New Line resulted in an infestation of mosquitos, flies, insects,
and bugs which made living at New Line intolerable. Plaintiffs

---

[1]    Lawrence Auch, Bruce Bennett, James Bourget, Kevin Brown,
Lloyd Cayman, Jose Garcia, Luke Janusz, Eric Knowles, Juan Muniz,
Stanley Matus, Jr., Dennis Paiva, Nelson Rodrigues, Philip Rogers,
Robert J. Simmington, Jr., Jose Solivan, Terrell Walker, Rudolph
West, Paul Woodley, Ronald Chambers, Randolph Clough, Antone Costa,
John DeDominicis, David Edwards, Lance Ekstrom, Roger Galio, Jose
Garcia, Thomas Gerraughty, William Lewis, Gary Melanson, Michael
Nelson, Gerald Pini, Andrew Puopolo, Jose Tavares, Larry Taylor,
Charles Thompson, Lawrence Trant, Gregory Washington, Richard
Whelan. All of the plaintiffs are or were in the custody of the
Department of Corrections.

[2]    Larry E. DuBois, Commissioner of Correction,
Massachusetts Department of Correction; Paul DiPaolo,
Superintendent, Massachusetts Correctional Institution at Concord;
Edward McDonald, Director of Engineering Services, Massachusetts
Correctional Institution at Concord; Kathleen O'Toole, Secretary of
Public Safety, Department of Public Safety.

[3]    None of the plaintiffs currently reside at New Line.

1

Ex.13

seek declaratory and compensatory relief. Defendants, administrators for the Department of Corrections ("DOC") and other state officials, move to dismiss and for summary judgment. For the following reasons, defendants' motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6) is **ALLOWED**.

## BACKGROUND

For purposes of this motion, the court accepts as true the facts, taken from plaintiffs' complaint. On June 30, 1994, plaintiff Wayne B. Alexander complained to defendant Paul DiPaolo, Superintendent, Massachusetts Correctional Institution at Concord ("DiPaolo") that he and other prisoners were being attacked in their New Line cells by mosquitos, insects, other bugs, and vermin.[4] The reason, according to plaintiffs, was a lack of screens on their cell windows. On July 15, 1994, Alexander also notified defendant Larry E. DuBois, Commissioner of Correction, Massachusetts DOC ("DuBois"), of the insect infestation and resultant "health risk." On July 13, 1994, Howard S. Wensley, director of Community Sanitation for the Department of Health wrote Alexander stating that he was in receipt of his complaint. Wensley notified DiPaolo regarding Alexander's complaint, however, nothing was done to replace the screens while plaintiffs were incarcerated at New Line.

## DISCUSSION

For purposes of Mass. R. Civ. P. 12(b)(6), the court must take

---

[4]     For purposes of this decision, these terms are used interchangeably.

2

the factual allegations of the complaint, as well as inferences which can be drawn from those allegations in plaintiff's favor, as true.  Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991), and cases cited.  The complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitled [them] to relief." Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Plaintiffs[5] appear as pro se litigants, therefore their complaint is liberally construed, Haines v. Kerner, 404 U.S. 519, 520-521 (1972).  Pro se plaintiffs, however, are still required to plead specific facts to support their claims of civil rights violations.  Glaros v. Perse, 628 F.2d 679 (1st Cir. 1980).

Plaintiffs argue that living conditions in New Line were intolerable due to an infestation of mosquitos, flies, bugs, and other "vermin" that entered their cells through screen-less windows.  In addition, plaintiffs contend that the close proximity of a garbage dumpster to New Line attracted pests to their cells.  They claim these conditions violated their civil rights under the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution and the Massachusetts Declaration of Rights.  They also allege that

---

[5]    The plaintiffs in this case include both convicted prisoners and pre-trial detainees.  Although pre-trial detainees may not be subjected to punishment at all, Ingraham v. Wright, 430 U.S. 651, 671-672 n. 40 (1977), convicted prisoners may be punished so long as the punishment is not cruel and unusual.  See Abdullah v. Secretary of Pub. Safety, 42 Mass. App. Ct. 387, 393 (1997).  For purposes of this action, however, the distinction between pre-trial detainees and prisoners is not relevant because the claims are moot.

3

defendants' failure to install screens was a violation of various health regulations and subjected plaintiffs to a higher risk of infection, disease, and sickness.

Defendants argue plaintiffs have failed to establish a claim under either the U.S. Constitution, the Massachusetts Declaration of Rights, or Massachusetts Department of Health Regulations; that plaintiffs claim is moot; and that defendants are entitled to qualified immunity.

A.  Mootness

The court recognizes that none of the defendants are currently housed in New Line and, for that reason, any claim for declaratory or injunctive relief is moot.  Blake v. Massachusetts Parole Bd., 369 Mass. 701, 703 (1976) (ordinarily, litigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome).  Further, plaintiffs are without standing to assert the claims listed in their complaint on behalf of other prisoners currently residing at New Line.  Third-party standing will be allowed in limited circumstances if (1) the third-party's rights are "inextricably bound up with the activity the litigant wishes to pursue,' and (2) a genuine obstacle bars the third-party from asserting a right himself.  See Singleton v. Wulff, 428 U.S. 106, 114 (1976); Eisenstadt v. Baird, 405 U.S. 438, 444 (1971).  Plaintiffs have not shown that these factors exist, therefore they may not assert their claims on behalf of those inmates currently incarcerated at New Line.  See Gilmore v. Utah, 429 U.S. 1012, 1017 (1976).

4

Any claim for monetary relief is also moot because plaintiffs have demonstrated no legally redressible injury. <u>Blake</u>, 369 Mass. at 703. Bug bites that occurred three summers ago, in and of itself, do not constitute a legally cognizable injury entitling plaintiffs to monetary relief. Plaintiffs have not demonstrated that they suffered actual infection, disease, or other injury from mosquitos and bug bites, therefore plaintiffs' claims for compensatory relief must be dismissed on mootness grounds. <u>Id</u>.

When an issue is "capable of repetition, yet evading review," however, the court will take an opportunity to address the substance of the complaint. <u>Stokes</u> v. <u>Superintendent, Massachusetts Correctional Institute, Walpole</u>, 389 Mass. 883, 887 (1983). Assuming that plaintiffs' claims were not moot and could be redressed, plaintiffs still fail to state a claim under the U.S. Constitution, the Massachusetts Declaration of Rights, or the Massachusetts Department of Public Health regulations.

**B.    Prison Health and Sanitation Regulations**

Plaintiffs allege violations of the prison health and sanitation regulations. See, e.g., 105 CMR 451.141.[6] Prison health and sanitation regulations do not enable a private cause of action. <u>Attorney General</u> v. <u>Sheriff of Worcester County</u>, 382 Mass. 57, 59 (1980) (the Attorney General is the appropriate party to maintain a civil action to enforce the departmental rules and

---

[6]    "Each window . . . shall have tight-fitting screens . . . to effectively block insects and rodents . . . ." 105 CMR 451.141.

5

regulations);[7] see also 105 CMR 451.409 and 410.    Therefore, plaintiffs lack standing to assert claims under 105 CMR 451.000, et. seq.

C.    Article 26 and Eighth Amendment Claims

Plaintiffs also assert an Eighth Amendment claim as well as a claim under Article 26 of the Massachusetts Declaration of Rights for "cruel and unusual punishment" in violation of their civil rights.  The bug infestation, they allege, created conditions that made the risk of disease, infection, and injury pervasive, constituting a "cruel and unusual punishment."

Under the Eighth Amendment, convicted criminals may be subject to punishment which is not cruel and unusual.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).  Similarly, Article 26 of the Massachusetts Declaration of Rights prohibits "cruel and unusual punishment." Massachusetts courts have concluded that Article 26 rights are co-extensive with rights guaranteed by the U.S. Constitution's Eighth Amendment.    See, e.g., Abdullah, 42 Mass. App. Ct. at 394. Therefore, the same legal analysis applies.

The Eighth Amendment applies to the states through the Fourteenth Amendment due process clause and prohibits "cruel and unusual punishment."  Robinson v. California, 370 U.S. 660, 666 (1962).

---

[7]    Violation of prison health and sanitation regulations also does not rise to a per se constitutional violation. Richardson v. Sheriff of Middlesex County, 407 Mass. 455, 460 (1990), but may be objective evidence of conduct violative of civil rights.  Id.; see also Michaud v. Sheriff of Essex County, 390 Mass. 523, 531 (1983).

6

> A prison official violates the Eighth Amendment when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious' . . . [it] must result in the denial of the 'minimal civilized measure of life's necessities.' Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prison official must have a sufficiently culpable state of mind, that is, the official must have "deliberate indifference" to the inmate's health or safety. Id. Thus, to be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement, a prison official must know and disregard an excessive risk to inmate health or safety.

Abdullah, 42 Mass. App. Ct. at 394 (citations and quotations omitted) (emphasis added).

Plaintiffs fail to establish the objective component of the Eighth Amendment test for cruel and unusual punishment. The court does not doubt that if the plaintiffs' current prison cells were continually infested with mosquitos, flies, and bugs, then they might state viable Eighth Amendment claim. See, e.g., Hutto v. Finney, 437 U.S. 678, 686-687 (1979) (prison conditions which might be tolerable for a few days may be intolerably cruel for weeks or months). But here, none of the plaintiffs currently live at New Line, therefore they cannot bring an Eighth Amendment action for past exposure to a summer bug infestation or mosquito bites. Plaintiffs also allege no resulting current injury, disease or infection from these bites that rise to the level of an Eighth Amendment violation. See Bell, 441 U.S. at 542.

Plaintiffs also fail to establish the subjective component of a cognizable Eighth Amendment claim. Plaintiffs allege no facts that would support a reasonable inference that defendants intentionally desired to subject plaintiffs to a substantial risk.

7

Farmer, 511 U.S. at 834. Without a demonstration of "deliberate indifference" on the part of prison and health officials, plaintiffs cannot establish the subjective component of their Eighth Amendment claim. Id.

D.  Due Process Claims

Plaintiffs also claim that defendants violated the Fifth Amendment's due process clause. The Fifth Amendment's due process clause, however, limits only federal action. See, e.g., Bartkus v. Illinois, 359 U.S. 121 (1959). The plaintiffs raise no claim against federal officials, therefore their Fifth Amendment due process claim against the defendants must be rejected.

Plaintiffs also raise a Fourteenth Amendment due process claim. Pretrial detainees,[8] while not protected by the prohibition against "cruel and unusual punishment" pursuant to the Eighth Amendment, are guaranteed substantive due process under the Fourteenth Amendment. Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). Massachusetts courts, like federal courts, have analogized the due process rights of pre-trial detainees to the Eighth Amendment rights of convicted prisoners. See Miga v. City of Holyoke, 398 Mass. 343 (1986). Pretrial detainees "retain at least those constitutional rights that . . . are enjoyed by convicted prisoners." Bell, 441 U.S. at 535 n. 16.

Applying this analogy to the plaintiffs in this case who are pre-trial detainees, Miga, 398 Mass. at 351, the court holds that

---

[8]  Pre-trial detainees are in custody pursuant to G.L. c. 276, § 52A. The statute has been held to be constitutional. Mendonza v. Commonwealth, 423 Mass. 771 (1996).

8

they have not demonstrated that the conditions of mosquito and bug infestation violate the objective "standards of decency which mark the progress of society." <u>Good</u> v. <u>Commissioner of Correction</u>, 417 Mass. 329, 335 (1994). The infestation occurred over three summers ago and no plaintiff claims to be currently suffering actual injury, disease, or infection as a result of that infestation. It is also not a reasonable inference that defendants purposely caused plaintiffs injury, disease, or infection by allowing mosquitos and other bugs to "feast" on plaintiffs. For those reasons, the plaintiffs' Fourteenth Amendment due process claim is rejected. Compare <u>Michaud</u>, 390 Mass. at 533-534 (unsanitary human waste disposal systems violated pre-trial detainees Fourteenth Amendment due process rights).

<u>ORDER</u>

For the foregoing reasons, it is <u>ORDERED</u> that defendants' motion to dismiss plaintiffs' complaint be <u>ALLOWED</u>.

DATED:    November 17, 1997

Wendie I. Gershengorn
Justice of the Superior Court

9

Entered~Pcd 18 Nov 1997

| | |
|---|---|
| **From:** | <ECFnotice@mad.uscourts.gov> |
| **To:** | <CourtCopy@mad.uscourts.gov> |
| **Date:** | 2/18/2005 3:10:48 PM |
| **Subject:** | Activity in Case 1:04-cv-30177-PBS Pentlarge v. Murphy et al "Appendix/Exhibit" |

***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.
<!-- rcsid='\$Header: /ecf/district/html/TextHead,v 3.1 2003-04-25 07:56:43-04 loy Exp \$' -->
United States District Court
District of Massachusetts

Notice of Electronic Filing
The following transaction was entered on 2/18/2005 at 2:51 PM EST and filed on 2/14/2005

#ident 'rcsid='\$Header: /ecf/district/server/TextBody,v 3.1 2003-04-25 07:52:35-04 loy Exp \$'
Case Name: Pentlarge v. Murphy et al
Case Number: 1:04-cv-30177 https://ecf.mad.uscourts.gov/cgi-bin/DktRpt.pl?96032

Document Number: 49
Copy the URL address from the line below into the location bar of your Web browser to view the
document: https://ecf.mad.uscourts.gov/cgi-bin/show_case_doc?49,96032,,3310099,

Docket Text:
APPENDIX of Exhibits re [47] Opposition to Motion for a Preliminary Injunction to Repair Roof and Heat by
Robert Murphy, Kathleen Dennehy, Massachusetts Department of Correction. (Patch, Christine)

The following document(s) are associated with this transaction:
Document description: Main Document
 Original filename: yes
 Electronic document Stamp:
 [STAMP dcecfStamp_ID=1029851931 [Date=2/18/2005] [FileNumber=863380-0]
 [b3bdc7df9fd2acca732a49aec640e193881a3ddf0487a3d79fe2fe8ff237af1d5fade1e21ca1d00798af211fd
 2eb7eb19a68fa3c5cd5a9b4fc63696e42532cd5]]

<!-- rcsid='\$Header: /ecf/district/server/TextAtyList,v 3.2 2003-06-02 17:37:56-04 bibeau Exp \$' -->
1:04-cv-30177 Notice will be electronically mailed to:
Mary P. Murray                            MPMurray@DOC.state.ma.us,
LegalDivision@DOC.state.ma.us;CACaluori@DOC.state.ma.us

1:04-cv-30177 Notice will not be electronically mailed to:
Kevin W. Mulvey
Mulvey & Sneider LLP
1622A Beacon St.
Brookline, MA 02446

Joel Pentlarge
Nemansket Correctional Center
30 Administration Road
Bridgewater, MA MA 02324